Derek W. Loeser, *admitted pro hac vice*
Gretchen Freeman Cappio, *admitted pro hac vice*
Zachary W. Gussin, *admitted pro hac vice*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900, Fax (206) 623-3384

Matthew J. Preusch (SBN 298144)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

Abbas Kazerounian (SBN: 249203)
KAZEROUNI LAW GROUP, APC
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
(800) 400-6808, Fax (800) 520-5523

[Additional Counsel on Signature Page]

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| PAMELA DELPAPA, SAMARA GREEN, PATRICK HEALY, BRETT JACOB, CHARLES JOHNSON, RENRICK and VIVIAN ROBINSON, and JOSE URISTA, and all others similarly situated,<br><br>                  Plaintiffs,<br><br>     v.<br><br>WELLS FARGO BANK, N.A., and WELLS FARGO & CO.,<br><br>                  Defendants. | No. 3:20-cv-06009-JD<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs PAMELA DELPAPA, SAMARA GREEN, PATRICK HEALY, BRETT JACOB, CHARLES JOHNSON, RENRICK and VIVIAN ROBINSON, and JOSE URISTA (collectively "Plaintiffs"), individually and on behalf of a class of similarly situated persons, bring this class action lawsuit against Defendants Wells Fargo Bank, N.A. ("Wells Fargo Bank") and Wells Fargo & Co. ("WFC") (collectively, "Wells Fargo" or "Defendants"), and allege as follows:

## I. INTRODUCTION

1. In March of 2020, Americans were suffering through one of the worst pandemics in our nation's history. Millions of Americans had lost their jobs, thousands had lost loved ones, and the impact of this terrible plague was extending over every sector of our domestic and professional lives. In response, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (codified as amended in sections of 2, 5, 12, 15, 20, 21, 29, 42, and 45 U.S.C.). That Act, among other things, gave American homeowners concerned about their ability to make mortgage payments as a result of the pandemic the right to forbearances for federally backed mortgages.

2. This relief provided a band-aid, not a cure, staunching what could otherwise have been a Great Recession-level foreclosure crisis. However, forbearance is not forgiveness, and it is not right for everyone. Loan forbearance plans are agreements allowing borrowers to reduce or suspend payments for a short period of time, providing extended time for borrowers to become current on their payments and repay the amounts owed. Forbearance plans do not forgive unpaid loan payments and have attendant financial consequences. Being in forbearance restricts a borrower's access to credit, can damage a borrower's credit score, can prevent a borrower from refinancing, and can disrupt collateral agreements – such as bankruptcy plans or repayment plans – which assume continued payment on the mortgage.

3. For that reason, the CARES Act and related regulatory guidance mandate that participation in a COVID-19 mortgage forbearance plan is entirely voluntary; that is, a borrower must

1

be informed of the various terms and conditions of the program and then affirmatively decide to enter

the program, and the borrower retains the right to shorten, terminate, or extend the forbearance term.

CARES ACT § 4022: FORECLOSURE MORATORIUM AND CONSUMER RIGHT TO REQUEST FORBEARANCE

. . .

(b) FORBEARANCE.— (1)

IN GENERAL.—During the covered period, *a borrower* with a Federally backed mortgage loan experiencing a financial hardship due, directly or indirectly, to the COVID–19 emergency *may request forbearance* on the Federally backed mortgage loan, regardless of delinquency status, by—

(A) *submitting a request to the borrower's servicer*;

and

(B) affirming that the borrower is experiencing a financial hardship during the COVID–19 emergency.

(2) DURATION OF FORBEARANCE.—

*Upon a request by a borrower* for forbearance under paragraph (1), such forbearance shall be granted for up to 180 days, and *shall be extended for an additional period of up to 180 days at the request of the borrower, provided that, at the borrower's request, either the initial or extended period of forbearance may be shortened.*

. . .

(c) REQUIREMENTS FOR SERVICERS.—

(1) IN GENERAL.— *Upon receiving a request for forbearance from a borrower under subsection (b), the servicer shall with no additional documentation required other than the borrower's attestation to a financial hardship caused by the COVID–19 emergency* and with no fees, penalties, or interest (beyond the amounts scheduled or calculated as if the borrower made all contractual payments on time and in full under the terms of the mortgage contract) charged to the borrower in connection with the forbearance, provide the forbearance for up to 180 days, *which may be extended for an additional period of up to 180 days at the request of the borrower, provided that, the borrower's request for an extension*

2

*is made during the covered period, and, at the borrower's request, either the initial or extended period of forbearance may be shortened.*[1]

4.     As detailed herein, Wells Fargo—without receiving any request or financial hardship attestation—opted unwitting borrowers into its COVID-19 mortgage forbearance program. The bank's primary purpose in doing so was the same profit motive that led to Wells Fargo's well-documented history of violating its customers' trust. By placing borrowers into forbearance, and causing them to skip payments, Wells Fargo capitalized on an incredibly lucrative loophole.

5.     The majority of borrowers that Wells Fargo placed into unwanted forbearance plans had loans that were securitized and pooled into mortgage-backed securities ("MBS") by one of two Government Sponsored Entities, ("GSEs"), the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation, ("Freddie Mac"), or the Government National Mortgage Association ("GNMA"). The resulting securities, agency MBS, trade on a secondary market.

6.     Under normal circumstances, investors who purchase agency MBS (as opposed to private label securities) are insulated from the risk that the borrowers whose mortgages underlie the securities might fail to make payments because loan servicers are obligated to advance most principal and interest payments for federally backed loans to the GSEs and Ginnie Mae regardless of whether the loan is performing.

7.     If a loan is non-performing for three consecutive months, the loan servicer acquires the option to voluntarily repurchase the loan from the securities pool at par value.[2] This provides loan servicers with some limit on their obligation to advance payments for non-performing loans and allows

---

[1] Coronavirus Aid, Relief, and Economic Security Act, H. R. 748, 116th Cong. (2nd Sess. 2020), https://www.congress.gov/116/bills/hr748/BILLS-116hr748enr.pdf (last visited Dec. 23, 2020) (emphasis added).

[2] Par value, also sometimes known as nominal or face value, is the amount at which a security can be redeemed, and its generally far less than market value.

3

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

the loan servicers to pursue loan modification options to help delinquent and distressed borrowers become current.

8.     The voluntary repurchase of loans at par value is a profit stream for loan servicers like Wells Fargo. Once the loan begins performing again, it can either be held for investment loan, re-securitized, or resold. Holding the loans for investment leads to profits based on the difference between the cost to service and the interest rate. Reselling or resecuritizing leads to a profit, as the resale price typically exceeds the par value that the loans are purchased for coupon. Under normal circumstances, this makes sense because it provides loan servicers a financial incentive to work with risky borrowers to recuperate loans that are more than 90 days delinquent.

9.     But by placing Federally-backed borrowers into *unsolicited* forbearance plans, Wells Fargo acquired the option to repurchase the underlying loans even though many borrowers did not want or need forbearance and remained financially solvent. Essentially, by placing loans in forbearance, Wells Fargo created the fiction that the loans were underperforming, then repurchased the loans at an artificially low price. As detailed below, Wells Fargo exercised this option at a historic rate, voluntarily repurchasing tens of billions of dollars' worth of otherwise performing mortgages out of the trust pools, for billions of dollars less than the loans' market price. Ted Tozer, the former President of Ginnie Mae, has said that banks engaging in this conduct "are setting themselves up for a huge windfall," and that the scheme is "almost pure profit."[3]

10.     In addition to exploiting this highly lucrative loophole, Wells Fargo benefitted by unilaterally opting unwitting homeowners into its forbearance program in several other ways. As detailed below, Wells Fargo profited by protecting and increasing the value of the mortgage servicing rights associated with the proposed class members' mortgages; by capping its potential advancement

---

[3] https://www.bloomberg.com/news/articles/2020-08-20/banks-poised-for-mortgage-bond-windfall-that-may-burn-investors.

**SECOND AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

liabilities for loans that were not voluntarily repurchased; by rendering the bank eligible for loan-workout incentive payments; and through spread earned on payments that class members made which were not timely credited to the borrower's mortgage. As Plaintiffs' experiences demonstrate, many borrowers received no notice that Wells Fargo had placed their mortgages into forbearance. They only found out about Wells Fargo's actions when they attempted to apply for credit (including the refinancing of their mortgage) and were denied, saw the forbearance noted on a credit report or tried, but were unable, to make a regularly scheduled mortgage payment with Wells Fargo.

11.     In those instances when Wells Fargo did send borrowers a template notice informing them that Wells Fargo had placed their loans into forbearance, the notice was both insufficient and inaccurate, containing misleading assurances and inadequate warnings about the potential consequences of being in forbearance.

12.     Some borrowers who initially wanted a forbearance later sought to end their forbearance plan upon learning more about the risks associated with forbearances. As Plaintiff Johnson's circumstances demonstrate, Wells Fargo not only failed to comply with the CARES Act's requirement that borrowers be allowed to end their forbearance at any time, but they unlawfully extended the period of forbearance after borrowers requested for their loans to be removed from the program.

13.     Numerous media reports suggest that these practices are widespread.

14.     Since the onset of COVID-19, approximately 6.3 million homeowners have participated in a mortgage forbearance program, either knowingly or unknowingly.  Upon information and belief, Wells Fargo accounted for over a million of those homeowners, many of whom never requested such forbearance.[4]

---

[4] *See, e.g.*, Gretchen Morgenson, *More Wells Fargo customers say the bank decided to pause their mortgage payments without asking*, NBC NEWS, (July 22, 2020, 1:00 PM PDT), https://www.nbcnews.com/business/personal-finance/more-wells-fargo-customers-say-bank-decided-pause-their-mortgage-n1234610.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

15. As a result, those homeowners, including Plaintiffs, suffered damages, including, but not limited to, an inability to access credit, an inability to refinance to lower interest rates (and with mortgage servicers instead of Wells Fargo), and time spent dealing with the difficult situation of removing their mortgages from a program they did not want.

16. Defendants' practice of involuntarily putting homeowners in the unwanted forbearance program without proper documentation prompted the following statement from Senator Sherrod Brown of Ohio, the ranking Democrat on the Banking Committee:

> Once again it seems that Wells Fargo's sloppy service and shoddy management are hurting consumers. Wells Fargo should immediately address each of these complaints and make changes to ensure that no borrower finds themselves worse off from actions that their servicer takes without their consent or notice.[5]

17. In addition to Senator Brown's public statement, Senators Elizabeth Warren of Massachusetts and Brian Schatz of Hawaii wrote a letter to the Chief Executive Officer of Wells Fargo seeking information regarding its now well-documented practice of putting mortgagors into forbearance programs without their consent.[6]

18. The Senators' July 29, 2020 letter stated that Wells Fargo "appears to be incapable of self-governance," and noted that reports of borrowers being placed in forbearance programs they did not want "raise even more questions about the inability of Wells Fargo and its leadership team to comply with the law and the needs of its customers."

19. The letter proclaimed that "if these reports are true, they represent one more addition to a long list of inexcusable actions by Wells Fargo at customers' expense" because such conduct can affect

---

[5] *Id.*

[6] Letter from Sens. Elizabeth Warren and Brian Schatz, United States Senate, to Charles W. Scharf, Chief Executive Officer and President, July 29, 2020, https://www.warren.senate.gov/imo/media/doc/2020.07.29%20Letter%20to%20Wells%20Fargo%20on%20Forbearance%20Filings.pdf.

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

borrowers' credit by suggesting that they are not making payments even when they are and can prevent them from refinancing their home loans to take advantage of lower interest rates.

20.     Wells Fargo, for its part, has not denied these allegations. Through its spokesperson Tom Goyda, Wells Fargo stated that "[i]n the spirit of providing assistance, [it] may have misinterpreted customers' intentions in a small number of cases."[7]

21.     Although Wells Fargo did not identify the complete number of borrowers who were unwillingly placed into the forbearance program, it reported having received 1,600 complaints of unwanted forbearances.[8]

22.     The true scope of the problem far exceeds that figure. Freddie Mac and Fannie Mae publish loan-level performance data containing details on the performance of loans underlying credit risk transfer securities. The data includes origination characteristics, monthly performance information on the underlying mortgage loans, and the company that services each loan. This data contains a large majority of mortgages guaranteed by Freddie Mac and Fannie Mae.

23.     Comparing Wells Fargo's loans to their closest peers, Plaintiffs found the initial forbearance rate for GSE loans serviced by Wells Fargo was over 30 times greater than the industry average in April, 2010. When only looking at loans that had always been current prior to the forbearance, the difference is even starker. The forbearance rate for Wells Fargo borrowers was 6%, compared to 0.14% for the industry. This means, that in the early days of the CARES Act, a *borrower whose loan had never previously been delinquent was more than 40 times more likely to be placed into forbearance if her loan was serviced by Wells Fargo.*

---

[7] Anna Hrushka, *Wells Fargo says it 'misinterpreted customers' intentions' in some forbearance cases*, BANKING DIVE, (July 24, 2020), https://www.bankingdive.com/news/wells-fargo-forbearance-mortgage-payments/582284/.

[8] Gretchen Morgenson, *1600 customers say Wells Fargo paused their mortgage payments*, NBC NEWS, (Oct. 1, 2020, 3:00 AM PDT), https://www.nbcnews.com/business/personal-finance/1-600-customers-say-wells-fargo-paused-their-mortgage-payments-n1241620.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

24.    This disparity declined as Wells Fargo began to face scrutiny and unfavorable media coverage for its faulty forbearance program. Wells Fargo's forbearance rates reached approximately 2% in June of 2020, still twice the industry average, and approached industry forbearance rates by August 2020. On the whole, Wells Fargo's forbearance rates were twice as high as the rest of the industry over this time period, suggesting that hundreds of thousands of Wells Fargo's forbearances were the result of its faulty forbearance program.

25.    In sum, Wells Fargo cynically converted the CARES Act from protection for borrowers to a profit driver for the bank, hurting the very people Congress intended to help in the process. And it did so at the worst possible time. Many customers, like Ms. Delpapa and Mr. Jacob, sought to refinance at more favorable rates or secure additional lines of credit and were unable to do so because they had been placed in forbearance. Some, like Mr. Johnson, noticed decreases in their credit scores. Others, like Ms. Green and Mr. Johnson, attempted to make payments, unaware that they were in forbearance, only to have Wells Fargo unlawfully retain those payments without crediting them towards the outstanding mortgage or escrow account balances.

26.    Plaintiffs allege as follows upon personal knowledge as to themselves and their own experiences and, as to all other matters, upon information and belief including due investigation conducted by their attorneys.

## II.    JURISDICTION AND VENUE

27.    The Court has jurisdiction over the lawsuit because the suit arises under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud); the Truth in Lending Act, ("TILA"), 15 U.S.C. § 1601, as implemented through Regulation Z; the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 22601, as implemented through Regulation X; and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

28.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are 100 or more Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

29.     The Court also has subject matter jurisdiction over Plaintiffs' non-federal claims under 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal claims.

30.     This Court has general personal jurisdiction over Wells Fargo & Co. because it has its principal place of business in San Francisco, California.

31.     This Court has general personal jurisdiction over Wells Fargo Bank, N.A., because its principal place of business is in San Francisco, California.

32.     This Court also has general personal jurisdiction over Wells Fargo Bank, N.A., because its contacts with California are so constant and pervasive as to render it essentially at home in California.

33.     This Court has specific personal jurisdiction over Wells Fargo Bank, N.A. because a substantial part of the actions or omissions giving rise to Plaintiffs' claims occurred in this District.

34.     The exercise of specific personal jurisdiction over Wells Fargo Bank, N.A. is consistent with due process, as Wells Fargo Bank regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and derives substantial revenue from services provided to, persons in this District and in California.

35.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants and Defendants have sufficient contacts with this District, the situs of their principal places of business.

36.     Venue is also proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint occurred in this District.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

### III. INTRADISTRICT ASSIGNMENT

37. This case is properly brought in the San Francisco Division of the Northern District of California. Under Local Rule 3-2(c), cases are to be filed in the Division "in which a substantial part of the events or omissions which give rise to the claim occurred."

38. Because WFC maintains its headquarters in San Francisco, and Wells Fargo Bank N.A.'s principal place of business is in San Francisco, under Local Rule 3-2(e), the proper venue for this case is the San Francisco Division of the Northern District of California.

### IV. PARTIES

**A. Representative Plaintiffs**

39. Plaintiff Pamela Delpapa is a resident and citizen of Riverside County, California. Her property is encumbered by a loan backed by the Fair Housing Administration, and her loan was serviced by Wells Fargo until late in 2020.

40. Plaintiff Samara Green is a resident and citizen of Rockdale County, Georgia, whose mortgage is serviced by Wells Fargo.

41. Plaintiff Patrick Healy is a resident and citizen of San Diego County, California, whose mortgage is serviced by Wells Fargo.

42. Plaintiff Brett Jacob is a resident and citizen of Nassau County, New York, whose mortgage is serviced by Wells Fargo.

43. Plaintiff Charles Johnson is a resident and citizen of Riverside County, California, whose mortgage is serviced by Wells Fargo.

44. Plaintiffs Renrick and Vivian Robinson are citizens and residents of Grand Prairie, Texas. Their property is encumbered by a Veterans Administration Loan, which loan was originated by, refinanced by, and is serviced by, Wells Fargo.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

45.     Plaintiff Jose Urista is a resident and citizen of San Diego County, California, whose mortgage is serviced by Wells Fargo.

**B.      Defendants**

46.     Defendant Wells Fargo & Co. ("WFC") is a diversified financial services company headquartered in San Francisco, California that provides banking, insurance, investments, mortgage banking, and consumer finance through banking stores, the internet, and other distribution channels to customers, businesses, and other institutions in all 50 states and in other countries.

47.     WFC exercises specific and financial control over the operations of Defendant Wells Fargo Bank, dictates the policies, procedures, and practices of Wells Fargo Bank, exercises power and control over the specific activities upon which the claims herein are based, and is the ultimate recipient of the ill-gotten gains described herein.

48.     Defendant Wells Fargo Bank, N.A. is a national banking association chartered under the laws of the United States. While it is nominally headquarters in Sioux Falls, South Dakota, Wells Fargo Bank N.A.'s principal place of business is in San Francisco, California. Wells Fargo Bank provides WFC personal and commercial banking services, is the successor by merger of Wells Fargo Home Mortgage, Inc., and is WFC's principal subsidiary.

**V.      FACTUAL ALLEGATIONS**

**A.      The Federal Government Passed the CARES Act to Help with the Economic Harm Caused by the COVID-19 Pandemic, in Part by Empowering Borrowers to Opt into Forbearance Plans.**

49.     On March 11, 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a global pandemic.

50.     On March 13, 2020, then-President Trump issued the Coronavirus Disease 2019 (COVID-19) Emergency Declaration, which declared that the COVID-19 pandemic was of "sufficient

11

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

1   severity and magnitude to warrant an emergency declaration for all states, territories and the District of

2   Columbia."

3       51.     In addition to the human tragedy caused by the pandemic, the economic fallout was

4   immediate and continues to be considerable.

5       52.     On March 25, 2020, in response to the economic damage beginning to be felt by

6   Americans throughout the country, the United States Senate passed the Coronavirus Aid, Relief and

7   Economic Security ("CARES") Act.

8       53.     The CARES Act was passed by the House of Representatives the following day and

9   signed into law on March 27, 2020. *See generally* CARES Act, Public Law No. 116-136.

10      54.     The CARES Act is the single-largest economic stimulus bill in the United States' history,

11  allocating approximately $2.2 trillion of support to individuals and business affected by the COVID-19

12  pandemic.

13      **1.    The CARES Act Grants Borrowers the Privilege to Elect Mortgage Forbearance
             From Their Loan Servicers.**

14      55.     A substantial part of the coronavirus aid package was designed to assist American

15  homeowners with Federally backed mortgages who were in economic distress as a result of the COVID-

16  19 pandemic.

17      56.     First, the CARES Act assisted American homeowners with government backed

18  mortgages by prohibiting their lenders and mortgage servicers from beginning a judicial or non-judicial

19  foreclosure or from finalizing a foreclosure judgment or sale through at least August 31, 2020.

20      57.     Second, and most relevant to this action, the CARES Act provided homeowners with

21  federally backed loans experiencing financial hardships because of COVID-19 with the option to request

22  up to 180 days of forbearance on their mortgage.

23      58.     Specifically, Section 4022(b) provides, in relevant part, that:

24

12

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

(1) IN GENERAL.—During the covered period [beginning February 15, 2020 and ending on June 30, 2020], a borrower with a Federally backed mortgage loan experiencing a financial hardship due, directly or indirectly, to the COVID-19 emergency ***may request*** forbearance on the Federally backed mortgage loan, regardless of delinquency status, by—

    (A)  submitting a request to the borrower's servicer and

    (B)  affirming that the borrower is experiencing a financial hardship during the COVID-19 emergency.

(2) DURATION OF FORBEARANCE.—***Upon a request by a borrower for forbearance*** under paragraph (1), such forbearance shall be granted for up to 180 days, and shall be extended for an additional period of up to 180 days ***at the request of the borrower***, provided that, ***at the borrower's request***, either the initial or extended period of forbearance may be shortened.

*See* CORONAVIRUS AID, RELIEF, AND ECONOMIC SECURITY ACT, PL 116-136, March 27, 2020, 134 Stat. 281, § 4022(b) (emphasis added).

59.    Section 4022(c) provides, in relevant part, that:

> ***Upon receiving a request for forbearance from a borrower under subsection (b),*** the servicer shall ***with no additional documentation required other than the borrower's attestation to a financial hardship caused by the COVID-19 emergency*** and with no fees, penalties, or interest (beyond the amounts scheduled or calculated as if the borrower made all contractual payments on time and in full under the terms of the mortgage contract) charged to the borrower in connection with the forbearance, provided the forbearance up to 180 days, which may be extended for an additional period of up to 180 days ***at the request of the borrower***, provided that, ***the borrower's request for an extension*** is made during the covered period, and, ***at the borrower's request***, either the initial or extended period of forbearance may be shortened.

*Id.*, § 4022(c) (emphasis added).

60.    These provisions make it abundantly clear that participation in a COVID-19 forbearance program is voluntary and to be initiated and maintained only at the request of the mortgagor.

61.    Congress intentionally limited CARES Act forbearances to only occur upon the request of a borrower, as can be shown through legislation considered but not enacted. At the same time that the CARES Act was being negotiated between the chambers, Congressman William Lacy Clay introduced a bill, H.R. 6340, which would have required servicers to grant automatic loan forbearance for

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

delinquent borrowers, in addition to granting borrowers the right to receive a forbearance regardless of delinquency. When the CARES Act was passed, Congressman Clay's approach was rejected, and the CARES Act was limited to providing forbearances only upon a borrower's request.

62. As explained by the CFPB, a forbearance is "when [] mortgage servicer[s] or lender[s] allow [mortgagors] to pause (suspend) or reduce [their] mortgage payments for a limited period of time while [they] regain [their] financial footing."[9]

63. Notably, while "the CARES Act provides many homeowners with the right to have all mortgage payments completely paused for a period of time," "[f]orbearance doesn't mean [mortgagors'] payments are forgiven or erased. [Rather, mortgagors] are still required to repay any missed or reduced payments in the future, which in most cases may be repaid over time."[10]

64. The CARES Act provided for an extension of the forbearance period (for a total of up to 360 days) for homeowners that continued to have trouble paying their mortgages once their initial 180-day term expired.[11]

65. For mortgagors to avail themselves of the COVID-19 mortgage forbearance option, they were instructed to contact their loan servicer to obtain information and, if appropriate, request forbearance.[12]

---

[9] *Learn about forbearance,* CONSUMER FIN. PROT. BUREAU, https://www.consumerfinance.gov/coronavirus/mortgage-and-housing-assistance/mortgage-relief/ (last visited Aug. 14, 2020).

[10] *Id.*

[11] *Extend your forbearance,* CONSUMER FIN. PROT. BUREAU, https://www.consumerfinance.gov/coronavirus/mortgage-and-housing-assistance/help-for-homeowners/extend-forbearance (stating that "[i]f you still face financial hardship, you can request a forbearance extension. Under the CARES Act, if you have a federally or GSE-backed mortgage, you also can request and obtain an extension of the forbearance for up to an additional 180 days) (last visited Mar. 30, 2022).

[12] *See Request forbearance or mortgage relief,* CONSUMER FIN. PROT. BUREAU, https://www.consumerfinance.gov/coronavirus/mortgage-and-housing-assistance/request-forbearance-or-mortgage-relief/ (last visited Mar. 30, 2022).

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

### 2. Guidance Clarifies the CARES Act's Protections

66. While the CARES Act was passed quickly and with laudable intentions, there has been a tremendous amount of consumer confusion around many aspects of the Act, including the forbearance program.

#### a. The Initiation, Maintenance, and Extension of a Forbearance are Decisions Left to Borrowers.

67. The initial term of CARES Act mortgage forbearances was designed to be 180 days[13] and, after that term expires, lenders were instructed to work with borrowers to—upon request by the homeowners—extend the forbearance or establish a repayment plan.[14] But borrowers were always intended to have the ability to only accept a shorter forbearance period, to shorten the term of a previously-accepted forbearance, and to cancel a forbearance plan. While the text of the Act is clear on this subject, subsequent guidance has further emphasized that borrowers retain the privilege to shorten, end, or decline a forbearance.

68. Freddie Mac issued an April 8, 2020 Temporary Service Guidance Related to COVID-19, which stated that "the length of each forbearance plan term must be for an appropriate length, based

---

[13] Wells Fargo provided three-month forbearances, notwithstanding guidance requiring that the default length of forbearance in the event that a loan servicer and borrower could not agree on a length of forbearance is 180 days. Three consecutive missed payments is enough to render a loan eligible for voluntary repurchase, as alleged below, further evincing the bank's true motive in effectuating this program.

[14] *See* U.S. DEP'T OF VETERANS AFFAIRS, *Information for VA home loan borrowers during COVID-19,* https://benefits.va.gov/homeloans/cares-act-frequently-asked-questions.asp#FAQ5 (stating that "[f]orbearance in the CARES Act is broken down into two pieces; an *initial* period and an *additional* period. For the initial period, you may notify your mortgage servicer that you are financially affected by the COVID-19 emergency and request up to 180 days of forbearance. For the additional period, you may notify your mortgage servicer that you are still financially affected by the COVID-19 emergency and request up to 180 additional days of forbearance.") (last visited Mar. 30, 2022).

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

on the Borrower's individual circumstances and nature of the hardship, and must be agreed upon with or requested by the Borrower."[15]

69.    As the April 27, 2020 U.S. Department of Housing and Urban Development's Inspector General report explained, "[t]he borrower also has the option at any time to shorten the forbearance period and resume payments." (emphasis added).[16] Likewise, Fannie Mae Lender Letter Lending Letter 2020-02 requires servicers to inform borrowers that they can shorten a forbearance plan's terms. https://singlefamily.fanniemae.com/media/22261/display.

70.    Thus, not only the initiation, but the maintenance and extension of a CARES Act forbearance were privileges held by the borrowers, not the loan servicers.

    **b. Accepting a Forbearance Plan Is an Important Financial Decision Obliging Servicers to Provide Ample and Accurate Information.**

71.    Forbearance plans can help people experiencing temporary hardships due to COVID-19. But a survey by LendingTree found that 70% of homeowners who have gone into forbearance did not need the relief.[17]

72.    Because forbearance does not forgive the missed payments and is an important financial decision, mortgage servicers are obligated to provide accurate notices to borrowers who are deciding whether a forbearance is right for them.

---

[15] *Temporary Servicing Guidance Related to COVID-19,* FREDDIEMAC, (Apr. 8, 2020) https://guide.freddiemac.com/app/guide/bulletin/2020-10 (last visited Mar. 30, 2022).

[16] Memorandum from Assistant Inspector Gen. Brian T. Pattison to Joseph M. Gormley, Deputy Assistant Sec'y, Some Mortgage Servicers' Websites Offer Information about CARES Act Loan Forbearance That Is Incomplete, Inconsistent, Dated, and Unclear (Apr. 27, 2020), https://www.hudoig.gov/sites/default/files/2020-04/Single%20Family%20Mortgage%20Forbearance%20Brief.pdf.

[17] Tendayi Kapfidze, *LendingTree Finds the Majority of Homeowners Approved for a Mortgage Forbearance May Not Have Needed One,* LENDING TREE, (May 18, 2020), https://www.lendingtree.com/home/mortgage/majority-of-homeowners-approved-for-mortgage-forbearance-may-not-have-needed-one-study/; *see also* Aly J. Yale, *70% Of Homeowners Seeking Mortgage Relief Don't Actually Need The Help,* FORBES, (May 19, 2020, 4:34 PM EDT), https://www.forbes.com/sites/alyyale/2020/05/19/70-of-homeowners-seeking-mortgage-relief-dont-actually-need-the-help/?sh=b52a98052a54.

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

73. As Fannie Mae directed in an "FAQ" for loan servicers: "It is important that the borrower go into the forbearance plan understanding that at the end of the forbearance period the forborne payments must be accounted for. Borrowers should not be left with the impression that the missed payments are forgiven."[18]

74. Servicers like Wells Fargo are required to make sure that borrowers like Plaintiffs are fully informed about the downsides to a forbearance and provided with an appropriate Evaluation Notice. As stated in the Fannie Mae, July 15 Lending Letter 2020-02:

> Servicers must inform the borrower that the payments which are the subject of a forbearance plan have only been delayed or reduced, not forgiven, and that once the forbearance plan is complete, one of the following must occur:
>
> (1) the mortgage loan must be brought current through a reinstatement,
>
> (2) the borrower is approved for another workout option,
>
> (3) the mortgage loan is paid in full, or
>
> (4) the servicer refers the mortgage loan to foreclosure in accordance with applicable law.
>
> The servicer must also inform the borrower that he or she may shorten a forbearance plan term at any time to reduce the amount of payments which are being delayed or reduced. As stated in the Servicing Guide D2-3.2-01, Forbearance Plan, the forbearance plan terms must be provided to the borrower using the appropriate Evaluation Notice, which must be revised in accordance with applicable law. In addition, the servicer must document in the individual mortgage loan file the borrower's request for forbearance and attestation as to a financial hardship caused by the COVID-19 emergency, and the terms of the initial and any extended forbearance, including the duration of the forbearance period.[19]

---

[18] *COVID-19 Frequently Asked Questions - Servicing,* FANNIE MAE, https://singlefamily.fanniemae.com/media/22361/display#:~:text=It%20is%20important%20that%20the,the%20missed%20payments%20are%20forgiven (last updated Oct. 14, 2020).

[19] *Lender Letter (LL-2020-02),* FANNIE MAE, https://singlefamily.fanniemae.com/media/22261/display, (last updated Dec. 9, 2020).

**SECOND AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

75. The template Evaluation Notice, provided in the Servicing Guide D2-3.2-01, contains the following warnings to borrowers contemplating forbearance:

> We will not pursue foreclosure during the forbearance plan term. However, the terms of your mortgage remain unchanged. By not making your mortgage payments during the plan's term you will become more delinquent and your credit score may be impacted. For more information refer to the **Additional Forbearance Plan Information and Legal Notices**.

and:

> ### Additional Forbearance Plan Information and Legal Notices
>
> **Credit Reporting**:
> - We will continue to report the delinquency status of your mortgage as well as your entry into a forbearance plan to credit reporting agencies in accordance with applicable law.
> - **CREDIT REPORTING AGENCIES MAY CONSIDER THE ENTRY INTO A FORBEARANCE PLAN AS AN INCREASED CREDIT RISK. HOWEVER, A FORECLOSURE WOULD HAVE A MORE NEGATIVE IMPACT TO YOUR CREDIT SCORE.**

### c. Deferment Is the Default Post-Forbearance Workout Option.

76. Leaving aside the issue of whether mortgagors are even aware that they are in a mortgage forbearance program, the provision that has caused the most confusion is that participating mortgagors often do not know if they have to get their mortgage current at the conclusion of the forbearance period or how their lender and/or servicer will treat the deferred payments.

77. When a mortgage servicer like Wells Fargo places a loan in forbearance, it permits borrowers to suspend or reduce mortgage payments for a limited time. However, those payments are not forgiven. They are just delayed. The borrower must still repay the missed payments in the future. Some borrowers may be eligible for deferment, which adds the missed payments to the end of loan. Others, however, may be required to pay them more rapidly. Moreover, during forbearance, interest continues to accrue even though the principal is not being paid down.

18

**SECOND AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

78.     Fannie Mae and Freddie Mac attempted to address the confusion about the post-CARES Act forbearance loss mitigation landscape when they introduced the "COVID-19 Payment Deferral" option with Lender Letter (LL-2020-07) and Bulletin 2020-15.[20]

79.     The COVID-19 Payment Deferral brought Fannie Mae and Freddie Mac in line with the United States Department of Housing and Urban Development's ("HUD") COVID-19 National Emergency Standalone Partial Claim option, which provides borrowers with a junior mortgage (zero additional interest, no fees) not payable until the mortgage is paid off, comprised of the total amount of payments missed during a CARES Act forbearance period.[21]

80.     Under a COVID-19 Payment Deferral described in LL-2020-07, all forborne payments (up to 12 months) are to be placed into a non-interest-bearing balance to be paid back at the end of the loan term. Thus, the forborne payments are not a source of increased interest accrual upon exiting forbearance. However, not all borrowers are eligible for a deferral.

**3.      Millions of Homeowners with Federally Backed Loans Are in a Forbearance Program.**

81.     As of June 30, 2020, 4.58 million homeowners were in COVID-19 related forbearance plans, representing 8.6% of all active mortgages.[22]

82.     All told, roughly 6.2 million homeowners entered into COVID-19 forbearances.

---

[20] *Lender Letter (LL-2020-07)*, FANNIE MAE, https://singlefamily.fanniemae.com/media/22916/display (last updated Nov. 18, 2020) and *Freddie Mac COVID-19 Payment Deferral Bulletin 2020-15,* FREDDIE MAC, (Issued May 13, 2020) https://guide.freddiemac.com/app/guide/bulletin/2020-15.

[21] U.S.     DEP'T     OF     *Mortgagee     Letter     2020-06*,     (Apr. 1, 2020)https://www.hud.gov/sites/dfiles/OCHCO/documents/20-06hsngml.pdf.

[22] *See* Diana Olick, *Loans in coronavirus mortgage bailouts see largest weekly decline yet – but there are more red flags*, CNBC, (Jul. 3, 2020, 7:43 AM EDT), https://www.cnbc.com/2020/07/03/loans-in-coronavirus-mortgage-bailouts-see-largest-weekly-decline-yet.html.

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

83.     Some 6.8% of all GSE-backed loans and 12.3% of all FHA/VA loans were in forbearance plans,[23] and approximately 11% of privately-held mortgages were in some type of forbearance or deferment program.

84.     Wells Fargo has stated publicly that it has deferred 2.5 million payments for consumer and small business customers since the start of the pandemic.[24]

**B.     Wells Fargo Seized Upon the CARES Act as an Opportunity for Profit.**

85.     Wells Fargo put borrowers into unwanted forbearances. Doing so put the bank "deeply in the money" while harming the borrowers. Tom Goyda, Wells Fargo's representative, admitted that the bank "misinterpreted" customer intent in many instances, placing loans into unwanted or unasked-for forbearances.[25] A more robust explanation for the bank's motives can be discerned from a statement that John Shrewsberry, Wells Fargo's Chief Financial Officer made in the bank's earnings call for the second quarter of 2020. Betsy Graseck, an analyst for Morgan Stanley, asked about American Banker's reporting on Wells Fargo's Ginnie Mae buyouts. Mr. Shrewsberry explained the option to repurchase loans placed into forbearances is "deeply in the money".

86.     This is not the first time that Wells Fargo has violated customers' trust in this manner. Implementing forbearance plans without customer approval is reminiscent of other troubling practices at Wells Fargo in recent years. Most notably, Wells Fargo opened an estimated 3.5 million debit or credit accounts without customer consent, as alleged in a class action complaint in this District and resolved

---

[23] *See* Black Knight Inc.: Forbearance Volumes Reverse Course For Largest Decline Yet, (Jul. 3, 2020), https://www.blackknightinc.com/blog-posts/forbearance-volumes-reverse-course-for-largest-decline-yet/.

[24] *See* Anna Hrushka, *Wells Fargo says it 'misinterpreted customers' intentions' in some forbearance cases,* BANKINGDIVE, (July 24, 2020), https://www.bankingdive.com/news/wells-fargo-forbearance-mortgage-payments/582284/.

[25] *Id.*

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

by a $142 million settlement finally approved by the Hon. Vince Chhabria and a $3 Billion settlement with the federal government. [26]

### 1. Wells Fargo Unilaterally Placed Homeowners into Forbearance Programs and Extended Homeowners' Forbearance Plans Without Their Consent.

87.     As detailed above, accepting a forbearance is an important financial decision, one that a loan servicer cannot unilaterally make on behalf of a borrower. Before the passage of the CARES Act, for instance, there were substantial restrictions on a loan servicer's ability to grant a Freddie Mac borrower a forbearance, requiring negotiations of the forbearance terms with the borrower.[27] Even if a borrower needs the help or is fully informed of the consequences, lenders may not put a loan in forbearance without a customer requesting it. As the Consumer Financial Protection Bureau explains, "You must contact your loan servicer to request this forbearance." Banks may not institute it automatically. But that's exactly what Wells Fargo did.

88.     Since the passage of the CARES Act in late March of 2020, millions of homeowners across the country have attempted to obtain information from their mortgage servicers and lenders as to the specifics of their COVID-19 forbearance program.[28]

89.     As numerous media reports have detailed, Wells Fargo unilaterally put borrowers into their mortgage forbearance programs despite having no clear indication of borrowers' consent.[29] Thousands of homeowners were put into mortgage forbearance programs they did not request or had

---

[26] *See* Pete Williams, *Wells Fargo to pay $3 billion over fake account scandal,* NBC NEWS, (Feb 21, 2020, 1:06 PM PST), https://www.nbcnews.com/news/all/wells-fargo-pay-3-billion-over-fake-account-scandal-n1140541.

[27] *Requirements for a forbearance plan*, FREDDIE MAC, https://guide.freddiemac.com/app/guide/section/9203.13, (last visited Mar. 29, 2022).

[28] Anna Bahney, *Homeowners are getting mortgage relief they didn't want*, CNN, (May 20, 2020, 4:25 PM ET), (https://www.cnn.com/2020/05/20/success/mortgage-forbearance-homeowner-complaints-coronavirus/index.html.

[29] Diana Olick, *Some homeowners are getting mortgage bailouts by mistake, and it's keeping them from refinancing*, CNBC, (May 12, 2020, 11:15 AM EDT), https://www.cnbc.com/2020/05/12/coronavirus-some-homeowners-getting-mortgage-bailouts-by-mistake.html.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

their forbearance period extended for an additional period of time without their consent, causing substantial problems for those homeowners.

90. As experienced by Plaintiffs, and as attested to in consumer complaints from across the nation, Wells Fargo automatically placed borrowers in forbearance when they contacted the bank by phone or online to merely inquire about their options.

91. As one consumer told the Consumer Financial Protection Bureau, a Wells Fargo employee admitted "that the system is like a 'hair trigger'" automatically placing loans into forbearance, "even though I did nothing to start a forbearance."[30]

92. In a recent interview with Fortune Magazine, the CEO of Wells Fargo, Paul Scharf, explained, regarding the forbearance program, that "every institution makes mistakes."[31]

93. That "mistake" was widespread. The Consumer Financial Protection Bureau's database of consumer complaints lists numerous examples of similar complaints. This is a sample:

> "Due to a job loss, I reached out to Wells Fargo and asked for information on their Covid-19 mortgage relief program. To clarify, I only asked for information on the program. The representative on the phone stated that an information packet would be mailed to me. About a week later, a letter arrived from Wells Fargo stating that they are 'confirming short term payment relief for the account.' This was not what I had requested. In addition, the letter states 'We won't report this account to consumer reporting agencies.' It has now come to light that Wells Fargo has put a forbearance on the mortgage, preventing any ability to refinance."[32]

> "Wells Fargo put my account in forbearance when I didn't request it. After talking to multiple individuals on the phone I was told that if you click the 'more info' button on the site that you will be automatically enrolled without asking." *Id.*

---

[30] *Consumer Complaint 3658898,* CONSUMER FIN. PROT. BUREAU, https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3658898 (last visited Dec. 23, 2020).

[31] Rey Mashayekhi, *Can anyone fix Wells Fargo?*, FORTUNE, (Feb. 3, 2021 3:30 AM PST), https://fortune.com/longform/fixing-wells-fargo-charles-scharf-ceo-regulatory-issues-privacy-fake-account-fraud-scandal-covid/.

[32] *Id.*

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

"Wells Fargo will NOT allow us to end our forbearance. We have spent over 7 hours trying to reach them to resolve this." *Id.*

"[W]e started getting email about COVID-19 relief from Wells Fargo, regarding mortgage assistance. I sent them an email for more information. . . I tried to pay my house note on the WF app, as I have always done. The app advised me that I did not have an active account, that's when we called to make the payment. We were told that our loan was in forbearance and we could make a payment, but it would not post to the loan until after the forbearance period was over." *Id.*

"I contacted my mortgage company WELLS FARGO to inquire about what types of services were available IF my renter's were unable to make their payment due to covid. It was for an inquiry purpose and I was told that I would receive a letter regarding any programs available. . . . I did in fact receive a letter and in that letter it stated my mortgage was placed in forbearance! I did not request any forbearance. Recently I was notified by a lender that it showed on my credit report and have been trying to have it removed since then." *Id.*

"Wells Fargo put me into CARES act forbearance without my consent. I was unable to make a payment online like I usually do. I called and was on hold for an hour but finally was able to talk to a rep, …. I told them they put me into forbearance without my consent. He apologized and said that the system is like a 'hair trigger' even though I did nothing to start a forbearance, I've never missed a payment, have no reason to apply for forbearance and am able to make payments." *Id.*

"Wells Fargo has placed or enrolled me in forbearance without my permission. This has negatively impacted me as [redacted] has placed my home equity mortgage application in denial status because of this." *Id.*

"I did not sign anything to agree to forbearance and subsequent calls to them I stressed that I'm paying my mortgage and don't want a forbearance. Instead they listed it on my credit without authorization. When I called them they said it was an error n they are working on it. They ruined my wife and my credit." *Id.*

"I called Wells Fargo, and asked what relief they could provide due to Covid-19. . . . I am very familiar with how a forbearance versus a deferment works. I was adamant if all they could offer me was a forbearance that I was not interested and I was assured by the Wells Fargo rep that they would just put the 3 payments at the back end of the loan and it was not a forbearance so I agreed. Yesterday . . . I received a notice from Wells Fargo asking If I need to extend my forbearance or discuss repayment options for the missed payments. I am livid!" *Id.*

23

94. A media report details Wells Fargo's monitoring of the Chapter 13 bankruptcy dockets of its debtor clients and unilateral placement of them into its mortgage forbearance program.[33]

95. That article, entitled *Troy Harlow has always made sure to pay his mortgage on time Wells Fargo had other plans for him*, details the plight of numerous borrowers who had been unwittingly enrolled in Wells Fargo's mortgage forbearance program:

> None of the borrowers in the lawsuit who were contacted by NBC News told the bank that they'd been affected by COVID-19, and **none had requested the bank's assistance because of it. Nor had they requested loan modifications when Wells Fargo claimed they wanted forbearance.** In addition, none of the borrowers or their attorneys say they were contacted by Wells Fargo.
>
> Asked about the discrepancies, Wells Fargo said that because it had seen references to COVID-19 in the borrowers' court filings, it provided forbearance.[34]

96. When reached for comment, Wells Fargo did not deny the practice of unilaterally enrolling unwitting persons to its mortgage forbearance program:

> In the early days of the pandemic, we provided immediate payment relief to customers in bankruptcy if a review of their court filings indicated they were impacted by COVID-19 or if they had a loan modification review in process.

97. Wells Fargo's blunder is not an inconsequential administrative glitch. Rather, forbearances can have grave impacts on a borrower's credit history or access to credit. As Sen. Elizabeth Warren (D-Mass.) and Sen. Brian Schatz (D-Hawaii) wrote in a July 29, 2020 letter to Wells Fargo CEO Charles Scharf, the bank was "putting consumers at risk of greater financial hardship amidst one of the worst economic downturns in our country's history."

---

[33] Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him.*, NBC NEWS, (Jul. 16, 2020, 2:00 AM PDT), https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

[34] *Id.*

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

98.     In its first response to the Senators' letter, sent on August 12, 2020, Wells Fargo admitted putting borrowers into forbearance when they had only "made an inquiry or expressed hardship but had not explicitly requested a forbearance." *Id.* Wells Fargo identified that over 821,000 forbearances had been granted since March 9, 2020. In addition, Wells Fargo identified five scenarios in which it admitted its practice was to place borrowers into unrequested forbearances. *Id.*

99.     First, Wells Fargo placed borrowers into forbearance for borrowers in active bankruptcy proceedings, without any borrower request. Second, Wells Fargo placed borrowers into forbearance when a customer contacted the bank via e-mail or telephone regarding a COVID-19 hardship, regardless of whether the borrower requested forbearance. Third, the bank automatically placed borrowers into forbearance when the borrower was in the process of seeking a loan modification. Fourth, the bank automatically placed borrowers into forbearance if the borrower had been denied a forbearance before the COVID-19 epidemic. Fifth, Wells Fargo placed mortgage and home equity accounts into forbearance when the borrower had another mortgage-linked account placed into forbearance.

100.     However, as Plaintiffs' experiences demonstrate, borrowers outside of these channels were placed into unwanted forbearances in response to misleading prompts after Wells Fargo representatives steered the borrowers into payment deferrals, or based on requests for more information.

101.     Wells Fargo has acknowledged that merely inquiring about forbearance options should not result in a borrower's unwitting entry into the program. Specifically, Tom Goyda, a Wells Fargo consumer lending spokesperson admitted that "[j]ust asking about a forbearance should not result in a forbearance being applied."[35] Paul Scharf, the CEO of Wells Fargo recently stated, regarding the

---

[35] *See* Anna Bahney, *Homeowners are getting mortgage relief they didn't want,* CNN, https://www.cnn.com/2020/05/20/success/mortgage-forbearance-homeowner-complaints-coronavirus/index.html (Updated May 20, 2020, 4:25 PM ET).

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

involuntary forbearance program, that "every institution makes mistakes."[36] This "mistake" came at the expense of the borrowers that Congress intended to protect through the passage of the CARES Act, and generated potentially billions of dollars of profits for Wells Fargo.

102.     In a second letter sent on September 4, 2020, Wells Fargo provided updates on the bank's attempt to contact borrowers. Wells Fargo identified 904 accounts held by customers in active bankruptcy for whom forbearance was granted without a borrower request. The bank attempted to contact each borrower, to confirm whether they wanted the forbearance assistance, and were able to contact 699 of the borrowers. Of those 699 borrowers, 355 confirmed that they wanted forbearances, and 344 confirmed that they did not – almost exactly 50%.

103.     While Wells Fargo's spokespeople have declined to say whether the bank has benefited financially from making unrequested forbearance filings, upon information and belief, Wells Fargo stands to gain a tremendous windfall based on these practices.[37]

**2.     Wells Fargo's Misconduct Rendered Billions of Dollars in Loans Eligible for Highly Lucrative Voluntary Repurchase.**

104.     Wells Fargo performs multiple roles in America's housing finance system. This case is primarily concerned with Wells Fargo's role as a mortgage servicer, in which it receives a fee for acting as an intermediary between the loan holder and the borrower, performing the day-to-day administrative tasks associated with the lending side of a mortgage loan. The majority of first lien mortgages in America are federally backed, meaning that the loan has been securitized by Fannie Mae, Freddie Mac, or Ginnie Mae, government sponsored mortgage companies ("GSMC's"). Wells Fargo acts as loan servicer for billions of dollars' worth of such loans.

---

[36] Rey Mashayekhi, *Can anyone fix Wells Fargo?*, FORTUNE, (Feb. 3, 2021, 3:30 AM PST), https://fortune.com/longform/fixing-wells-fargo-charles-scharf-ceo-regulatory-issues-privacy-fake-account-fraud-scandal-covid/.

[37] *Id.*

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

105.    Both Fannie Mae and Freddie Mac are government-sponsored private corporations with congressional charters. They provide liquidity to the housing finance market by purchasing mortgages from lenders and guaranteeing the default risk linked to their issuances of mortgage-backed securities tied to those loans. Likewise, Ginnie Mae is a federal government agency that guarantees MBSs which are issued by program participants (like Wells Fargo) for loans linked to mortgages whose default risks are guaranteed by the FHA, VA, and USDA. Ginnie Mae guarantees MBS investors timely principal and interest payments for those investments.

106.    Wells Fargo acts as loan servicer for loans that have been securitized by all three entities, and in exchange, is paid servicing fees. In this role, Wells Fargo forwards principal and/or interest payments to the GSCM's, or the investors, depending upon the remittance types of the underlying servicing contracts.

107.    For the vast majority of Wells Fargo's GSCM servicing contracts, the obligation to advance monthly principal and/or interest payments for pooled loans exists even if the borrower does not pay the bank.

108.    For Fannie Mae loans, a loan servicer has the option to voluntarily repurchase a mortgage loan from the MBS pool when the loan has four consecutive payments past due, cutting off the advancement risk. Fannie Mae Servicing Guide A1-3-01, Requirements for Voluntary Repurchase (11/12/2014). Likewise, for Freddie Mac Loans, a servicer may request to voluntarily repurchase the GSE's interest in a mortgage, a request that is generally granted for mortgages that are 90 or more days delinquent. Freddie Mac Servicing Guide, 3602.4.

109.    For Ginnie Mae loans, the loan servicer has the option to repurchase delinquent loans issued on or after January 1, 2003, so long as the borrower fails to make payment for three consecutive months.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

110. After repurchasing, the servicer's obligation to advance principal and interest payments ends. In addition, the loan servicer has more flexibility to negotiate workout options with the borrowers to preserve the mortgage, or, if loss mitigation fails, foreclose.

111. Many of these loans were, before Wells Fargo's misconduct, performing. They generally represent a low risk of falling into foreclosure, as Wells Fargo itself recognized in an earnings call. Michael Santomassimo, Wells Fargo's Senior Executive Vice President and Chief Financial Officer stated that for loans that had already exited their COVID-19 forbearance plans, "90% of the balance is current as of the end of the year."

112. Once a voluntarily repurchased loan becomes reperforming, it can either be sold in the non-agency secondary mortgage market, held by the bank/servicer (who profits based on the spread between the servicing costs and the loan's interest), or resold into the GSCM pools. If resold in the GSCM pools, the resale price is generally substantially higher than par. For instance, the average trading price for a Ginnie Mae MBS with a 3.5% coupon was well above the coupon rate from January of 2020 to January of 2022, with an average trade value from January of 2021 to January of 2022 of 107. Thus, if a 3.5% loan is purchased at par and resold after it becomes reperforming, the loan servicer stands to make a 7% return.



**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

113. On the other side of the voluntary purchase transaction are the MBS investors. When they purchase an MBS at 105 basis points, and part of that pool is bought out at par, the yield of the MBS decreases. In its disclosures to potential investors, the GSCM's disclose voluntary repurchase as a potential risk to investors. However, in typical years, prepayment rates are stable and tied to the normally occurring delinquencies in the housing market. For instance, on information and belief, in 2017, Wells Fargo voluntary purchased roughly $8.6 billion in loans out of GNMA pools. In 2018, that figure was $7.8 billion, and in 2019 it was $6.2 billion. That changed in 2020. Wells Fargo purchased $30.3 billion in loans out of GNMA pools in 2020, an unprecedented amount. In 2021, the repurchase rates returned to normal, $4.6 billion.



114. Wells Fargo's conduct did not go unnoticed. Industry reports began to circulate in July of 2020, as Wells Fargo's unprecedented buyout rate of 99% of eligible loans serviced by the bank was having a dramatic and outsized impact on the overall buyout rate (CBR) for Ginnie Mae backed securities.

115. Riskspan, a consulting firm in the residential mortgage, MBS trading, and structured finance space, published the following chart, detailing the buyout rate increase in July of 2020 and

29

reporting that "this increase was driven almost entirely by Wells [Fargo], which accounted for 25% of the servicing in some pools."[38]

116.    American Banker began reporting on Wells Fargo's conduct, with articles titled "Banks uncover loophole to buy home loans at below market prices," reporting that in July and August of 2020 alone, Wells Fargo bought $19 billion of loans out the Ginnie Mae reserves for $1.5 billion less than the loans' market price.[39] As former Ginnie Mae president Ted Tozer told Bloomberg News, Wells Fargo and other banks exercising this voluntary repurchase option for loans placed into CARES Act forbearances are "setting themselves up for a huge windfall. It's almost pure profit."[40] While many banks exercised this option, Wells Fargo's repurchasing far exceeded its peers.

117.    The FHFA, which regulates the GSE's, anticipated the potential that COVID forbearances could be abused by loan servicers, and issued guidance on March 21, 2020, informing servicers that loans forborne due to COVID-19 would not generally be available for voluntary repurchase, under a national disaster's exception.[41] In that same guidance, FHFA created a new limit on the servicer advance obligations, capping the advance obligations at four months. As discussed below, this created an additional incentive for Wells Fargo to place GSE loans into forbearance, but as a result of this policy, Fannie Mae and Freddie Mac loans did not experience as high of a spike in artificially inflated voluntary repurchased.

---

[38] Don Brown, *Edge: Bank Buyouts in Ginnie Mae Pools*, RISKSPAN, (July 20, 2020), https://riskspan.com/bank-buyouts-in-ginnie-mae-pools/.

[39] Bloomberg News, *Banks uncover loophole to buy home loans at below-market prices,* AMERICAN BANKER, (Aug. 20, 2020 8:53 AM EDT), https://www.americanbanker.com/articles/banks-uncover-loophole-to-buy-home-loans-at-below-market-prices.

[40] https://www.bloomberg.com/news/articles/2020-08-20/banks-poised-for-mortgage-bond-windfall-that-may-burn-investors.

[41] *FHFA Addresses Servicer Liquidity Concerns, Announces Four Month Advance Obligation Limit for Loans in Forbearance*, FED. HOUS. FIN. AGENCY, (Apr. 21, 2020), https://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Addresses-Servicer-Liquidity-Concerns-Announces-Four-Month-Advance-Obligation-Limit-for-Loans-in-Forbearance.aspx.

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

118. Ginnie Mae, however, took a different approach. On June 29, 2020, Ginnie Mae issued APM-20-07, a memorandum incorporating new terms into its policies for re-securitizing re-performing loans, due to the recognition that mass early buyouts "could undermine the integrity of the MBS program." [42] Prior to APM-20-07, a loan that had been voluntarily repurchased out of a Ginnie Mae pool and brought back to performing status could be resold into the same pool type it was purchased out of. Under the new guidance, re-performing loans will be eligible instead to be sold into new pool types created just for resecuritizing such loans. In addition, the loan must have been current for each of the six months immediately preceding resecuritization, essentially requiring servicers to hold repurchased loans for a longer period of time before profiting.

119. Wells Fargo's plan was to do exactly that – hold the reperforming loans until they could be sold or resecuritized. In its 2020 Q4 earnings call, Mike Santomassimo stated that the bank's mortgage balances would see "headwinds" in 2021, in part due to the "expected sale or resecuritization of loans previously purchased out of agency mortgage securitizations."

120. Mr. Santomassimo was correct – the bank profited tremendously. Based on Wells Fargo's 2021 reporting, the bank profited by at least $789 million on the resecuritization of roughly $13 billion of the $30 billion in 2020 GNMA repurchases. If the remaining $17 billion in GNMA repurchased are resecuritized at the same profit rate, that would lead to $1.8 billion in profits from resecuritization alone.

121. Although the underlying regulations may be complicated, the scheme itself is simple and conducted in the open. Place otherwise solvent borrowers into unrequested forbearances, purchase their loans out of security pools at par, hold the loans and profit once the loans exit forbearance (due to the

---

[42] *All Participant Memorandum APM 20-18: Extension to the Deadline for Submission of Resolution of Board of Directors and Certificate of Authorized Signatures (HUD-11702) Certification and Renewal of Other Master Agreements,* GINNIEMAE, (Dec. 16, 2020, 8:30 AM), https://www.ginniemae.gov/issuers/program_guidelines/Pages/mbsguideapmslibdisppage.aspx?ParamI D=109.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

delta between the interest payments on the loan and the cost of servicing), and once eligible for resecuritization, repool the loans for even greater profits.[43]

122. To effectuate this scheme, WFC's loan servicing subsidiary, Wells Fargo Bank, artificially placed the loans into forbearance even when the borrower did not request such relief. But Wells Fargo Bank did not act alone in performing its part in this scheme – it had the assistance of Black Knight, Inc., a long-time vendor.

123. Black Knight Inc., a publicly-traded company, provides a platform for mortgage loan servicing and borrower communication application, referred to as MSP and LoanSphere. Wells Fargo's use of these platforms represents a substantial portion of Black Knight's business – in 2016, Black Knight reported to the SEC in relation to a merger that Wells Fargo was its "largest client," and "accounted for approximately 12% of Black Knight's consolidated revenues" and 15% of the revenues from Black Knight's Technology and Data segment.[44]

124. Black Knight capitalized on the COVID-19 crisis by marketing its MSP platform, distributing a white paper advertising its products as assisting mortgage servicers in establishing forbearance, allowing mortgage servicers to automate the management of forbearance programs.[45]

---

[43] Wells Fargo is not the first bank to use GNMA's repurchasing in order to unjustly profit. In 2016, the SEC filed a civil enforcement action under the Securities Act and Exchange Act against First Mortgage Corporation, a privately-held GNMA mortgage issuer which delayed crediting borrower payments in order to render the mortgages eligible for voluntary repurchase. *S.E.C. v. First Mortgage Corp., Inc. et al*, 2:16-cv-03772 (C.D. Cal., filed May 31, 2016*)*. The SEC alleged that FMC profited by $7.5 million on a mere 532 transactions, at a profit rate of 7.5%, and ultimately the United States District Court for the Central District of California entered a consent judgment against FMC for $12,700,000.

[44] Black Knight Financial Services Letter to Shareholders, U.S. Sec. and Exch. Comm'n, https://www.sec.gov/Archives/edgar/data/1704177/000104746917005400/a2233097z424b3.htm.

[45] Michelle Kersch and Mitch Cohen, *Black Knight Issues White Paper on Managing COVID-19 Challenges for Clients Using MSP Servicing System*, (Apr. 13, 2020), https://www.blackknightinc.com/black-knight-issues-white-paper-on-managing-covid-19-challenges-for-clients-using-msp-servicing-system/.

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

Black Knight gained increased revenue through this churn, assisting Wells Fargo with identifying loans to be placed into forbearance through its automated services program.

125.    This enterprise formed of WFC, Wells Fargo Bank, and Black Knight, perpetuated this fraud through the use of wires and mails, and committed thousands of predicate violations by reporting the mortgages to be in faulty forbearance that the enterprise had imposed without the borrowers' knowledge or consent. Thus, the participants are liable under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), as detailed *infra*.

### 3.    Wells Fargo's Misconduct Capped Its Principal and Interest Advancement Obligations for Loans that Remain in GSE Pools.

126.    Even for loans that are not voluntarily repurchased for profit, Wells Fargo is incentivized to place GSE loans into forbearance in order to minimize its exposure to servicing requirements obligating Wells Fargo to advance borrowers' delinquent principal and interest payments to the investors in GSE-sponsored trusts when the loan is not paying.

127.    Ordinarily, as described above, Wells Fargo's advancement obligations continued for Fannie Mae loans regardless of whether Wells Fargo collected payment from the borrowers, unless and until Wells Fargo either foreclosed on the property or determined that the property's foreclosure value was insufficient to reimburse Wells Fargo for any further advances of monthly principal and interest after satisfying the remaining principal balance of the delinquent loan.

128.    However, exclusively for loans in CARES Act forbearances, Fannie Mae and Freddie Mac have modified those advancement requirements.[46] Servicers of GSE loans, including Wells Fargo, are obliged to only make four monthly advances of principal and interest payments for delinquent loans that have been in a CARES Act forbearance.

---

[46] Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him*, NBC News, (July 16, 2020, 2:00 AM PDT), https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

Thus, the servicing rights associated with loans that have ever been in a CARES Act forbearance are increased in value, as they present a lower risk of loss due to the obligation to make advances while nonperforming for the life of the loan.

4. **Wells Fargo's Misconduct Prevents Runoff for its Mortgage Servicing Rights by Reducing Refinancing Opportunities for Borrowers.**

129. For much of the last two years, interest rates were at all-time lows, and many homeowners sought to take advantage of these historically low rates by refinancing. If an account is placed into a forbearance program, those borrowers cannot typically refinance for many months, even after bringing the account current. As detailed more fully below, by retaining borrowers who might otherwise refinance their mortgages with other institutions, Wells Fargo protected their mortgaging servicing rights – accounts associated with the fees Wells Fargo earns for servicing mortgages.

130. Wells Fargo generates millions of dollars in revenue servicing mortgages. Mortgage servicing rights ("MSR") are the capitalized value of the right to receive future cash flows from the servicing of mortgage loans. In Wells Fargo's 2021 Annual Report, the bank reported MSR accounts with a fair value of over $6,000,000, recognizing that "MSRs may increase upon repurchase [of loans from GNMA loan securitization pools]."

131. When borrowers refinance a mortgage with a different servicer, the associated mortgage servicing rights are terminated. Thus, when capitalizing the present value of MSRs, loan servicers adjust for the risk that borrowers will prepay or refinance. This risk of run-off decreases the present value of MSRs. In 2021, despite historically low interest rates and a red-hot real estate market, Wells Fargo's estimate of prepayment rates for their MSR portfolio *declined* by 11% compared to the prior year.

132. As Plaintiffs Delpapa and Jacob experienced, being placed in forbearance is a barrier to refinancing. Before May 19, 2020, a borrower was generally required to wait a year until they could refinance. As told by a Wells Fargo mortgage servicer client, it was virtually impossible to obtain any form of credit for up to a year after a forbearance program concluded:

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

> The note on his credit report saying the loan is in forbearance makes it impossible for him to refinance. Fannie Mae and Freddie Mac, which, along with the Federal Housing Administration and the Department of Veterans Affairs, fund or insure the vast majority of mortgages from lenders, do not allow borrowers with a loan in forbearance to either refinance or obtain a new loan until one year after the loan payments are up to date again.[47]

133. Even after the FHFA updated guidance relating to borrowers in forbearance,[48] a borrower with a Fannie Mae or Freddie Mac loan will typically have to wait three months after exiting forbearance in order to be able to refinance. Thus, by placing borrowers into unsolicited forbearance, Wells Fargo increased the value of the associated MSR accounts by reducing the risk of runoff through refinancing.

**5. Wells Fargo's Misconduct Entitles the Bank to Workout Incentive Payments.**

134. By placing borrowers into unrequested forbearances, Wells Fargo was manufacturing delinquencies which it could receive incentive payments for curing. Upon information and belief, for each loan placed into forbearance that Wells Fargo subsequently modifies in accordance with Fannie Mae and Freddie Mac's matrix for loan retention workout options, Wells Fargo receives an incentive fee of up to $1,000.[49]

135. If the borrower enters into a repayment plan, under which the forborne payments are brought current over a period of up to 12 months, the loan servicer is eligible for a $500 incentive payment. Likewise, if the forborne payments are deferred to the back of the loan, the servicer is eligible

---

[47] *See* Diana Olick, *Some homeowners are getting mortgage bailouts by mistake, and it's keeping them from refinancing*, CNBC, (May 12, 2020, 11:15 AM EDT), https://www.cnbc.com/2020/05/12/coronavirus-some-homeowners-getting-mortgage-bailouts-by-mistake.html (stating that "It also puts barriers in front of homeowners who could really benefit now from refinancing and saving on their monthly payments. Servicers are swamped with those requests as well. Applications to refinance a home loan are currently up more than 200% from a year ago").

[48] *Lender Letter (LL-2021-03)*, *Impact of COVID-19 on Originations,* FANNIE MAE, (Feb. 2, 2022), https://selling-guide.fanniemae.com/Content-Management-Labels/KB-Management/Guide-FM-com/2169430921/Lender-Letter-LL-2021-03-Impact-of-COVID-19-on-Originations-01-14-2021.htm.

[49] *See Lender Letter (LL-*2020-09), FANNIE MAE, https://singlefamily.fanniemae.com/media/23091/display, (updated July 15, 2020).

**SECOND AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

for a $500 incentive payment. If the loan is modified, to permanently change the payment terms, the servicer is eligible for a $1,000 incentive payment. The below chart, from Freddie Mac Bulletin 2020-21,[50] details those incentives.

| Incentive Type | Incentive Amount |
|---|---|
| Repayment Plan | $500<br><br>Effective for all repayment plans with a first payment due date under the repayment plan on or after July 1, 2020 |
| Payment Deferral/COVID-19 Payment Deferral | $500<br><br>Effective immediately for all Payment Deferrals/COVID-19 Payment Deferrals (NOTE: Payment Deferral evaluations do not begin until on or after July 1, 2020) |
| Flex Modification® | $1,000<br><br>Effective for all Flex Modifications completed with a Trial Period Plan effective date on or after July 1, 2020 |

### 6. Wells Fargo's Misconduct Allowed the Bank to Profit from Spread from Servicing Repurchased Loans.

136.    In Wells Fargo's 2021 Annual Report the bank reported that it had interest income associated with loans we purchased from Government National Mortgage Association (GNMA) loan securitization pools of $1.1 billion. In its earning call associated with the Q4 2021 report, Wells Fargo stated that it earned $318 million of interest income associated with EPBO loans in the fourth quarter alone. Meanwhile, Wells Fargo reported the annual cost to service at a mere $91 per loan. Thus, Wells Fargo has earned hundreds of millions of dollars servicing loans that it repurchased, with staggering profit margins. Rather than spend the amount necessary to properly service those loans (for instance, confirming with each borrower whether they in fact had request a forbearance), Wells Fargo continues to profit at the borrowers' expense.

---

[50] *Temporary Servicing Guidance Related to COVID-19 (Bulletin 2020-21)*, FREDDIE MAC, (June 10, 2020), https://guide.freddiemac.com/app/guide/bulletin/2020-21.

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

**C.      Wells Fargo's Misconduct Harmed the Very Consumers that the CARES Act Was Intended to Protect.**

137.    These gains come at the expense of borrowers, who were placed into unwanted forbearances or who had forbearance terms extended without their intent. Despite Wells Fargo's protestations in its response to Senators Warren and Schatz, these forbearance plans led to real and substantial damages to borrowers.

138.    As has previously been briefed before this Court, FICO performed an analysis which concluded that the majority of borrowers whose loans were placed into a CARES Act forbearance can expect a resulting decrease in their credit score.[51]

139.    In addition, borrowers are rendered ineligible to refinance and capitalize on record low interest rates, or potentially remove PMI, during the term of the forbearance and for some time after the forbearance plan ends.

140.    The actions taken by Defendants were in direct contravention of the CARES Act requirements that forbearances be provided in response to the request of the borrower, and with an attestation of hardship due to COVID-19. In many instances, the borrowers received no notice that they had been placed in forbearance at all, and in those instances in which the borrowers received some notice, it was woefully insufficient under the requirements of RESPA, 12 U.S.C. §§ 2601 *et seq*.

141.    Many borrowers, unaware that they were in forbearance, attempted to continue to make payments on their loans. Wells Fargo failed to timely credit those payments to borrowers' mortgage loans, instead, holding those payments in separate "unapplied funds" accounts without notifying the borrowers. For those borrowers whose loans were owned by Wells Fargo, this failure to timely credit

---

[51] Paul Panichelli, *Simulated FICO Score Impacts due to Mortgage Forbearance*, FICO, (Sept. 29, 2020), https://www.fico.com/blogs/simulated-fico-score-impacts-due-mortgage-forbearance.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

payments constituted an actionable violation of the Truth in Lending Act, 15 U.S.C. § 1601, as detailed *infra*.

142.    Some individuals, such as Mr. Jacob, noticed that their mortgages had been noted as "in forbearance," despite never having requested that relief and that their credit scores had declined as a result of Wells Fargo's actions. When these borrowers submitted notices of dispute to the credit reporting agencies, Wells Fargo was obligated under FCRA, 15 U.S.C. § 1681a, to adequately investigate and correct the matter. Wells Fargo did not, violating FCRA § 1681a(b).

143.    Many borrowers were in the process of seeking a HAMP loan modification or had already received such relief. In an article by Pulitzer Prize-winning journalist Gretchen Morgenson, writing for NBC News, a Wells Fargo representative explained that it was Wells Fargo's practice to unilaterally place loans of borrowers who were in the modification process into forbearance status under the CARES Act, without such borrowers' prior knowledge or consent.[52] By placing borrowers into forbearance, Wells Fargo risked rendering them ineligible for the HAMP loan modifications that they would otherwise have been eligible to receive.

144.    Tragically, the harms have disproportionately impacted borrowers of color. Borrowers of color were twice as likely to miss mortgage payments during the early months of the pandemic. When borrowers attempted to refinance during the historic low interest rates of 2020, Wells Fargo approved refinancing applications for only 47% of Black homeowners, compared to 72% of White homeowners. According to Bloomberg's look at federal data, the racial wealth gap between White and Black Americans increased by a mind-boggling $20 trillion during the pandemic.

---

[52] Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him*, NBC NEWS, (July 16, 2020), https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

145.    The representative Plaintiffs' experiences further demonstrate some of the harms caused by the unilateral forbearance scheme.

**D.    Wells Fargo Placed Plaintiffs' Loans in Forbearance Without Their Consent**

**1.    Pamela Delpapa, a California resident.**

146.    One of the many victims of Wells Fargo's Faulty Forbearance Program is Plaintiff Pamela Delpapa. Ms. Delpapa lost her job at a nail salon due to COVID-19.

147.    Concerned about whether she would be able to make her mortgage payments, she called Wells Fargo—her mortgage servicer—to learn about her options.

148.    At that point, she was paid in advance for five months; in fact, the Wells Fargo representative she spoke to said she would *not* be a candidate for assistance at this time, but should feel free to call back in five months. She relied on this misrepresentation to her detriment.

149.    Unbeknownst to her, after that call Wells Fargo placed her loan in forbearance anyway. She only found out when she called her mortgage broker to refinance her home. Her mortgage broker told she could not refinance because her loan was in forbearance. She was understandably shocked.

150.    When she called Wells Fargo to complain, a Wells Fargo employee told her that when a borrower calls the bank and pushes the button directing them to information on COVID mortgage options, the bank automatically places those accounts in forbearance.

151.    Ms. Delpapa never requested that her mortgage be placed in forbearance. In a June letter to her, Wells Fargo admitted it placed her mortgage in forbearance without her consent and without discussing it with her "in detail":

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

> We found that On March 17, 2020, your account was set up for the 90-day forbearance option that was being offered to our customers. After listening to the phone call between you and our representative, we discovered that you never requested to be placed on the plan nor was the plan discussed with you in detail. On May 21, 2020, we updated the account and removed your account from the forbearance plan as you requested. Additionally we updated our reporting to ensure the forbearance comment was removed.

152. The bank's letter also conceded that by reporting her mortgage as in forbearance, Wells Fargo may have damaged Ms. Delpapa's ability to get consumer credit, as she experienced firsthand:

> The credit bureaus have independent credit score models. We cannot speculate how any of their proprietary models account for this; however, we do know, generally, those are not used for underwriting of credit. If you apply for credit while on a forbearance plan, however, the lender will see the "account in forbearance" comment on your credit report, and the fact that your account is in forbearance may impact your ability to qualify for new credit or refinance.

153. Since then, Ms. Delpapa attempted to refinance her loan to capitalize on historically low interest rates. Despite having been prepaid for the period she was in forbearance, that is, despite *not missing a single payment*, she was unable to refinance for months as a result of the forbearance notation.

154. This delay in refinancing cost Ms. Delpapa hundreds of dollars, as she remained locked into her higher interest payment with Wells Fargo for months after Wells Fargo represented that they had removed her account from a forbearance plan she never requested.

**2. Samara Green, a Georgia resident.**

155. Plaintiff Samara Green has a mortgage serviced by Wells Fargo.

156. On or about June 15, 2020, a representative from Wells Fargo called Ms. Green to address concerns Ms. Green had about her escrow payments. During this call, the Wells Fargo representative talked to Ms. Green about the option of placing her mortgage in forbearance.

157. Ms. Green told the Wells Fargo representative that she was not interested in Wells Fargo's forbearance program.

158. Before the June 15, 2020 phone call, Ms. Green had already made a mortgage payment to Wells Fargo on June 12, 2020.

159. However, unbeknownst to Ms. Green, her June 12, 2020 payment was not timely applied to her mortgage or her escrow account because Wells Fargo placed her mortgage in forbearance without her knowledge or consent.

160. On or around June 26, 2020, Ms. Green called Wells Fargo again to further inquire about fees and the application of escrow payments. During the phone call, the Wells Fargo representative informed Ms. Green that her mortgage had been placed in forbearance.

161. Ms. Green informed the representative that she had never requested nor consented to forbearance on her mortgage, that Wells Fargo had acted without her knowledge or consent, and demanded that her account be taken out of forbearance.

162. Ms. Green received a letter from Wells Fargo dated July 1, 2020 which memorialized this conversation. As the letter recounted, Wells Fargo placed Ms. Green's mortgage into forbearance though she "did not request this."

163. Wells Fargo admits in the letter that though Ms. Green called Wells Fargo to discuss her escrow account, Wells Fargo instead suspended all her mortgage payments.

164. Wells Fargo never informed Ms. Green, either on the June 26, 2020 phone call or in the July 1, 2020 letter, that Wells Fargo had failed to apply her June 12, 2020 payment to her mortgage or her escrow account.

165. On or about July 15, 2020, Ms. Green went to a Wells Fargo bank branch in order to make another mortgage payment to Wells Fargo.

166. However, when Ms. Green spoke with the Wells Fargo representative at the bank branch, she was told that the amount due on her mortgage was over $3,500, that her prior June payment had not been applied to her mortgage or her escrow, and that her mortgage had been placed in forbearance.

167. After Ms. Green's visit to the Wells Fargo branch, she immediately called Wells Fargo and spoke to a representative. The Wells Fargo representative confirmed that Ms. Green's mortgage

41

1    payment had not been applied to her mortgage or her escrow because she had been placed in forbearance.

2    The Wells Fargo representative told Ms. Green that her payment had been placed in an "unapplied fund"

3    and that those payments would be reversed because they could not be applied to her mortgage or escrow

4    while she was in forbearance.

5        168.    Wells Fargo placed Ms. Green's loan in forbearance without her consent and incorrectly

6    reported this to credit reporting agencies.

7        169.    Because Wells Fargo failed to timely apply her June 12, 2020 payment, Wells Fargo

8    reported to the Credit Reporting Agencies that Ms. Green was 30 days late on her mortgage for the

9    month of June 2020.

10       170.    While Wells Fargo did, ultimately, apply the June 12, 2020 payment to her mortgage,

11   they did so months late and after reporting Ms. Green as in forbearance.

12       171.    Ms. Green did not request a forbearance of her mortgage loan payment obligations, did

13   not contact Wells Fargo about a forbearance, and she did not—and does not—want a forbearance of her

14   mortgage payment obligations.

15       **3.    Patrick Healy, a California resident.**

16       172.    Mr. Healy's residential property located in San Marcos, California is encumbered by a

17   lien securing repayment of a mortgage that is issued serviced by Wells Fargo.

18       173.    In June of 2020, Mr. Healy discovered that Wells Fargo had been persistently reporting

19   inaccurate credit information about this mortgage loan account with Wells Fargo. Specifically, Wells

20   Fargo had been falsely reporting that his mortgage loan was in forbearance and that no payments had

21   been made on the account for months, at least as of April 2020.

22       174.    In a letter from Wells Fargo dated June 3, 2022, Wells Fargo incorrectly stated that

23   Mr. Healy "had asked for help with [his] mortgage payments because [he] was facing a financial

24

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

hardship as a result of the [COVID-19] crisis." The letter then went on to say, "To help, we suspended your mortgage payments for three months, but you've still been making your payments."

175. However, Mr. Healy never requested or agreed to a forbearance on his mortgage loan or any type of deferment.

176. During the purported period of forbearance, Mr. Healy has been making each monthly mortgage payment in full and on time.

177. Mr. Healy contacted Wells Fargo about the forbearance status on the loan that he did not request. In response, in a letter from Wells Fargo, dated June 15, 2020, Wells Fargo stated "Thank you for updating us on your situation. We're confirming that we've canceled the short-term payment suspension."

178. In fact, in a letter from Wells Fargo dated July 6, 2020, Wells Fargo admitted that Mr. Healy did not request a forbearance. Specifically, Wells Fargo stated: "We found that when you first spoke with us you requested information about the forbearance plan. We can confirm you did not request or accept the plan at that time and the plan was added to the account in error." The letter further stated in part, "We apologize for any confusion or frustration regarding how your credit report may have been impacted due to the COVID-19 pandemic."

179. Unfortunately, as a result of the false mortgage forbearance reporting by Wells Fargo, Mr. Healy was deprived of a home mortgage refinance loan with another lender who declined to extend Mr. Healy credit in light of Wells Fargo's reporting of the account in forbearance with no recent payment made.

180. After the inaccurate credit reporting with Experian was disputed, Experian in response indicated that following their "reinvestigation" of the dispute, "The information you disputed has been updated," and the credit report, generated on June 20, 2020, then showed that the mortgage account was current on payments from January to June 2020.

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

181.    Only after the dispute was correct was Mr. Healy able to secure new credit that has previously been denied for months.

**4.    Brett Jacob, a New York resident.**

182.    Plaintiff Brett Jacob has a mortgage serviced by Wells Fargo.

183.    On or about March 16, 2020, Mr. Jacob called Wells Fargo and asked that his mortgage payments no longer be automatically debited from his bank account.

184.    Mr. Jacob requested that he be permitted to make payments at a time and in a manner of his own choosing.  Wells Fargo honored Mr. Jacob's request and, a few days later, Mr. Jacob received a letter from Wells Fargo dated March 20, 2020 confirming that Wells Fargo had "completed your request to suspend your automatic mortgage payments."

185.    However, approximately one week later, Mr. Jacob received a second letter from Wells Fargo dated March 26, 2020.  This letter informed Mr. Jacob, much to his surprise, that Wells Fargo had placed his mortgage into forbearance for six months.  The letter stated that his monthly mortgage obligations had been suspended until October 1, 2020.

186.    Mr. Jacob never requested that Wells Fargo place his mortgage into forbearance.

187.    Since being placed in forbearance, Mr. Jacob has tried to make mortgage payments, but Wells Fargo suspended his online payment option.

188.    Further, though Wells Fargo assures its customers otherwise, the forbearance that he did not request is reflected on his credit report.  Mr. Jacob filed a written notice of dispute with Experian on September 9, 2020.

189.    After Wells Fargo placed him in forbearance, Mr. Jacob attempted to secure a small-business loan but was denied, at least in part because the lender pulled his credit report and saw that his mortgage had been placed in forbearance.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

190.     In addition, Mr. Jacob's attempt to refinance his mortgage and to obtain a lower interest rate on his mortgage was denied because Wells Fargo placed his mortgage into forbearance without his consent.

191.     Wells Fargo placed Mr. Jacob's loan in forbearance without his consent and incorrectly reported this to credit reporting agencies such that it appears on Mr. Jacob's credit report.

192.     Mr. Jacob disputed this inaccurate credit reporting with Experian. In response, Experian added a comment to Mr. Jacob's credit report, generated on September 25, 2020, that opined, "The information you disputed has been verified as accurate; however, information unrelated to your dispute has been updated."

193.     Mr. Jacob disputed the forbearance notation, as he had never requested a forbearance. Rather than investigate whether it had erred in placing Mr. Jacob into a forbearance, Wells Fargo merely confirmed to Experian that it *had* placed Mr. Jacob into a forbearance. This paltry investigation is inadequate – akin to a debt collector only investigating whether a disputed debt had been paid, and not whether they had reported it against the right debtor.

194.     The credit reporting concerning the forbearance was incorrect, as Mr. Jacob did not request a forbearance of his mortgage loan payment obligations, did not contact Wells Fargo about a forbearance, and did not—and does not—want a forbearance of his mortgage payment obligations.

**5.     Charles Johnson, a California resident.**

195.     Plaintiff Charles Johnson has a mortgage serviced by Wells Fargo.

196.     At the end of March 2020, Mr. Johnson called Wells Fargo and asked to be placed into the forbearance program, to receive short-term payment relief for his mortgage account.

197.     Per his request, Mr. Johnson's forbearance period was to last three months, from April through June 2020.

45

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

198.    Mr. Johnson received a letter from Wells Fargo dated April 6, 2020 confirming that they had "suspended [his] obligation to make monthly mortgage payments for three months" and that Mr. Johnson needed to resume his "regular mortgage payment schedule beginning on July 1, 2020."

199.    Wells Fargo sent Mr. Johnson a letter dated May 26, 2020 informing him that his account was due for two payments "for the month(s) of April 1, 2020 through May 26, 2020."

200.    Concerned by this correspondence, Mr. Johnson called Wells Fargo and spoke to a customer representative and asked specifically to be removed from the program when his three-month period ended.

201.    He also asked about the process of resuming payments when his forbearance period ended on July 1, 2020.

202.    Mr. Johnson did not ask that his forbearance period be extended; in fact, he requested the exact opposite.

203.    Despite this conversation, Mr. Johnson received a letter from Wells Fargo dated June 17, 2020, asking Mr. Johnson if he wished to extend his period of forbearance for another three months.

204.    Mr. Johnson did not want the period of forbearance be extended, and since he already called Wells Fargo he expected that he would be taken out of the forbearance program.

205.    However, in a letter from Wells Fargo dated July 8, 2020, Mr. Johnson was informed that Wells Fargo had yet again "suspended [his] mortgage payments for an additional three months." Mr. Johnson was told that he would not need to resume his mortgage payments until October 1, 2020.

206.    Mr. Johnson made a $1,446.80 mortgage payment on or about July 1, 2020 which Wells Fargo accepted.

207.    However, Wells Fargo failed to apply Mr. Johnson's July 1, 2020 payment to his mortgage account.

46

**SECOND AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

208. Mr. Johnson made a $1,446.80 mortgage payment on or about August 1, 2020 which Wells Fargo accepted.

209. However, Wells Fargo failed to apply Mr. Johnson's August 1, 2020 payment to his mortgage account, and decrease his principal and interest.

210. Mr. Johnson called Wells Fargo on or about July 16, 2020, told a customer service representative that he never requested that his forbearance period be extended, and requested to be removed from the forbearance program.

211. Wells Fargo did not provide Mr. Johnson with answers to his questions nor was he told that he was removed from the forbearance program.

212. Instead, Mr. Johnson was told to not make a payment on his mortgage and that he would be receiving further correspondence.

213. Mr. Johnson did not receive any further correspondence regarding the status of his mortgage account.

214. Mr. Johnson called Wells Fargo three additional times—on or about August 6th, 7th, and 11th—but Wells Fargo was not able to tell Mr. Johnson that he had been removed from the forbearance program.

215. Because Mr. Johnson's mortgage was placed in an extended forbearance program without his consent and without his knowledge, Wells Fargo incorrectly reported to the credit reporting agencies that his mortgage was in forbearance after July 1, 2020 and until October 1, 2020.

216. Mr. Johnson's credit score dropped by 13 points after July 1, 2020 as a result of Wells Fargo's incorrectly reporting to the credit reporting agencies that his mortgage was in forbearance.

217. Wells Fargo placed Mr. Johnson's loan in a second forbearance without his consent, and incorrectly reported this to credit reporting agencies such that it appears on Mr. Johnson's credit report.

47

**SECOND AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

218.     Wells Fargo also incorrectly reported the total balance of Mr. Johnson's mortgage, failing to account for the payments made for the months of April 2020 and May 2020.

219.     Further, despite placing Mr. Johnson unwillingly into forbearance during these months and taking Mr. Johnson's payments, Wells Fargo reported to the credit reporting agencies that Mr. Johnson's mortgage balance had increased from $141,175 in April 2020 to $143,288 in June 2020.

220.     As such, Mr. Johnson suffered damages to his credit and reputation.

221.     Further, Wells Fargo's extension of Mr. Johnson's forbearance without his request, failure to account for the payments he made, incorrect reporting to the credit bureaus, and to date failure to remedy the issues, are continuously causing Mr. Johnson mental anguish, embarrassment, and stress.

**6.     Renrick and Vivian Robinson, Texas residents.**

222.     The Robinsons' residence, in Grand Prairie, Texas, is encumbered by a Veterans Administration mortgage, which on information and belief was originated by Wells Fargo, refinanced by Wells Fargo, and is serviced by Wells Fargo.

223.     On March 20, 2020, Ms. Robinson called Wells Fargo to discuss a potential refinance, to take advantage of the historically low prevailing interest rates. The Wells Fargo representative told her about the forbearance program and asked if she wanted to receive some literature on forbearance relief. Ms. Robinson agreed to accept the literature, but expressly stated that she was not accepting forbearance.

224.     As Wells Fargo explained in a letter sent to the Robinsons months later, the customer service representative added the coding on the Robinsons' loan to have the informational packet sent, however, this also placed their mortgage into forbearance.

225.     When the Robinsons received the information, they reviewed it together. They decided that they did not want or need a forbearance and threw away the notice. However, Wells Fargo had already placed them into a forbearance.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

226.    The Robinsons discovered this when Mr. Robinson applied for a personal line of credit from American Express, seeking the travel benefits and perks associated with that credit card. He was denied because he was in forbearance.

227.    Shocked, the Robinsons called Wells Fargo and demanded to be removed from forbearance.

228.    Although Wells Fargo represented that they had been removed, Mr. Robinson's application for the personal line of credit was again denied due to the forbearance code on his credit report. Ultimately, he was only able to secure the personal line of credit after sending verification of his income.

**7.      Jose Urista, a California resident.**

229.    Plaintiff Urista has a residential mortgage serviced by Wells Fargo for a property located in El Cajon, California.

230.    Mr. Urista is currently in a Chapter 13 Bankruptcy Case in the Southern District of California Bankruptcy Court with case number 19-00910-LA13.

231.    On or about mid-March of 2020, after being contacted by Wells Fargo regarding offers of COVID-19 relief, Mr. Urista's spouse clicked on an informational link on Wells Fargo's website which offered only to "provide more information" about possible forbearance options.  However, in response, Wells Fargo provided a temporary suspension of Mr. Urista's mortgage payments, without contacting Mr. Urista's known bankruptcy attorney.

232.    Neither Mr. Urista nor his spouse wanted any mortgage payment suspension or forbearance.

233.    Mr. Urista contacted Wells Fargo about the unwanted forbearance status on the loan.

49

234.     Although Mr. Urista would have liked to obtain refinancing of the mortgage loan at historically low rates during the COVID-19 pandemic, Mr. Urista was aware that the forbearance would prevent him from obtaining refinancing.

235.     The forbearance status of Mr. Urista's loan was disseminated through Wells Fargo's filing, in Mr. Urista's bankruptcy proceeding, a misleading Notice of Temporary Forbearance. That notice falsely stated that "due to a recent financial hardship resulting directly or indirectly from the COVID-19 emergency, the Debtor [Mr. Urista] has requested, and [Wells Fargo] has provided a temporary suspension of mortgage payments."

## VI.     CLASS ACTION ALLEGATIONS

236.     Plaintiffs bring this complaint on behalf of themselves and all others similarly situated under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), or alternatively 23(b)(4). The nationwide Class that Plaintiffs seek to represent is defined as follows:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage into forbearance or continued forbearance without receiving the borrower's request or continued consent for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

237.     In addition, Plaintiffs Delpapa, Johnson, Healy and Urista seek to represent the following California Class:

> All residential mortgage for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in California into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

238.     In addition, Plaintiff Green seeks to represent the following Georgia Class:

> All residential mortgage for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in Georgia into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

239.    In addition, Plaintiff Jacob seeks to represent the following New York Class:

All residential mortgage for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in New York into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

240.    In addition, Plaintiffs Renrick and Vivian Robinson seek to represent the following Texas Class:

All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in Texas into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

241.    Excluded from the Classes are Wells Fargo's officers, directors and employees; the judicial officers and associated court staff assigned to this case; and the immediate family members of such officers and staff.

242.    **Numerosity**: The members of the Classes are so numerous that joinder of all members would be impractical. Wells Fargo is one of the nation's largest home lenders and servicers, and media reports indicate borrowers in at least 14 states have experience non-requested forbearances. The Consumer Financial Protection Bureau has documented dozens of complaints. Wells Fargo recently reported to the United States Senate that approximately 1,600 borrowers had called to complain about being placed into unwanted forbearances. Based on the elevated volume of Wells Fargo's borrowers placed into forbearances, when compared to its industry peers, Plaintiffs estimate that hundreds of thousands of forbearances were the result of Wells Fargo's faulty program.

243.    **Commonality and Predominance**: Common questions of law and fact predominate over any questions affecting only individual members of the Classes. For Plaintiffs and the Classes, the common legal and factual questions include, but are not limited to the following:

A.    Whether Wells Fargo negligently or intentionally enrolled customers in forbearance programs without their consent;

B.    Whether Wells Fargo has breached terms implied in its contracts with Plaintiffs and the Class Members;

C.    Whether Wells Fargo's actions or inactions violated the consumer protection statutes invoked herein;

D.    Whether Plaintiffs and the Class members were damaged by Wells Fargo's conduct and, if so, the appropriate amount of damages;

E.    Whether, because of Wells Fargo's misconduct, Plaintiffs and the Classes are entitled to equitable and declaratory relief, and, if so, the nature of such relief.

244.    **Typicality**: The representative Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all the members of the Classes have been injured by the same wrongful practices of Wells Fargo. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Classes and are based on the same legal theories.

245.    **Adequacy**: Plaintiffs will fully and adequately assert and protect the interests of the Classes, and have retained class counsel who are experienced and qualified in prosecuting class actions. None of the Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Classes.

246.    **Predominance and Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class members are likely in the hundreds of millions of dollars, the individual damages incurred by each Class member are too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if

**SECOND AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

1  every member of the Classes could afford individual litigation, the court system would be unduly

2  burdened by individual litigation of such cases.

3       247.    Further, individual members of the Classes do not have a significant interest in

4  individually controlling the prosecution of separate actions, and individualized litigation would also

5  result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to

6  all of the parties and the court system because of multiple trials of the same factual and legal issues.

7  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude

8  its maintenance as a class action. In addition, Wells Fargo has acted or refused to act on grounds

9  generally applicable to the Classes and, as such, final injunctive relief or corresponding declaratory relief

10  with regard to the Class members as a whole is appropriate.

11       248.    Wells Fargo has, or has access to, address and/or other contact information for the Class

12  members, which may be used to provide notice of the pendency of this action.

13  

14  
## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

15  **Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") on Behalf of Plaintiffs and the Nationwide Class**

16       249.    Plaintiffs incorporate by reference every prior and subsequent allegation of this

17  Complaint as if fully restated here.

18       250.    This claim is brought by Plaintiffs against Wells Fargo & Co. and Wells Fargo Bank

19  N.A. for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of

20  18 U.S.C. § 1961, et seq.

21       251.    Section 1962(c) makes it "unlawful for any person employed by or associated with any

22  enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

23  participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

24  racketeering activity …" 18 U.S.C. § 1962(c).

53

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

252.    At all relevant times, each Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

253.    WFC and Wells Fargo Bank conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), as described herein.

254.    Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue under 18 U.S.C. § 1964(c) as they were and are injured in their business and/or property "by reason of" the RICO Act violations described herein.

255.    Plaintiffs demand the applicable relief set forth in the Prayer for Relief below.

**A.    WFC, Wells Fargo Bank, and Black Knight Comprised an Enterprise Whose Activities Affect Interstate or Foreign Commerce.**

256.    Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

257.    Based upon Plaintiffs' current knowledge and belief, the following persons constitute an associated in fact enterprise that will be referred to herein as the "Fraudulent Forbearance Enterprise:" (1) WFC; (2) Wells Fargo Bank; and (3) vendors, including (without limitation) Black Knight, Inc., that created, maintained, and implemented the systems and processes used by Wells Fargo to impose unrequested forbearances and to voluntarily repurchase GSE backed loans that had been placed into unrequested forbearances.

258.    The Fraudulent Forbearance Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

259.    The members of the Fraudulent Forbearance Enterprise function as a continuing unit and share the common purpose of maximizing their profits by placing borrowers into CARES Act

forbearances, regardless of whether the borrower requested to be placed into such a plan. The Fraudulent Forbearance Enterprise is linked systematically through contractual relationships, financial ties, and parent/subsidiary relationships.

260.    Wells Fargo Bank has contracted with Black Knight Inc. for the purposes of using the MSP mortgage servicing system to identify loans to be placed into unsolicited forbearance. Wells Fargo Bank contracts with Black Knight Inc. for the purposes of using Black Knight's Loss Mitigation services to identify borrowers who can be placed into deferment post-forbearance, entitling Wells Fargo to GSE incentive payments.

261.    While all Enterprise members participate in and are part of the Fraudulent Forbearance Enterprise, they each also exist as separate and distinct entities apart from the Enterprise.

262.    WFC is a diversified financial services company organized under the laws of Delaware and registered as a financial holding company and a bank holding company under the Bank Holding Company Act of 1956, as amended.

263.    WFC provides banking, investment and mortgage products and services, as well as consumer and commercial finance through banking locations, ATMs, the internet and mobile banking.

264.    WFC conducts substantially all of its operations through its subsidiaries, including but not limited to Wells Fargo Bank, although WFC is a separate and distinct legal entity from its subsidiaries, including Wells Fargo Bank.

265.    A significant source of the funds WFC uses to pay dividends on its common and preferred stock and debt service on its debt is dividends from WFC's subsidiaries, including dividends from Wells Fargo Bank generated by the Wells Fargo Enterprise's fraudulent forbearance scheme.

266.    WFC uses funds it obtains from Wells Fargo Bank, including funds generated in connection with the Fraudulent Forbearance Enterprise, to satisfy WFC's financial obligations, including payments of principal and interest on WFC's debt.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

267. WFC and Wells Fargo Bank control, operate, and direct the affairs of the Fraudulent Forbearance Enterprise by, among other things, working with Black Knight to program their computer systems to identify borrower accounts for inclusion in the fraudulent forbearance scheme.

268. The Fraudulent Forbearance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity.

**B.     The Fraudulent Forbearance Enterprise Committed Thousands of Predicate Acts.**

269. Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth herein, Defendants have engaged, and continue to engage, in conduct violating each of these laws in order to effectuate their scheme.

270. As alleged herein, for the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to serving through the mail correspondence with some borrowers and correspondence regarding proposed loan retention workout options with respect to accounts placed into unauthorized forbearance status.

271. For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, including but not limited to loan data, proposed post-forbearance workout terms and agreements, false forbearance notices, false reporting to the GSMC's, as well as to the Securities and Exchange Commission, Federal Reserve Board, and the Office of the Comptroller of the Currency, among others, regarding loans Wells

Fargo subjected to its fraudulent forbearance scheme, as well as related email correspondence, monthly

mortgage statements and online account information, and telephone correspondence.

272. The matter and things sent by Defendants via the Postal Service, commercial carrier,

wire, or other interstate electronic media included, inter alia: false reports to credit reporting agencies

that borrowers requested forbearance and/or failure to report and/or disclose payment receipts; false,

deceptive and misleading written correspondence with borrowers; email correspondence; misleading

websites and mobile device electronic user interfaces that placed borrowers into forbearance with the

click of a single button without warning or explanation, as well as other data used to place accounts into

forbearance status and/or to inform third parties of borrowers' loans that Wells Fargo placed into

forbearance status without borrowers' consent; agreements; monthly mortgage statements; investor

reporting; correspondence; and payments.

273. Other matter and things sent through or received via the Postal Service, commercial

carrier, wire, or other interstate electronic media by Defendants include information or communications

in furtherance of or necessary to effectuate the scheme.

274. Defendants' misrepresentations, acts of concealment, and failures to disclose were

knowing and intentional and made for the purpose of deceiving borrowers, the GSEs, investors in GSE-

backed trusts, the credit markets, equity and debt investors in Wells Fargo, and other persons, regulators,

and entities to conceal or perpetuate Wells Fargo's unlawful scheme.

275. Because this is a class action, and there were numerous acts of mail and wire fraud that

were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all details of the

scheme with particularity. Therefore, Plaintiffs cannot plead the precise dates of all of Defendants' use

of the U.S. mail and interstate wire facilities, and corresponding acts of mail and wire fraud, as this

information cannot be alleged without access to Defendants' records.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

276.    Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and that the GSMCs, their investors, Defendants' debt and equity investors, the credit reporting agencies, and participants in credit markets that rely on the integrity of credit information, as well as the Plaintiffs and the other members of the class, relied upon or were injured by their and others' reliance upon the Defendants' misrepresentations and omissions. Had the GSMCs and their investors, Wells Fargo's debt and equity investors, the participants in the credit markets, and Plaintiffs and other members of the class, known that Wells Fargo's placement of loans into forbearance status without borrower authorization was used as a profit center and/or unlawful loss mitigation hedge, rather than to effectuate bona fide requested and agreed-to forbearance plans, they would have immediately halted Defendants' misconduct.

**C.    Pattern of Racketeering Activity.**

277.    The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past four years.

278.    Defendants began placing of borrowers' mortgage loans into unauthorized forbearances in March of 2020, which is within four years of Plaintiffs' filing of their original complaint in this case.

279.    Each of the Defendants has committed numerous acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and the other class members.

280.    The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). Wells Fargo continues to profit, by

resecuritizing billions of dollars in illicitly repurchased GNMA loans, and reaping the windfalls associated with servicing and holding those loans up until they are resecuritized.

281. As a direct and proximate result, Plaintiffs and class members have been injured in their business or property or both by the predicate acts, which make up the Defendants' patterns of racketeering activity.

282. Plaintiffs were injured by Wells Fargo's material omissions of fact and fraudulent placement of their loans into forbearance status, including credit damage, loss of access to credit markets and/or home equity lines of credit, an inability to refinance and costs associated with delayed refinancing, reputational damage, frustration, outrage, and various out-of-pocket costs, and other pecuniary damages and general damages.

**SECOND CAUSE OF ACTION**

**Violation of the Truth in Lending Act, 15 U.S.C. § 1601 et seq. ("TILA")
on Behalf of Plaintiffs and the Nationwide Class**

283. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

284. TILA requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights. In 2010, the Dodd–Frank Wall Street Reform and Consumer Protection Act amended the Truth in Lending Act ("TILA") to, among other things, require servicers to promptly credit mortgage payments. 15 U.S.C. § 1639f. 212.

285. This requirement is implemented through Regulation Z, which states that:

> "In connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall . . . (f)ail to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency …"

Reg Z., 12 C.F.R. § 226.36(i).

59

286. The Dodd–Frank Act amendments to the Truth in Lending Act ("TILA") also mandate that servicers credit periodic payments on consumer credit transactions secured by a consumer's principal dwelling as of the date of receipt. 15 U.S.C. § 1639f(a).

287. As demonstrated through the experiences of Plaintiffs Green and Johnson, Wells Fargo failed to timely credit payments.

288. In some instances, Wells Fargo reversed payments. In others, Wells Fargo accepted the payments, but did not credit those payments to the mortgage account. Instead, the payments were held, without the borrowers' knowledge or consent, in "unapplied funds" accounts.

289. TILA contains a private right of action for violations of these provisions. 15 U.S.C. § 1640(a). This cause of action extends to suits against entities who violate the provisions of TILA and who, at some point, owned the loan obligation. 15 U.S.C. § 1641(f). On information and belief, Wells Fargo voluntarily repurchased tens of billions of dollars of loans that had been placed into fraudulent forbearance, subjecting them to liability for TILA servicing violations for those loans.

### THIRD CAUSE OF ACTION

**Violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 22601 et seq. ("RESPA") on Behalf of Plaintiffs and the Nationwide Class**

290. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

291. RESPA, and the accompanying Regulation X, impose requirements on loan servicers who receive incomplete applications for loan modification. 12 C.F.R. § 1024.41. Guidelines relating to the CARES Act make clear that borrowers' inquiries into forbearance are incomplete applications for loan modification. Lending Letter 2020-02.

292. Generally, loan servicers are not to "evade the requirement to evaluate a complete loss mitigation application for all loss mitigation options available to the borrower by offering a loss mitigation option based upon" an incomplete application. 12 C.F.R. § 1024.41(c)(2)(i). However, upon

1   receipt of an incomplete application, a loan servicer may nonetheless offer a short-term payment

2   forbearance program based on that application. *Id.* § 1024.41(c)(2)(iii). "Promptly after offering" a

3   forbearance program, unless the borrower rejects the offer, "the servicer must provide the borrower a

4   written notice stating the specific payment terms and duration of the program or plan, that the servicer

5   offered the program or plan based on an evaluation of an incomplete application, that other loss

6   mitigation options may be available, and that the borrower has the option to submit a complete loss

7   mitigation application to receive an evaluation for all loss mitigation options available to the borrower

8   regardless of whether the borrower accepts the program or plan." *Id.*

9       293.   Plaintiffs Delpapa and Green never received this notice, in contravention to RESPA and

10  Regulation X.

11      294.   In addition to the above information, servicers are required to send an Evaluation Notice

12  along with the offer of a forbearance program. The Evaluation Notice template provided by Fannie Mae

13  is optional, though "it reflects a minimum level of information that the servicer must communicate and

14  illustrates a level of specificity that complies with the requirements of this Guide." Fannie Mae Servicing

15  Guide D2-2-05.

16      295.   If not using the template, the notice to be sent communicating the offer of forbearance

17  must: "Be written in clear, concise language; (i) identify whether the borrower is receiving an offer of a

18  workout option and, if so, the decision for the workout option that is being offered to the borrower;

19  (p)rovide the steps the borrower must take to participate in or accept any offer;" and "provide a 14-day

20  time frame for the borrower to accept or decline the workout option or inform the servicer of the

21  borrower's intent to accept the workout option, if applicable." Servicing Guide D2-2-05.

22      296.   In the instances in which Wells Fargo did send a notice, that notice was woefully

23  inadequate. It did not provide any timeline for acceptance. Instead, it informed the borrower that the

24

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

bank was "confirming the following short-term payment relief for [their] account" – relief that had been unilaterally imposed by the bank.

297.    The notice stated that borrowers could terminate the forbearance either by continuing to make payments, or by contacting Wells Fargo. However, as Plaintiff Johnson discovered, this was not so. Instead of shortening or canceling forbearance plans after receiving payments or requests to terminate, forbearance plans were *extended*, in direct contravention to the CARES Act.

298.    The CARES Act expressly states, in a subsection titled "Requirements for Servicers," that a forbearance "may be extended for an additional period of up to 180 days **at the request of the borrower**, provided that, the borrower's request for an extension is made during the covered period, and, at the borrower's request, **either the initial or extended period of forbearance may be shortened.**" Section 4022(c)(1) of the CARES Act, Pub. L. No. 116-136, 134 Stat. 281, 490 (2020) (codified at 15 U.S.C. § 9056(c)(1)) (emphasis added).

299.    In addition, as alleged above, Fannie Mae's Evaluation Notice template includes the following sections regarding the impacts of forbearance:

We will not pursue foreclosure during the forbearance plan term. However, the terms of your mortgage remain unchanged. By not making your mortgage payments during the plan's term you will become more delinquent and your credit score may be impacted. For more information refer to the **Additional Forbearance Plan Information and Legal Notices**.

and

### Additional Forbearance Plan Information and Legal Notices

**Credit Reporting:**
- We will continue to report the delinquency status of your mortgage as well as your entry into a forbearance plan to credit reporting agencies in accordance with applicable law.
- **CREDIT REPORTING AGENCIES MAY CONSIDER THE ENTRY INTO A FORBEARANCE PLAN AS AN INCREASED CREDIT RISK. HOWEVER, A FORECLOSURE WOULD HAVE A MORE NEGATIVE IMPACT TO YOUR CREDIT SCORE.**

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

300.     Wells Fargo's notice provided no warnings about the potential credit impacts of being placed in forbearance.

301.     Not only did Wells Fargo omit such warnings when sending notices to borrowers after placing them in unwanted forbearance plans, when those borrowers contacted Wells Fargo about this misconduct, the bank provided assurances which this Court has already instructed them to correct. In fact, as Plaintiffs Delpapa, Jacob, and Johnson learned, being placed into forbearance had a serious and negative impact on their credit score and creditworthiness.

302.     The CARES Act does contain an amendment to the notice requirements of Regulation X, granting greater flexibility to loan servicers, but only with regard to deferrals, not forbearance. *See* 12 U.S.C. § 1024.41(c)(2)(v). Congress thus made a clear distinction between a loan deferral, and forbearance. The latter is an important financial decision that borrowers should make for themselves, and only when armed with all the necessary information. RESPA contains a private right of action for violations of this provision. 12 C.F.R. § 1024.41(a). ("A borrower may enforce the provisions of this section [Regulation X] pursuant to section 6(f) of RESPA (12 U.S.C. 2605(f )"). Plaintiffs allege a violation of Regulation X for the proposed nationwide class, as even those borrowers who received any notice received notices that were woefully inadequate.

**FOURTH CAUSE OF ACTION**

**Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA")
on Behalf of Plaintiffs and the Nationwide Class**

303.     Plaintiffs repeat and reallege the allegations in this complaint.

304.     Plaintiff Jacob is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

305.     Wells Fargo is a "furnisher" of consumer information as defined by 12 C.F.R. § 1022.41(c) and as described throughout the Fair Credit Reporting Act ("FCRA"), as Wells Fargo regularly reports consumer account information to the credit reporting agencies for inclusion in credit reports.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

306. Wells Fargo willfully violated 15 U.S.C. § 1681s-2(b) by failing to adequately investigate and correct inaccurate credit reporting information with the credit reporting agencies following Plaintiff Jacob's formal reinvestigation requests with the credit reporting agencies under 15 U.S.C. § 1681i.

307. Plaintiffs and the putative class members in this case have had their credit information compiled and furnished by Wells Fargo regarding their mortgage loans indicating falsely that Plaintiffs' and the putative class members' loans are in forbearance when Plaintiffs and the putative class members did not request forbearance.

308. Wells Fargo knew, or should have known, that Plaintiffs and the class members did not request or affirmatively consent to the mortgage loan forbearances that Wells Fargo reported to the credit reporting agencies.

309. Despite the fact that Wells Fargo knew or should have known that it placed borrowers into mortgage forbearances that they did not request or consent to, Wells Fargo had a policy of reporting the forbearance in the comments section of Plaintiffs' and the class members' credit reports.

310. Plaintiff Jacob submitted a dispute letter to Experian on September 9, 2020, disputing Wells Fargo's reporting of his mortgage loan account as "in forbearance" when Plaintiff Jacob never requested or authorized such forbearance.

311. Wells Fargo received notice of Plaintiff Jacob's dispute from the credit reporting agencies and failed to reasonably investigate the dispute.

312. Wells Fargo failed to conduct and report the results of a complete investigation into each dispute raised by Mr. Jacob. Wells Fargo failed to promptly delete, modify, or block reporting of inaccurate, incomplete, or unverifiable information in response to each dispute raised by Mr. Jacob.

313. Wells Fargo has breached its duties as set forth in 15 U.S.C. § 1681s-2(a) by failing to adequately investigate and fully correct inaccurate credit reporting information with the credit reporting agencies following Mr. Jacob's dispute of the credit reporting errors.

314.    Mr. Jacob has incurred actual damages and has suffered physically, mentally, and emotionally as a result of Wells Fargo's willful violations of the Fair Credit Reporting Act.

315.    Based on Wells Fargo's violations of 15 U.S.C. § 1681s-2(b), Plaintiffs and the class members are entitled to actual damages, costs, and attorneys' fees pursuant to 15 U.S.C. § 1681o.

316.    Moreover, as a result of each and every negligent violation of the FCRA, Plaintiffs and the class are entitled to statutory damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681o.

317.    Plaintiffs and the class members are also entitled to statutory damages, punitive damages, and reasonable attorneys' fees for each and every of Wells Fargo's willful violation of the FCRA pursuant to 15 U.S.C. § 1681n(a).

## FIFTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing on Behalf of Plaintiffs and the Nationwide Class

318.    Plaintiffs brings this claim on behalf of themselves and the Nationwide Class.

319.    Plaintiffs, the Class members, and Wells Fargo were parties to contracts, referred to as Deeds, Deeds of Trust, or Securities (collectively, "Deeds"). Wells Fargo may be either a signatory to those contracts as the mortgage lender, as in the case of the Robinsons, or an assignee of that contract as mortgage servicer. For instance, in Ms. Delpapa's case, Wells Fargo, as the loan servicer, assumed the obligations of the original lender in her Deed:

> with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

320.    In either case, those Deed's for GSE-backed loans are substantially identical for all borrowers in material respects. The covenant of good faith and fair dealing is a common foundation inherent in all of the Deeds between the Plaintiffs, Class members, and Wells Fargo.

321.    In addition to the above language contained in the deeds, some borrowers, had HAMP agreements with Wells Fargo, which Wells Fargo violated by unilaterally changing those terms.

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

322.     Every contract contains an implied covenant of good faith and fair dealing. The implied covenant obligates the parties to cooperate so that each party may obtain the full benefit of performance of the contract. The duty of good faith and fair dealing means that parties may not interfere with or fail to cooperate in the other party's performance. Neither party may engage in conduct that impairs or prevents the other party from enjoying the benefits of the contract or engage in conduct that prevents the other party from performing under the contract.

323.     Wells Fargo impliedly covenanted as a servicer that it would undertake its duties in good faith. In particular, Wells Fargo has a contractual duty under the Deed to apply payments it receives from borrower to interest, principal, and escrow items, in that order. Borrowers are obliged to timely pay the amounts due for those items.

324.     By placing the Class members in forbearance without their consent, Wells Fargo frustrated and interfered with Class Members' ability to perform under the Deeds and failed to cooperate with the Class members' performance of their contracts.

325.     No reasonable party would expect that Wells Fargo would put their mortgage into forbearance without their consent.

326.     Wells Fargo likewise engaged in conduct that was contrary to the spirit of the contracts and the Class members' rights thereunder. Wells Fargo lacked diligence in performing its duties, acted recklessly in its servicing of the Class members' mortgages, and abused its power by placing loans in forbearance without consent for its own interest.

327.     By its actions, Wells Fargo engaged in conduct that was contrary to the spirit of the contracts, lacked diligence and constituted an abuse of its power.

328.     As a result of Wells Fargo's breaches of the covenant of good faith and fair dealing, Plaintiffs were injured. Their damages include, but are not limited to, damage to their credit including

66

increased borrowing costs, increased interest accrued as a result of the forbearance, and an inability to refinance or secure additional lines of credit.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment on Behalf of Plaintiffs and the Nationwide Class

329.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

330.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

331.    Plaintiffs and members of the Nationwide Class have conferred a benefit upon Wells Fargo which received benefits by placing Plaintiffs and the Nationwide Class into forbearance without their consent. By placing Plaintiffs' and members of the Nationwide Class' mortgages in forbearance, Wells Fargo continued to hold and service those mortgage loans, preventing Plaintiffs and the Class from refinancing with another institution, and thus increasing the value of the mortgage servicing rights.

332.    Wells Fargo's forcing Plaintiffs and the Nationwide class into forbearance without consent also provides a potential predicate for Wells Fargo to place GSE-backed mortgages in payment deferrals or repayment plans, making Wells Fargo eligible for GSE incentive payments of up to $1,000 per mortgage.

333.    Wells Fargo's forcing of Plaintiffs and the Nationwide class into forbearance without consent additionally capped Wells Fargo's potential obligations to make principal and interest advancements on loans that remained in the GSE trusts when nonperforming.

334.    As alleged *supra*, Wells Fargo's voluntary repurchase of loans from the GSE trust presents a substantial source of unjust profits. By placing the loans into forbearance, Wells Fargo simultaneously rendered those loans eligible for voluntary repurchase out of the GSE trusts, and distressed the value of the loans. Wells Fargo exercised the voluntary repurchase option at a historic rate, buying tens of billions of dollars of loans out of the GSE trusts, at par value. As the borrowers did

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

not request forbearance, these loans are easily resold or resecuritized at the normal traditional trading value of 5% to 10% above par after the borrowers become current.

335.    Wells Fargo's retention of these benefits is unjust because it placed those loans in forbearance without the consent of the Plaintiffs and the Nationwide class and in contravention of the requirements of the CARES Act.

336.    Damages in law alone would be inadequate to redress this wrong. Wells Fargo's profit incentives led to the faulty forbearance program, and nonrestitutionary disgorgement is necessary to deter and prevent future conduct. Wells Fargo's profits from placing borrowers into forbearance are not coextensive with the damages plaintiffs suffered, save for above-market interest payments made to Wells Fargo while borrowers were barred from refinancing. Further, while the consumer damage is capable of proof with sufficient certainty, Wells Fargo's profits are more certain and swiftly calculable. The future harm to consumers due to reduced credit scores, restricted access to credit, and inability to refinance, are less fixed than Wells Fargo's profits, and preventing Wells Fargo from retaining those profits is the only adequate remedy.

337.    As a result, the Plaintiffs and Nationwide class members are entitled to nonrestitutionary disgorgement of the benefits Wells Fargo has unjustly retained, in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

**California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200** *et seq.*
**Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, Urista, and the California Class**

338.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

339.    Plaintiffs Delpapa, Healy, Johnson, and Urista bring this claim on behalf of the California Class.

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

340.     California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices."  Wells Fargo engaged in unlawful and unfair business acts and practices in violation of the UCL as follows.

341.     Wells Fargo's nonconsensual forbearance program is unlawful under the UCL because it violates Sections 4022 and 4023 of the CARES Act, which require that a borrower affirmatively request that their mortgage be placed in forbearance and affirmatively acknowledge they are experiencing a hardship due to COVID-19, and that loan servicers only extend forbearance upon a borrower's request. Additionally, by failing to comply with federal guidance regarding the CARES Act, Wells Fargo's forbearance program violated Cal Civ. Code § 3273.11(a).

342.     Additionally, Wells Fargo's practices are unlawful because they violate Regulation N, "Mortgage Acts and Practices—Advertising," which forbids "any person to make any material misrepresentation, expressly or by implication, in any commercial communication, regarding any term of any mortgage credit product[.]" 12 C.F.R. § 1014.3. Wells Fargo violated Regulation N by failing to inform borrowers that they were placing their mortgages in forbearance without their consent, and by sending notices with inaccurate information regarding the impact of forbearances.

343.     Additionally, Wells Fargo violated Regulations X and Z, as alleged *supra*, by failing to timely credit loan payments and by failing to provide adequate notice to borrowers associated with the unilateral forbearance plans.

344.     Wells Fargo's conduct described herein threatens an incipient violation of California's consumer protection laws, violates the policy or spirit of such laws, and/or otherwise significantly threatens or harms competition by avoiding procedures intended by the Legislature to protect California's consumers, including under the California Consumer Credit Reporting Act, Cal. Civ. Code § 1785. 25, *et seq*., and the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.*

345. Wells Fargo's practices were also unfair under the UCL because placing borrowers' mortgages in forbearance without their consent is contrary to established public policy; immoral, unethical, oppressive or unscrupulous; and causes injury to consumers that outweighs its benefits.

346. The harm to Plaintiffs and Class members of being placed in a mortgage forbearance without their consent outweighs the utility, if any, of Wells Fargo's policies and practices.

347. Plaintiffs and the Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misconduct.

348. Pursuant to Cal. Bus. & Prof. Code § 17200, Plaintiffs and the Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices; any such orders or judgments as may be necessary to restore to Plaintiffs and the Class members any money acquired by unfair competition, including restitution, as provided in Cal. Bus. & Prof. Code §§ 17203 and 3345; public injunctive relief to prohibit future violations as alleged herein in the interest of protecting the California public; and any other just and proper relief available under the California UCL. To the extent these remedies are equitable, Plaintiffs seek them in the alternative to any adequate remedy at law they may have.

## EIGHTH CAUSE OF ACTION

**California Consumer Credit Reporting Act, Cal. Civ. Code § 1785. 25** *et seq.*
**Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, Urista, and the California Class**

349. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

350. Plaintiffs Delpapa, Healy, Johnson, and Urista bring this claim on behalf of the California Class.

351. The California Consumer Credit Reporting Act (CCRA) provides that a "person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." Cal. Civ. Code § 1785.25(a).

352. Wells Fargo, a "person" under the CCRA, furnished information on Plaintiffs' and Class Member's mortgage forbearances that it knew or should have known was incomplete or inaccurate to consumer credit reporting agencies.

353. Wells Fargo acknowledged in its form letter to Plaintiffs that it informed the consumer reporting agencies that their mortgage was in forbearance:

> plan. We also provided the credit bureaus with a comment code that says the account was in a forbearance plan. We have validated with FICO that this 'Account in Forbearance' code does not

354. Indeed, Johnson's credit report included a comment referencing his Wells Fargo account and stating, "Account in Forbearance."

355. The forbearance information reported by Wells Fargo was incomplete, inaccurate, or materially misleading because the Plaintiffs did not request that their account would be placed in forbearance, or for that forbearance to be extended, and the false information was negative to the Plaintiffs and Class members.

356. Plaintiffs suffered actual damage as a result of this violation because they were not able to pursue a refinancing or other forms of credit while in forbearance and for months after exiting those plans.

357. Wells Fargo's violation was willful under Cal. Civ. Code § 1785.31 because Wells Fargo acted with reckless disregard for the rights of the Plaintiffs and the Class in exploiting a statutory scheme meant to help, not further harm, borrowers.

358. As a result of Wells Fargo's negligent and willful violations of the CCRA, Plaintiffs seek all available remedies under the CCRA, including actual damages, court costs, loss of wages, attorney's fees, pain and suffering, and punitive damages.

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

## NINTH CAUSE OF ACTION

**Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.***
**Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, Urista, and the California Class**

359.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

360.    Plaintiffs Delpapa, Healy, Johnson, and Urista bring this claim on behalf of the California Class.

361.    The Rosenthal Fair Debt Collection Practices Act ("Rosenthal FDCPA") prohibits debt collectors from, among other things, making false, deceptive, or misleading representations in an effort to collect a debt. Cal. Civ. Code § 1788.

362.    Wells Fargo is a "debt collector" because it "regularly . . . engages in debt collection" as a mortgage servicer. *See* Cal. Civ. Code § 1788.2(c). Plaintiffs and Class members are persons, and their mortgage loans are "consumer debts" under the Rosenthal FDCPA. *Id.* § 1788.2(f), (g).

363.    The Rosenthal FDCPA incorporates by reference and prohibits violations of the federal Fair Debt Collection Practices Act. Cal. Civ. Code § 1788.17. That includes the Federal Act's prohibition of "false, deceptive, or misleading representation or means in connection with the collection of any debt[,]" including the false representation of the status of any debt, "communicating or threatening to communicate to any person credit information which is known or which should be known to be false," and the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. 15 U.S.C. § 1692e(2), (8), (10).

364.    Wells Fargo violated the Rosenthal FDCPA through its violations of Section 1692e of the Federal Act, when it provided false, deceptive, or misleading information about the mortgage debt of Plaintiffs and the Class.

72

**SECOND AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

365.    As a result of Wells Fargo's violation of the State and Federal Acts, Plaintiffs are entitled to actual and statutory damages, fees, and costs available under those Acts. *See* Cal. Civ. Code § 1788.17; 15 U.S.C. § 1692k.

### TENTH CAUSE OF ACTION

**Georgia Fair Business Practices Act O.C.G.A. §§ 10-1-390,** *et seq.*
**Asserted on behalf of Plaintiff Green & the Georgia Class**

366.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

367.    Wells Fargo committed unfair business acts and practices in violation of The Georgia Fair Business Practices Act, O.C.G.A §§ 10-1-390, et seq. ("GFBA"), by inaccurately reporting to credit reporting agencies that Plaintiff Green's and the purported Class Members' mortgages were "in forbearance" when Plaintiff and the putative Georgia Class Members never requested to be entered into Wells Fargo's COVID-19 mortgage forbearance program.

368.    Wells Fargo failed to disclose the consequences of the forbearance option, and moreover, involuntarily enrolled Plaintiff Green and the Georgia Class Members into this program.

369.    Wells Fargo's unconscionable, deceptive and/or unfair practices caused damages to Plaintiff Green and the Georgia Class Members who were unaware that their mortgages had been place in forbearance without their knowledge or consent.

370.    Defendants' foregoing deceptive acts and practices, including their omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

371.    As a direct and proximate result of Wells Fargo's unfair and deceptive practices, Plaintiff Green and the Georgia Class Members suffered and will continue to suffer actual damages.

372.    As a direct and proximate result of Defendants' deceptive acts and practices, including their omissions, Plaintiff Green and the Georgia Class Members have been damaged as alleged herein,

73

and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

373. In addition, Plaintiff Green and the Georgia Class Members seek equitable and injunctive relief against Wells Fargo on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

## ELEVENTH CAUSE OF ACTION

### New York Deceptive Trade Practices Act., N.Y. Gen. Bus Law § 340
### Asserted on behalf of Plaintiff Jacob & the New York Class

374. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

375. Wells Fargo committed unfair business acts and practices in violation of The New York General Business Law § 349, *et seq*., by inaccurately reporting to credit reporting agencies that Plaintiff Jacob's and the New York Class Members' mortgages were "in forbearance" when Plaintiff Jacob and the New York Class Members never requested to be entered into Wells Fargo's COVID-19 mortgage forbearance program.

376. Wells Fargo failed to disclose the consequences of the forbearance option, and moreover, involuntarily opted Plaintiff Jacob and the New York class members class into this program.

377. Wells Fargo's practices were consumer oriented because they essentially placed unwilling consumers, who wished to continue making payments on their loans and preserve their credit history, into forbearance, without even notifying such consumers or obtaining their permission.

378. Wells Fargo's unconscionable, deceptive and/or unfair practices caused damages to Plaintiff Jacob and the New York Class Members who were unaware that their mortgages had been place "in forbearance" without their knowledge or consent.

379. Defendants' foregoing deceptive acts and practices, including their omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

380. As a direct and proximate result of Wells Fargo's unfair and deceptive practices, Plaintiff Jacob and the New York Class Members suffered and will continue to suffer actual damages.

381. Defendants' practice was misleading in a material respect because it caused Plaintiff and the New York Class Members damages.

382. Plaintiff Jacob and the New York Class Members did not wish to opt into forbearance, and yet, that was not an option for them.

383. As a direct and proximate result of Defendants' deceptive acts and practices, including their omissions, Plaintiff Jacob and the New York Class Members have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

384. In addition, Plaintiff Jacob and the New York Class Members seek equitable and injunctive relief against Wells Fargo on terms that the Court considers reasonable and appropriate, as well as reasonable attorneys' fees and costs.

### TWELFTH CAUSE OF ACTION

**Texas Debt Collection Practices Act, Tex. Fin. Code § 392**
**Asserted on behalf of the Robinsons and the Texas Class**

385. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

386. Wells Fargo committed unfair business acts and practices in violation of the Texas Debt Collection Practice Act, ("TDCPA") Tex. Fin. Code § 342, *et seq.*, by inaccurately reporting to credit reporting agencies that the Robinsons and the Texas class members' mortgages were "in forbearance" when the Robinsons and the Texas Class Members never requested to be entered into Wells Fargo's COVID-19 mortgage forbearance program.

387. Renrick and Vivian Robinson are "consumers" as that term is defined by the TDCPA.

**SECOND AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

388.    The Robinson's relationship with Wells Fargo arose out of a "consumer debt" as that term is defined under the TCPA.

389.    Wells Fargo Bank NA regularly collects consumer debt and is a "debt collector" as that term is defined in the TCPA.

390.    Wells Fargo violated the TCPA by misleadingly reporting to the credit agencies that the Robinsons and the Texas Class Members were in "forbearance," when those individuals had never requested or consented to forbearance.

391.    The Robinsons and the Texas Class Members have suffered actual damage, as alleged above, as a result of Wells Fargo's misleading reporting of their loan status.

392.    The Texas Class members are entitled to their actual damages, attorneys' fees, and injunctive relief under § 392.403 of the TDCPA.

### VIII.   REQUEST FOR RELIEF

393.    Plaintiffs, individually and on behalf of all others similarly situated, request that the Court enter judgment against Defendants, and for Plaintiffs, as follows:

A.    Certify the Classes under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), or alternatively 23(b)(4), and appoint Plaintiffs as representatives of the Classes and appoint Plaintiffs' counsel as Class counsel;

B.    Award declaratory relief, including but not limited to a declaration that Wells Fargo's actions and business practices are unlawful and that Wells Fargo must comply with state and federal lending laws;

C.    Award injunctive relief, including public injunctive relief permanently enjoining Wells Fargo from performing further unfair and unlawful acts as alleged;

D.    Award all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the Classes, including penalties, and all other relief allowed under applicable law;

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

E.    Grant Plaintiffs and the Class awards of restitution and nonrestitutionary disgorgement of Wells Fargo's profits from its unfair and unlawful practices described above;

F.    Award all costs of prosecuting this action, including attorneys' fees and expert fees as may be allowable under applicable law;

G.    Award both pre-judgment and post-judgment interest on any amounts awarded;

H.    Award treble or punitive damages insofar as they are allowed by applicable laws;

I.    Award appropriate individual relief as requested above; and

J.    Grant such other and further relief, including declaratory, injunctive, and equitable relief, as the Court may deem proper.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED this 15th day of April, 2022.

KELLER ROHRBACK L.L.P.

By *s/ Matthew J. Preusch*
    Matthew J. Preusch (SBN 298144)
    801 Garden Street, Suite 301
    Santa Barbara, CA 93101
    (805) 456-1496, Fax (805) 456-1497
    mpreusch@kellerrohrback.com

    Derek W. Loeser, *admitted pro hac vice*
    Gretchen Freeman Cappio, *admitted pro hac vice*
    Zachary W. Gussin, *admitted pro hac vice*
    KELLER ROHRBACK L.L.P.
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101-3052
    (206) 623-1900, Fax (206) 623-3384

    Abbas Kazerounian (SBN: 249203)
    ak@kazlg.com
    Kazerouni Law Group, APC
    245 Fischer Avenue, Suite D1
    Costa Mesa, CA 92626
    (800) 400-6808, Fax (800) 520-5523

77

**SECOND AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

1    Jason A. Ibey (SBN: 284607)
     jason@kazlg.com
2    Kazerouni Law Group, APC
     321 N Mall Drive, Suite R108
3    St. George, Utah 84790
     (800) 400-6808, Fax (800) 520-5523
4
     Babak Semnar (SBN: 224890)
5    bob@sandiegoconsumerattorneys.com
     Jared M. Hartman (SBN 254860)
6    jared@sandiegoconsumerattorneys.com
     SEMNAR & HARTMAN, LLP
7    41707 Winchester Road, Suite 201
     Temecula, CA 92590
8    (951) 293-4187, Fax (888) 819-8230
9    Ahren A. Tiller, Esq. (SBN: 250608)
     ahren.tiller@blc-sd.com
10   BLC LAW CENTER, APC
     1230 Columbia St., Ste. 1100
11   San Diego, CA 92101
     (619) 894-8831, Fax (866) 444-7026

12

13

14

15

16

17

18

19

20

21

22

23

24

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

**CERTIFICATION OF SERVICE**

I hereby certify that on April 15, 2022, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record who have appeared in this action.

*s/ Leslie Nims*
Leslie Nims

**SECOND AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**