Gretchen Freeman Cappio (*Pro Hac Vice*)
Derek W. Loeser (*Pro Hac Vice*)
Zachary W. Gussin (*Pro Hac Vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900, Fax (206) 623-3384

Matthew J. Preusch (SBN 298144)
KELLER ROHRBACK L.L.P.
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

[Additional Counsel on Signature Page]

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>WELLS FARGO FORBEARANCE<br>LITIGATION | No. 3:20-cv-06009-JD<br><br>**FOURTH AMENDED CONSOLIDATED<br>CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br>**REDACTED** |

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................ 1

II. JURISDICTION AND VENUE ................................................................................. 9

III. INTRADISTRICT ASSIGNMENT ....................................................................... 10

IV. PARTIES ................................................................................................................. 10

    A. Representative Plaintiffs .................................................................... 10

    B. Defendants ......................................................................................... 12

V. FACTUAL ALLEGATIONS ................................................................................... 12

    A. The Federal Government Passed the CARES Act to Help with the Economic Harm Caused by the COVID-19 Pandemic, in Part by Empowering Borrowers to Opt into Forbearance Plans. .............................................................................. 12

        1. The CARES Act Grants Borrowers the Privilege to Elect Mortgage Forbearance from Their Loan Servicers. ....................................... 13

        2. Guidance Clarifies the CARES Act's Protections. ...................... 16

            a. The Initiation, Maintenance, and Extension of a Forbearance are Decisions Left to Borrowers. ....................................... 16

            b. Accepting a Forbearance Plan Is an Important Financial Decision Obliging Servicers to Provide Ample and Accurate Information. .... 17

            c. Deferment Is the Default Workout Option for Federally-Backed Loans. ....................................................................... 19

        3. Millions of Homeowners with Federally Backed Loans Were in a Forbearance Program. ............................................................... 21

    B. Wells Fargo Seized Upon the CARES Act as an Opportunity for Profit. ................. 21

        1. Wells Fargo Unilaterally Placed Homeowners into Forbearance Programs and Extended Homeowners' Forbearance Plans Without Their Consent. .... 22

        2. Wells Fargo's Misleading and Inaccurate Representations Led to Hundreds of Thousands of Borrowers Being Placed in Forbearances They Did Not Knowingly Request. ....................................................... 28

            a. Misleading Phone Calls ............................................... 29

            b. Misleading Interactive Voice Response System ......................... 30

i

c.     Misleading Online Tool .................................................. 32

3.     The Faulty Forbearance Program Led to Billions of Dollars in Profits for
       Wells Fargo. ........................................................................................ 34

       a.     Wells Fargo's Misconduct Rendered Billions of Dollars in Loans
              Eligible for Highly Lucrative Voluntary Repurchase. ...................... 34

       b.     Wells Fargo's Misconduct Capped Its Principal and Interest
              Advancement Obligations for Loans That Remain in GSE Pools. .... 42

       c.     Wells Fargo's Misconduct Prevents Runoff for its MSRs by Reducing
              Refinancing Opportunities for Borrowers. ....................................... 43

       d.     Wells Fargo's Misconduct Entitles the Bank to Workout Incentive
              Payments. .................................................................................. 45

       e.     Wells Fargo's Misconduct Allowed the Bank to Profit from Spread
              from Servicing Repurchased Loans. ............................................... 46

C.     Wells Fargo's Misconduct Harmed the Very Consumers That the CARES Act Was
       Intended to Protect. ......................................................................................... 46

D.     Wells Fargo Placed Plaintiffs' Loans in Forbearance Without Their Consent. ........ 49

       1.     Luis and Marisol Castro, Texas residents .................................................... 49

       2.     Pamela Delpapa, a California resident ........................................................ 53

       3.     Jenna Doctor, a Florida resident ................................................................ 55

       4.     Gerald Forsburg, a Virginia resident. ........................................................ 59

       5.     Samara Green, a Georgia resident ............................................................. 63

       6.     Patrick Healy, a California resident ............................................................ 65

       7.     Brett Jacob, a New York resident ............................................................... 67

       8.     Charles Johnson, a California resident. ...................................................... 69

       9.     Barbara Prado, a California resident ........................................................... 72

       10.    Renrick and Vivian Robinson, Texas residents ........................................... 78

VI.    CLASS ACTION ALLEGATIONS ................................................................................ 79

VII.   CAUSES OF ACTION .................................................................................................. 83

       FIRST CAUSE OF ACTION .......................................................................................... 83

ii

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* on Behalf of Plaintiffs and the Nationwide Class ............................ 83

A.  WFC, Wells Fargo Bank, and Black Knight Comprised an Enterprise Whose Activities Affect Interstate or Foreign Commerce. .................................. 84

B.  The Enterprise Committed Thousands of Predicate Acts. ....................... 92

C.  Pattern of Racketeering Activity............................................................... 94

SECOND CAUSE OF ACTION............................................................... 95

Violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* on Behalf of Plaintiffs and the Nationwide Class.................................................................... 95

THIRD CAUSE OF ACTION ............................................................... 97

Violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* on Behalf of Plaintiffs and the Nationwide Class.................................................... 97

FOURTH CAUSE OF ACTION............................................................... 103

Violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* on Behalf of Plaintiffs and the Nationwide Class.................................................................... 103

FIFTH CAUSE OF ACTION ............................................................... 105

Breach of Implied Covenant of Good Faith and Fair Dealing on Behalf of Plaintiffs Delpapa, Healy, Johnson, and Prado, and the Proposed California Subclass ........ 105

Breach of Implied Covenant of Good Faith and Fair Dealing on Behalf of Plaintiff Doctor and the Proposed Florida Subclass ..................................................... 109

Breach of Implied Covenant of Good Faith and Fair Dealing on Behalf of Plaintiff Green and the Proposed Georgia Subclass ..................................................... 112

SIXTH CAUSE OF ACTION............................................................... 115

Unjust Enrichment (Proposed Nationwide Class Applying California Law)..................... 115

Unjust Enrichment (Single-State Subclasses)................................................................. 119

California Unjust Enrichment Subclass Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, and Prado, and the California Subclass .................................. 120

Florida Unjust Enrichment Subclass Asserted on Behalf of Plaintiff Doctor and the Florida Subclass ............................................................................................. 123

iii

Georgia Unjust Enrichment Subclass Asserted on Behalf of Plaintiff Green and the Georgia Subclass ........................................................................................... 126

New York Unjust Enrichment Subclass Asserted on Behalf of Plaintiff Jacob and the New York Subclass ................................................................................... 128

Texas Unjust Enrichment Subclass Asserted on Behalf of Plaintiffs Castros and Robinsons and the Texas Subclass............................................................................... 131

Virginia Unjust Enrichment Subclass Asserted on Behalf of Plaintiff Forsburg and the Virginia Subclass ................................................................................... 134

SEVENTH CAUSE OF ACTION ..................................................................... 136

California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, and Prado, and the California Class 136

California Consumer Credit Reporting Act ("CCRA"), Cal. Civ. Code § 1785. 25 *et seq.* Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, and Prado, and the California Class ............................................................................... 138

EIGHTH CAUSE OF ACTION.......................................................................... 140

Rosenthal Fair Debt Collection Practices Act ("Rosenthal FDCPA"), Cal. Civ. Code § 1788 *et seq.* Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, and Prado, and the California Class ............................................................................... 140

NINTH CAUSE OF ACTION ........................................................................... 143

Georgia Fair Business Practices Act ("GFBA"), O.C.G.A. § 10-1-390 *et seq.* Asserted on behalf of Plaintiff Green & the Georgia Class ...................................... 143

TENTH CAUSE OF ACTION .......................................................................... 145

New York Deceptive Trade Practices Act, N.Y. Gen. Bus Law § 340 *et seq.* Asserted on behalf of Plaintiff Jacob and the New York Class.................................. 145

ELEVENTH CAUSE OF ACTION .................................................................... 147

Texas Debt Collection Practices Act ("TDCPA"), Tex. Fin. Code § 392.001 *et seq.* Asserted on behalf of Plaintiffs Castros and Robinsons and the Texas Class ...................... 147

TWELFTH CAUSE OF ACTION ...................................................................... 151

Florida Consumer Collections Practices Act ("FCCPA"), Fla. Stat. § 559 *et seq.* Asserted on behalf of Plaintiff Doctor and the Florida Class.................................... 151

THIRTEENTH CAUSE OF ACTION .............................................................. 153

iv

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

Gross Negligence on Behalf of Plaintiffs and the Nationwide Class .................................. 153

VIII.   REQUEST FOR RELIEF ................................................................................. 154

IX.   DEMAND FOR JURY TRIAL............................................................................. 155

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

Plaintiffs Luis and Marisol Castro, Pamela Delpapa, Jenna Doctor, Gerald Forsburg, Samara Green, Patrick Healy, Brett Jacob, Charles Johnson, Barbara Prado, and Renrick and Vivian Robinson (collectively, "Plaintiffs"), individually and on behalf of a class of similarly situated persons, bring this class action lawsuit against Defendants Wells Fargo Bank, N.A. ("Wells Fargo Bank") and Wells Fargo & Co. ("WFC") (collectively, "Wells Fargo" or "Defendants"), and allege as follows:

## I.    INTRODUCTION

1.    In March 2020, Americans were suffering through one of the worst pandemics in our nation's history. Millions of Americans had lost their jobs, thousands had lost loved ones, and the impact of this terrible plague was extending over every sector of our domestic and professional lives. In response, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (codified as amended in sections of 2, 5, 12, 15, 20, 21, 29, 42, and 45 U.S.C.). The CARES Act, among other things, gave American homeowners concerned about their ability to make mortgage payments, as a result of the pandemic, the right to forbearances for federally backed mortgages.

2.    This relief provided a band-aid, not a cure, staunching what could otherwise have been a Great Recession-level foreclosure crisis. However, forbearance is not forgiveness, and it is not right for everyone. Loan forbearance plans are agreements allowing borrowers to reduce or suspend payments for a short period of time, providing extended time for borrowers to become current on their payments and repay the amounts owed. Forbearance plans do not forgive unpaid loan payments and have attendant financial consequences. Being in forbearance restricts a borrower's access to credit, can damage a borrower's credit score, can prevent a borrower from refinancing, and can disrupt collateral agreements—such as bankruptcy plans or repayment plans—which assume continued payment on the mortgage.

1

3.    For that reason, the CARES Act and related regulatory guidance mandate that participation in a COVID-19 mortgage forbearance plan is entirely voluntary; that is, a borrower must be informed of the various terms and conditions of the program and then affirmatively decide to enter the program, and the borrower retains the right to shorten, terminate, or extend the forbearance term.

**SEC. § 4022. FORECLOSURE MORATORIUM AND CONSUMER RIGHT TO REQUEST FORBEARANCE.**

. . .

(b) FORBEARANCE.—

(1) IN GENERAL.—During the covered period, *a borrower* with a Federally backed mortgage loan experiencing a financial hardship due, directly or indirectly, to the COVID–19 emergency *may request forbearance* on the Federally backed mortgage loan, regardless of delinquency status, by—

(A) *submitting a request to the borrower's servicer*;

and

(B) affirming that the borrower is experiencing a financial hardship during the COVID–19 emergency.

(2) DURATION OF FORBEARANCE.—*Upon a request by a borrower* for forbearance under paragraph (1), such forbearance shall be granted for up to 180 days, and *shall be extended for an additional period of up to 180 days at the request of the borrower, provided that, at the borrower's request, either the initial or extended period of forbearance may be shortened.*

. . .

(c) REQUIREMENTS FOR SERVICERS.—

(1) IN GENERAL.— *Upon receiving a request for forbearance from a borrower under subsection (b), the servicer shall with no additional documentation required other than the borrower's attestation to a financial hardship caused by the COVID–19 emergency* and with no fees, penalties, or interest (beyond the amounts scheduled or calculated as if the borrower made all contractual payments on time and in full under the terms of the mortgage contract) charged to the borrower in connection with the forbearance, provide the forbearance for up to 180 days, *which may be extended for an additional period of up to 180 days at the request*

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

> *of the borrower, provided that, the borrower's request for an extension*
> *is made during the covered period, and, at the borrower's request, either*
> *the initial or extended period of forbearance may be shortened.*[1]

4.      As detailed herein, Wells Fargo—without receiving any request or financial hardship attestation—opted unwitting borrowers into its COVID-19 mortgage forbearance program. The bank's primary purpose in doing so was the same profit motive that led to Wells Fargo's well-documented history of violating its customers' trust. By placing borrowers into forbearance, and causing them to skip payments, Wells Fargo capitalized on an incredibly lucrative loophole.

5.      The majority of borrowers that Wells Fargo placed into unwanted forbearance plans had loans that were securitized and pooled into mortgage-backed securities ("MBS") by one of two Government Sponsored Entities, ("GSEs"), the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), or the Government National Mortgage Association ("GNMA" or "Ginnie Mae"). The resulting securities, agency MBS, trade on a secondary market.

6.      Under normal circumstances, investors who purchase agency MBS (as opposed to private label securities) are insulated from the risk that the borrowers whose mortgages underlie the securities might fail to make payments because loan servicers are obligated to advance most principal and interest payments for federally backed loans to the GSEs and Ginnie Mae regardless of whether the loan is performing.

7.      If a loan is non-performing for three consecutive months, the loan servicer acquires the option to voluntarily repurchase the loan from the securities pool at par value.[2] This provides loan servicers with some limit on their obligation to advance payments for non-performing loans and allows

---

[1] *Coronavirus Aid, Relief, and Economic Security Act*, H.R. 748, 116th Cong. (2nd Sess. 2020), https://www.congress.gov/116/bills/hr748/BILLS-116hr748enr.pdf (emphasis added).

[2] Par value, also sometimes known as nominal or face value, is the amount at which a security can be redeemed, and its generally far less than market value.

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

the loan servicers to pursue loan modification options to help delinquent and distressed borrowers become current.

8. The voluntary repurchase of loans at par value is a profit stream for loan servicers like Wells Fargo. Once the loan begins performing again, it can either be held for investment, resecuritized, or resold. Holding the loans for investment leads to profits based on the difference between the cost to service and the interest rate. Reselling or resecuritizing leads to a profit, as the resale price typically exceeds the par value that the loans are purchased for coupon. Under normal circumstances, this makes sense because it provides loan servicers a financial incentive to work with risky borrowers to recuperate loans that are more than 90 days delinquent.

9. But by placing federally backed borrowers into *unsolicited* forbearance plans, Wells Fargo acquired the option to repurchase the underlying loans even though many borrowers did not want or need forbearance and remained financially solvent. Essentially, by placing loans in forbearance, Wells Fargo created the fiction that the loans were underperforming, then repurchased the loans at an artificially low price. As detailed below, Wells Fargo exercised this option at a historic rate, voluntarily repurchasing tens of billions of dollars' worth of otherwise performing mortgages out of the trust pools, for billions of dollars less than the loans' market price. Ted Tozer, the former President of Ginnie Mae, has said that banks engaging in this conduct "are setting themselves up for a huge windfall," and that the scheme is "almost pure profit."[3]

10. In addition to exploiting this highly lucrative loophole, Wells Fargo benefitted by unilaterally opting unwitting homeowners into its forbearance program in several other ways. As detailed below, Wells Fargo profited by protecting and increasing the value of the mortgage servicing

---

[3] Joe Light, *Banks Uncover Loophole to Buy Home Loans at Below-Market Prices*, Bloomberg (Aug. 20, 2020), https://www.bloomberg.com/news/articles/2020-08-20/banks-poised-for-mortgage-bond-wind fall-that-may-burn-investors.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

rights ("MSRs") associated with the proposed class members' mortgages; by capping its potential advancement liabilities for loans that were not voluntarily repurchased; by rendering the bank eligible for loan-workout incentive payments; and through spread earned on payments that class members made which were not timely credited to the borrower's mortgage. As Plaintiffs' experiences demonstrate, many borrowers received no notice that Wells Fargo had placed their mortgages into forbearance. They only found out about Wells Fargo's actions when they attempted to apply for credit (including the refinancing of their mortgage) and were denied, saw the forbearance noted on a credit report, or tried, but were unable, to make a regularly scheduled mortgage payment with Wells Fargo.

11.    In those instances when Wells Fargo did send borrowers a template notice informing them that Wells Fargo had granted them temporary mortgage payment relief, the notice was both insufficient and inaccurate, containing misleading assurances and inadequate warnings about the potential consequences of being in forbearance.

12.    Some borrowers who initially thought they wanted a forbearance later sought to end their forbearance plan upon learning more about the risks associated with forbearances, which risks Wells Fargo failed to disclose or misleadingly minimized. As Plaintiff Johnson's circumstances demonstrate, Wells Fargo not only failed to comply with the CARES Act's requirement that borrowers be allowed to end their forbearance at any time, but they unlawfully extended the period of forbearance after borrowers requested for their loans to be removed from the program.

13.    Numerous media reports suggest that these practices are widespread.

14.    Since the onset of COVID-19, approximately 6.3 million homeowners participated in a mortgage forbearance program, either knowingly or unknowingly. Upon information and belief, Wells

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

Fargo accounted for over a million of those homeowners, many of whom never requested such forbearance.[4]

15. As a result, those homeowners, including Plaintiffs, suffered damages, including, but not limited to an inability to access credit, an inability to refinance to historically lower interest rates (and with mortgage servicers instead of Wells Fargo), an inability to secure additional lines of consumer credit or to access existing credit, an inability to remove private mortgage insurance ("PMI"), termination of pending mortgage modification agreements, and time spent dealing with the difficult situation of removing their mortgages from a program they did not want.

16. Defendants' practice of involuntarily putting homeowners in the unwanted forbearance program without proper documentation prompted the following statement from Senator Sherrod Brown of Ohio, the ranking Democrat on the Banking Committee:

> Once again it seems that Wells Fargo's sloppy service and shoddy management are hurting consumers. . . . Wells Fargo should immediately address each of these complaints and make changes to ensure that no borrower finds themselves worse off from actions that their servicer takes without their consent or notice.[5]

17. In addition to Senator Brown's public statement, Senators Elizabeth Warren and Brian Schatz wrote a letter to the Chief Executive Officer and President of WFC seeking information regarding its practice of putting mortgagors into forbearance programs without their consent.[6]

18. The Senators' July 29, 2020 letter stated that Wells Fargo "appears to be incapable of self-governance," and noted that reports of borrowers being placed in forbearance programs they did

---

[4] *See, e.g.*, Gretchen Morgenson, *More Wells Fargo customers say the bank decided to pause their mortgage payments without asking*, NBC News (July 22, 2020), https://www.nbcnews.com/business/ personal-finance/more-wells-fargo-customers-say-bank-decided-pause-their-mortgage-n1234610.
[5] *Id.*
[6] Letter from Senators Elizabeth Warren & Brian Schatz, U.S. Senate, to Charles W. Scharf, Chief Exec. Off. & President Wells Fargo & Co. (July 29, 2020), https://www.warren.senate.gov/imo/media/doc/ 2020.07.29%20Letter%20to%20Wells%20Fargo%20on%20Forbearance%20Filings.pdf.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

1  not want "raise even more questions about the inability of Wells Fargo and its leadership team to comply

2  with the law and the needs of its customers."[7]

3  19.   The letter proclaimed that "if these reports are true, they represent one more addition to

4  a long list of inexcusable actions by Wells Fargo at customers' expense" because such conduct can affect

5  borrowers' credit by suggesting that they are not making payments even when they are and can prevent

6  them from refinancing their home loans to take advantage of lower interest rates.[8]

7  20.   Wells Fargo, for its part, has not denied these allegations. Through its spokesperson Tom

8  Goyda, Wells Fargo stated that "[i]n the spirit of providing assistance, [it] may have misinterpreted

9  customers' intentions in a small number of cases[.]"[9]

10  21.   Although Wells Fargo did not identify the complete number of borrowers who were

11  unwillingly placed into the forbearance program, it reported having received 1,600 complaints of

12  unwanted forbearances.[10] In a more recent filing with this Court, however, Wells Fargo reported

13  receiving more than 33,853 complaints.[11] ████████████████████

14  ███████████████████

15  22.   The true scope of the problem far exceeds that figure. Freddie Mac and Fannie Mae

16  publish loan-level performance data containing details on the performance of loans underlying credit

17  risk transfer securities. The data includes origination characteristics, monthly performance information

---

[7] *Id.* at 1.
[8] *Id.* at 2.
[9] Anna Hrushka, *Wells Fargo says it 'misinterpreted customers' intentions' in some forbearance cases*, Banking Dive (July 24, 2020), https://www.bankingdive.com/news/wells-fargo-forbearance-mortgage-payments/582284/.
[10] Gretchen Morgenson, *1600 customers say Wells Fargo paused their mortgage payments without their consent*, NBC News (Oct. 1, 2020), https://www.nbcnews.com/business/personal-finance/1-600-customers-say-wells-fargo-paused-their-mortgage-payments-n1241620.
[11] *See* Dkt. No. 140 at 2 n.1.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

on the underlying mortgage loans, and the company that services each loan. This data contains a large majority of mortgages guaranteed by Freddie Mac and Fannie Mae.

23. Comparing Wells Fargo's loans to their closest peers, Plaintiffs found the initial forbearance rate for GSE loans serviced by Wells Fargo was over 30 times greater than the industry average in April 2020.

24. When only looking at loans that had always been current prior to the forbearance, the difference is even starker. The forbearance rate for Wells Fargo borrowers who were current when their loan entered forbearance was 6%, compared to 0.14% for the industry. This means, that in the early days of the CARES Act, a *borrower whose loan had never previously been delinquent was more than 40 times more likely to be placed into forbearance if her loan was serviced by Wells Fargo.*

25. This disparity declined as Wells Fargo began to face scrutiny and unfavorable media coverage for its faulty forbearance program. Wells Fargo's forbearance rates reached approximately 2% in June 2020, still twice the industry average, and approached industry forbearance rates by August 2020. On the whole, Wells Fargo's forbearance rates were twice as high as the rest of the industry over this time period, suggesting that hundreds of thousands of Wells Fargo's forbearances were the result of its faulty forbearance program.

26. In sum, Wells Fargo cynically converted the CARES Act from protection for borrowers to a profit driver for the bank, hurting the people Congress intended to help. And it did so at the worst possible time. Many customers, like Ms. Delpapa, the Castros, Ms. Doctor, and Mr. Jacob, sought to refinance at more favorable rates or secure additional lines of credit and were unable to do so because they had been placed in forbearance. Some, like Mr. Johnson, noticed decreases in their credit scores. Others, like Ms. Green and Mr. Johnson, attempted to make payments, unaware that they were in forbearance, only to have Wells Fargo unlawfully retain those payments without crediting them towards the outstanding mortgage or escrow account balances.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

27.     Plaintiffs allege as follows upon personal knowledge as to themselves and their own experiences and, as to all other matters, upon information and belief including due investigation conducted by their attorneys.

## II.     JURISDICTION AND VENUE

28.     The Court has jurisdiction over the lawsuit because the suit arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud); the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, as implemented through Regulation Z; the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, as implemented through Regulation X; and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681.

29.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are 100 or more Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

30.     The Court also has subject matter jurisdiction over Plaintiffs' non-federal claims under 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal claims.

31.     This Court has general personal jurisdiction over WFC because it has its principal place of business in San Francisco, California.

32.     This Court has general personal jurisdiction over Wells Fargo Bank because its principal place of business is in San Francisco, California.

33.     This Court also has general personal jurisdiction over Wells Fargo Bank because its contacts with California are so constant and pervasive as to render it essentially at home in California.

34.     This Court has specific personal jurisdiction over Wells Fargo Bank because a substantial part of the actions or omissions giving rise to Plaintiffs' claims occurred in this District.

9

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

35.     The exercise of specific personal jurisdiction over Wells Fargo Bank is consistent with due process, as Wells Fargo Bank regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and derives substantial revenue from services provided to, persons in this District and in California.

36.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants and Defendants have sufficient contacts with this District, the situs of their principal places of business.

37.     Venue is also proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint occurred in this District.

### III.     INTRADISTRICT ASSIGNMENT

38.     This case is properly brought in the San Francisco Division of the Northern District of California. Under Local Rule 3-2(c), cases are to be filed in the Division "where a substantial part of the events or omissions giving rise to the claim occurred."

39.     Because WFC maintains its headquarters in San Francisco, and Wells Fargo Bank's principal place of business is in San Francisco, under Local Rule 3-2(e), the proper venue for this case is the San Francisco Division of the Northern District of California.

### IV.     PARTIES

**A.     Representative Plaintiffs**

40.     Plaintiffs Luis and Marisol Castro are Texas citizens whose homestead property is located in Dallas, Texas. Mr. and Mrs. Castro's property is encumbered by a lien securing repayment of a federally related loan backed by Fannie Mae and is serviced by Wells Fargo.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

41.     Plaintiff Pamela Delpapa is a resident and citizen of Riverside County, California. Her property is encumbered by a loan backed by the Fair Housing Administration, and her loan was serviced by Wells Fargo until late in 2020.

42.     Plaintiff Jenna Doctor is a citizen of Florida whose homestead property is located in Castleberry, Florida. Ms. Doctor's homestead property is encumbered by a lien securing repayment of a federally related loan backed by the Federal Housing Administration ("FHA") and is serviced by Wells Fargo.

43.     Plaintiff Gerald Forsburg is a resident and citizen of Virginia whose homestead property is located in Shenandoah County, Virginia. Mr. Forsburg's homestead property is encumbered by a lien securing repayment of a federally related loan backed by the FHA and is serviced by Wells Fargo.

44.     Plaintiff Samara Green is a resident and citizen of Rockdale County, Georgia, whose mortgage is serviced by Wells Fargo.

45.     Plaintiff Patrick Healy is a resident and citizen of San Diego County, California, whose mortgage is serviced by Wells Fargo.

46.     Plaintiff Brett Jacob is a resident and citizen of Nassau County, New York, whose mortgage is serviced by Wells Fargo.

47.     Plaintiff Charles Johnson is a resident and citizen of Riverside County, California, whose mortgage is serviced by Wells Fargo.

48.     Plaintiff Barbara Prado is a California citizen whose homestead property is located in Fremont, California. Ms. Prado's property is encumbered by liens securing repayment of two federally related loans backed by the FHA, which are both serviced by Wells Fargo.

49.     Plaintiffs Renrick and Vivian Robinson are citizens and residents of Grand Prairie, Texas. Their property is encumbered by a Veterans Administration ("VA") Loan, which loan was originated by, refinanced by, and is serviced by, Wells Fargo.

11

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

**B.    Defendants**

50.    Defendant Wells Fargo & Co. ("WFC") is a diversified financial services company headquartered in San Francisco, California that provides banking, insurance, investments, mortgage banking, and consumer finance through banking stores, the internet, and other distribution channels to customers, businesses, and other institutions in all 50 states and in other countries.

51.    WFC exercises specific and financial control over the operations of Defendant Wells Fargo Bank, dictates the policies, procedures, and practices of Wells Fargo Bank, exercises power and control over the specific activities upon which the claims herein are based, and is the ultimate recipient of the ill-gotten gains described herein.

52.    Defendant Wells Fargo Bank, N.A. ("Wells Fargo Bank") is a national banking association chartered under the laws of the United States. While it is nominally headquartered in Sioux Falls, South Dakota, Wells Fargo Bank's principal place of business is in San Francisco, California. Wells Fargo Bank provides WFC personal and commercial banking services, is the successor by merger of Wells Fargo Home Mortgage, Inc., and is WFC's principal subsidiary.

## V.    FACTUAL ALLEGATIONS

**A.    The Federal Government Passed the CARES Act to Help with the Economic Harm Caused by the COVID-19 Pandemic, in Part by Empowering Borrowers to Opt in to Forbearance Plans.**

53.    On March 11, 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a global pandemic.

54.    On March 13, 2020, then-President Trump issued the Coronavirus Disease 2019 (COVID-19) Emergency Declaration, which declared that the COVID-19 pandemic was of sufficient

12

severity and magnitude to warrant an emergency declaration for all states, territories and the District of Columbia.[12]

55.     In addition to the human tragedy caused by the pandemic, the economic fallout was immediate and continues to be considerable.

56.     On March 25, 2020, in response to the economic damage beginning to be felt by Americans throughout the country, the United States Senate passed the CARES Act.

57.     The CARES Act was passed by the House of Representatives the following day and signed into law on March 27, 2020.[13]

58.     The CARES Act is the single-largest economic stimulus bill in the United States' history, allocating approximately $2.2 trillion of support to individuals and business affected by the COVID-19 pandemic.

**1.     The CARES Act Grants Borrowers the Privilege to Elect Mortgage Forbearance from Their Loan Servicers.**

59.     A substantial part of the coronavirus aid package was designed to assist American homeowners with federally backed mortgages who were in economic distress as a result of the COVID-19 pandemic.

60.     First, the CARES Act assisted American homeowners with government backed mortgages by prohibiting their lenders and mortgage servicers from beginning a judicial or non-judicial foreclosure or from finalizing a foreclosure judgment or sale through at least August 31, 2020.

61.     Second, and most relevant to this Action, the CARES Act provided homeowners with federally backed loans experiencing financial hardships because of COVID-19 with the option to request up to 180 days of forbearance on their mortgage.

---

[12] *See* Trump Whitehouse Archives, March 13, 2020 LETTER FROM PRESIDENT DONALD J. TRUMP ON EMERGENCY DETERMINATION UNDER THE STAFFORD ACT, https://trumpwhitehouse.archives.gov/briefings-statements/letter-president-donald-j-trump-emergency-determination-stafford-act/.
[13] *See generally* CARES Act, Pub. L. No. 116-136.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

62.     Specifically, Section 4022(b) provides, in relevant part, that:

(b) FORBEARANCE.—

(1) IN GENERAL.—During the covered period [beginning February 15, 2020 and ending on June 30, 2022], a borrower with a Federally backed mortgage loan experiencing a financial hardship due, directly or indirectly, to the COVID-19 emergency *may request* forbearance on the Federally backed mortgage loan, regardless of delinquency status, by—

> (A)  submitting a request to the borrower's servicer and
> (B)  affirming that the borrower is experiencing a financial hardship during the COVID-19 emergency.

(2) DURATION OF FORBEARANCE.—*Upon a request by a borrower for forbearance* under paragraph (1), such forbearance shall be granted for up to 180 days, and shall be extended for an additional period of up to 180 days *at the request of the borrower*, provided that, *at the borrower's request*, either the initial or extended period of forbearance may be shortened.

CARES Act, Pub. L. No. 116-136, 134 Stat. 281, § 4022(b) (emphasis added).

63.     Section 4022(c) provides, in relevant part, that:

(c) REQUIREMENTS FOR SERVICERS.—

(1) IN GENERAL.—*Upon receiving a request for forbearance from a borrower under subsection (b),* the servicer shall *with no additional documentation required other than the borrower's attestation to a financial hardship caused by the COVID-19 emergency* and with no fees, penalties, or interest (beyond the amounts scheduled or calculated as if the borrower made all contractual payments on time and in full under the terms of the mortgage contract) charged to the borrower in connection with the forbearance, provided the forbearance up to 180 days, which may be extended for an additional period of up to 180 days *at the request of the borrower*, provided that, *the borrower's request for an extension* is made during the covered period, and, *at the borrower's request*, either the initial or extended period of forbearance may be shortened.

*Id*. § 4022(c) (emphasis added).

64.     These provisions make it abundantly clear that participation in a COVID-19 forbearance program is voluntary and to be initiated and maintained only at the request of the mortgagor.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

65. Congress intentionally limited CARES Act forbearances to only occur upon the request of a borrower, as can be shown through legislation considered but not enacted. At the same time that the CARES Act was being negotiated between the chambers, Congressman William Lacy Clay introduced a bill, H.R. 6340, which would have required servicers to grant automatic loan forbearance for delinquent borrowers, in addition to granting borrowers the right to receive a forbearance regardless of delinquency. When the CARES Act was passed, Congressman Clay's approach was rejected, and the CARES Act was limited to providing forbearances only upon a borrower's request.

66. As explained by the Consumer Financial Protection Bureau ("CFPB"), a "[f]orbearance is when [] mortgage servicer[s] or lender[s] allow [mortgagors] to pause or reduce [their] mortgage payments for a limited period of time while [they] build back [their] finances."[14]

67. Notably, while the CARES Act provides many homeowners with the right to have all mortgage payments completely paused for a period of time, "[f]orbearance doesn't mean [mortgagors'] payments are forgiven or erased. [Rather, mortgagors] are still obligated to repay any missed payments, which, in most cases, may be repaid over time[.]"[15]

68. For mortgagors to avail themselves of the COVID-19 mortgage forbearance option, they were instructed to contact their loan servicer to obtain information and, if appropriate, request forbearance.[16]

---

[14] *Learn about forbearance*, CFPB (page last modified Oct. 21, 2021), https://www.consumerfinance.gov/coronavirus/mortgage-and-housing-assistance/mortgage-relief/.
[15] *Id.*
[16] *See Request forbearance*, CFPB (page last modified Mar. 25, 2021), https://www.consumerfinance.gov/coronavirus/mortgage-and-housing-assistance/request-forbearance-or-mortgage-relief/.

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

**2. Guidance Clarifies the CARES Act's Protections.**

69.     While the CARES Act was passed quickly and with laudable intentions, there has been a tremendous amount of consumer confusion around many aspects of the CARES Act, including the forbearance program.

**a. The Initiation, Maintenance, and Extension of a Forbearance are Decisions Left to Borrowers.**

70.     The initial term of CARES Act mortgage forbearances was designed to be 180 days[17] and, after that term expires, lenders were instructed to work with borrowers to—upon request by the homeowners—extend the forbearance or establish a repayment plan.[18] But borrowers were always intended to have the ability to only accept a shorter forbearance period, to shorten the term of a previously-accepted forbearance, and to cancel a forbearance plan. While the text of the Act is clear on this subject, subsequent guidance has further emphasized that borrowers retain the privilege to shorten, end, or decline a forbearance.

71.     Freddie Mac issued an April 8, 2020 Temporary Service Guidance Related to COVID-19, which stated that "the length of each forbearance plan term must be for an appropriate length, based

---

[17] Wells Fargo provided three-month forbearances, notwithstanding guidance requiring that the default length of forbearance in the event that a loan servicer and borrower could not agree on a length of forbearance is 180 days. Three consecutive missed payments is enough to render a loan eligible for voluntary repurchase, as alleged below, further evincing the bank's true motive in effectuating this program.

[18] *See Information for VA home loan borrowers during COVID-19*, U.S. Dep't of Veterans Affairs (last updated Aug. 5, 2022), https://benefits.va.gov/homeloans/cares-act-frequently-asked-questions. asp#FAQ6 (stating that "forbearance is broken down into two pieces; an *initial* period and an *additional* period. To receive the initial period, you may notify your mortgage company that you are experiencing financial hardship due to the COVID-19 pandemic. As mentioned above, the hardship can be direct or indirect. When you notify the mortgage company, you may request up to 180 days of forbearance. You don't have to use the entire forbearance period if you can resume payments sooner, but **the deadline to request COVID-19 forbearance is through the __end of the nationally declared emergency__**. If you need the additional period, you may notify your mortgage company that you are still experiencing hardship due to the COVID-19 pandemic and request up to 180 additional days of forbearance.").

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

on the Borrower's individual circumstances and nature of the hardship, and must be agreed upon with or requested by the Borrower."[19]

72.     As the April 27, 2020 U.S. Department of Housing and Urban Development's Inspector General report explained, "[t]he borrower also has the option at any time to shorten the forbearance period and resume payments."[20] Likewise, Fannie Mae Lending Letter 2020-02 requires servicers to inform borrowers that they can shorten a forbearance plan's terms.[21]

73.     Thus, not only the initiation, but the maintenance and extension of a CARES Act forbearance were privileges held by the borrowers, not the loan servicers.

**b.  Accepting a Forbearance Plan Is an Important Financial Decision Obliging Servicers to Provide Ample and Accurate Information.**

74.     CARES Act forbearance plans can help people experiencing temporary hardships due to COVID-19. But a survey by LendingTree found that 70% of homeowners who have gone into forbearance did not need the relief.[22]

75.     Forbearances do not forgive the missed payments and are an important financial decision, leading to negative credit reporting that effectively denies borrowers access to traditional credit markets.

---

[19] *Bulletin 2020-10: Temporary Servicing Guidance Related to COVID-19*, FreddieMac (Apr. 8, 2020), https://guide.freddiemac.com/app/guide/bulletin/2020-10.

[20] Memorandum from Brian T. Pattison, Assistant Inspector Gen. for Evaluation to Joseph M. Gormley, Deputy Assistant Sec'y for Single Family Housing, *Some Mortgage Loan Servicers' Websites Offer Information about CARES Act Loan Forbearance That Is Incomplete, Inconsistent, Dated, and Unclear* at 2, U.S. Dep't Hous. & Urban Dev. (Apr. 27, 2020), https://www.hudoig.gov/sites/default/files/2020-04/Single%20Family%20Mortgage%20Forbearance%20Brief.pdf.

[21] *Lender Letter (LL-2020-02)* at 7, Fannie Mae (updated Dec. 9, 2020), https://singlefamily.fanniemae.com/media/22261/display.

[22] *See* Tendayi Kapfidze, *LendingTree Finds the Majority of Homeowners Approved for a Mortgage Forbearance May Not Have Needed One*, LendingTree (May 18, 2020), https://www.lendingtree.com/home/mortgage/majority-of-homeowners-approved-for-mortgage-forbearance-may-not-have-needed-one-study/; *see also* Aly J. Yale, *70% Of Homeowners Seeking Mortgage Relief Don't Actually Need The Help*, Forbes (May 19, 2020), https://www.forbes.com/sites/alyyale/2020/05/19/70-of-homeowners-seeking-mortgage-relief-dont-actually-need-the-help/?sh=b52a98052a54.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

Thus, mortgage servicers are obligated to provide accurate notices to borrowers who are deciding whether a forbearance is right for them. This, Wells Fargo did not do.

76. Servicers like Wells Fargo are required to make sure that borrowers like Plaintiffs are fully informed about the downsides to a forbearance and provided with an appropriate Evaluation Notice. As stated in the Fannie Mae, July 15 Lending Letter 2020-02:

> [S]ervicers must inform the borrower that the payments which are the subject of a forbearance plan have only been delayed or reduced, not forgiven, and that once the forbearance plan is complete, one of the following must occur:
>
> - the mortgage loan must be brought current through a reinstatement,
>
> - the borrower is approved for another workout option,
>
> - the mortgage loan is paid in full, or
>
> - the servicer refers the mortgage loan to foreclosure in accordance with applicable law.
>
> The servicer must also inform the borrower that he or she may shorten a forbearance plan term at any time to reduce the amount of payments which are being delayed or reduced.
>
> As stated in the *Servicing Guide* D2-3.2-01, Forbearance Plan, the forbearance plan terms must be provided to the borrower using the appropriate Evaluation Notice, which must be revised in accordance with applicable law. In addition, the servicer must document in the individual mortgage loan file the borrower's request for forbearance and attestation as to a financial hardship caused by the COVID-19 emergency, and the terms of the initial and any extended forbearance, including the duration of the forbearance period.[23]

77. The template Evaluation Notice, provided in the *Servicing Guide* D2-3.2-01, contains the following warnings to borrowers contemplating forbearance:

---

[23] *Lender Letter (LL-2020-02)* at 7, Fannie Mae (updated Dec. 9, 2020), https://singlefamily.fanniemae.com/media/22261/display.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

> We will not pursue foreclosure during the forbearance plan term. However, the terms of your mortgage remain unchanged. By not making your mortgage payments during the plan's term you will become more delinquent and your credit score may be impacted. For more information refer to the **Additional Forbearance Plan Information and Legal Notices**.

and:[24]

> ### Additional Forbearance Plan Information and Legal Notices
>
> **Credit Reporting**:
> - We will continue to report the delinquency status of your mortgage as well as your entry into a forbearance plan to credit reporting agencies in accordance with applicable law.
> - **CREDIT REPORTING AGENCIES MAY CONSIDER THE ENTRY INTO A FORBEARANCE PLAN AS AN INCREASED CREDIT RISK. HOWEVER, A FORECLOSURE WOULD HAVE A MORE NEGATIVE IMPACT TO YOUR CREDIT SCORE.**

78.     Yet Wells Fargo's forbearance practices failed to ensure that borrowers understood their obligations and options at the end of the forbearance period; for instance, misleadingly indicating that deferments would be available when that was not the case. Wells Fargo did not include any such warnings. Borrowers were thus deprived of the information required to make an informed decision about whether a forbearance was right for them.

### c. Deferment Is the Default Workout Option for Federally-Backed Loans.

79.     Leaving aside the issue of whether mortgagors were even aware that they are in a mortgage forbearance program, the provision that has caused the most confusion is that participating mortgagors often did not know if they had to get their mortgage current at the conclusion of the forbearance period or how Wells Fargo would treat the deferred payments.

80.     When a mortgage servicer like Wells Fargo places a loan in forbearance, it permits borrowers to suspend or reduce mortgage payments for a limited time. However, those payments are not forgiven. They are just delayed. The borrower must still repay the missed payments in the future. Some

---

[24] *Evaluation Notices* at 18, 19, Fannie Mae (Apr. 12, 2023), https://www.fanniemae.com/content/guide_exhibit/evaluation-model-clauses.doc?_ga=2.176411808.465931103.1684514334-593630053.1683832803.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

borrowers may be eligible for deferment, which adds the missed payments to the end of loan. Others, however, may be required to pay them more rapidly. Moreover, during forbearance, interest continues to accrue even though the principal is not being paid down, and borrowers' escrow accounts are not funded as anticipated, resulting in an escrow deficit.

81. Fannie Mae and Freddie Mac attempted to address the confusion about the post-CARES Act forbearance loss mitigation landscape when they introduced the "COVID-19 Payment Deferral" option with Lender Letter (LL-2020-07) and Bulletin 2020-15.[25]

82. The COVID-19 Payment Deferral brought Fannie Mae and Freddie Mac in line with the United States Department of Housing and Urban Development's ("HUD") COVID-19 National Emergency Standalone Partial Claim option, which provides borrowers with a junior mortgage (zero additional interest, no fees) not payable until the mortgage is paid off, comprised of the total amount of payments missed during a CARES Act forbearance period.[26]

83. Under a COVID-19 Payment Deferral described in LL-2020-07, all forborne payments (up to 12 months) are to be placed into a non-interest-bearing balance to be paid back at the end of the loan term. Thus, the forborne payments are not a source of increased interest accrual upon exiting forbearance. However, not all borrowers are eligible for a deferral.

84. Wells Fargo provided misleading communications to borrowers contemplating entering payment suspensions, indicating that they would receive a deferral or deferment even when the borrower was not eligible for a deferral.

---

[25] *Lender Letter (LL-2020-07)*, Fannie Mae (updated Nov. 18, 2020), https://singlefamily.fanniemae.com/media/22916/display; *Bulletin 2020-15: Freddie Mac COVID-19 Payment Deferral*, Freddie Mac (May 13, 2020) https://guide.freddiemac.com/app/guide/bulletin/2020-15.

[26] *See Mortgagee Letter 2020-06*, HUD(Apr. 1, 2020), https://www.hud.gov/sites/dfiles/OCHCO/documents/20-06hsngml.pdf.

20

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

**3.** **Millions of Homeowners with Federally Backed Loans Were in a Forbearance Program.**

85.    As of June 30, 2020, 4.58 million homeowners were in COVID-19 related forbearance plans, representing 8.6% of all active mortgages.[27]

86.    All told, roughly 6.2 million homeowners entered into COVID-19 forbearances.

87.    Some 6.8% of all GSE-backed loans and 12.3% of all FHA & VA loans were in forbearance plans,[28] and approximately 11% of privately-held mortgages were in some type of forbearance or deferment program.

88.    Wells Fargo has stated publicly that it deferred 2.5 million payments for consumer and small business customers since the start of the pandemic.[29]

**B.** **Wells Fargo Seized Upon the CARES Act as an Opportunity for Profit.**

89.    Wells Fargo put borrowers into unwanted forbearances. Doing so put the bank "deeply in the money" while harming the borrowers. Tom Goyda, Wells Fargo's spokesman, admitted that the bank "misinterpreted" customer intent in many instances, placing loans into unwanted or unasked-for forbearances.[30] A more robust explanation for the bank's motives can be discerned from a statement that John Shrewsberry, Wells Fargo's Chief Financial Officer ("CFO") made in the bank's earnings call for the second quarter 2020. Betsy Graseck, an analyst for Morgan Stanley, asked about American Banker's

---

[27] *See* Diana Olick, *Loans in coronavirus mortgage bailouts see largest weekly decline yet – but there are more red flags*, CNBC (July 3, 2020), https://www.cnbc.com/2020/07/03/loans-in-coronavirus-mortgage-bailouts-see-largest-weekly-decline-yet.html.

[28] *See Forbearance Volumes Reverse Course For Largest Decline Yet*, Black Knight, Inc. (July 3, 2020), https://www.blackknightinc.com/blog-posts/forbearance-volumes-reverse-course-for-largest-decline-yet/ [https://web.archive.org/web/20200707235819/https://www.blackknightinc.com/blog-posts/forbearance-volumes-reverse-course-for-largest-decline-yet/].

[29] *See* Anna Hrushka, *Wells Fargo says it 'misinterpreted customers' intentions' in some forbearance cases*, BankingDive (July 24, 2020), https://www.bankingdive.com/news/wells-fargo-forbearance-mortgage-payments/582284/.

[30] *Id.*

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

reporting on Wells Fargo's Ginnie Mae buyouts. Mr. Shrewsberry explained the option to repurchase loans placed into forbearances is "deeply in the money."[31]

90.     This is not the first time that Wells Fargo has violated customers' trust in this manner. Implementing forbearance plans without customer approval is reminiscent of other troubling practices at Wells Fargo in recent years. Most notably, Wells Fargo opened an estimated 3.5 million debit or credit accounts without customer consent, as alleged in a class action complaint in this District and resolved by a $142 million settlement finally approved by the Honorable Vince Chhabria[32] and a $3 billion settlement with the federal government.[33]

**1.     Wells Fargo Unilaterally Placed Homeowners into Forbearance Programs and Extended Homeowners' Forbearance Plans Without Their Consent.**

91.     As detailed above, accepting a forbearance is an important and consequential financial decision, one that a loan servicer cannot unilaterally make on behalf of a borrower. Before the passage of the CARES Act, for instance, there were substantial restrictions on a loan servicer's ability to grant a Freddie Mac borrower a forbearance, requiring negotiations of the forbearance terms with the borrower.[34] Even if a borrower needs the help or is fully informed of the consequences, lenders may not put a loan in forbearance without a customer requesting it. As the CFPB explains, "you must contact your loan servicer to request this forbearance."[35] Banks may not institute it automatically. But that's exactly what Wells Fargo did.

---

[31] *See Wells Fargo (WFC) Q2 2020 Earnings Call Transcript*, Motley Fool (July 14, 2020), https://www.fool.com/earnings/call-transcripts/2020/07/14/wells-fargo-wfc-q2-2020-earnings-call-transcript.aspx.

[32] *See* Revised Order Granting Final Approval of Class Action Settlement at 4, *Jabbari v. Wells Fargo & Co.*, No. 3:15-cv-02159-VC (N.D. Cal. June 14, 2018), Dkt. No. 271.

[33] *See* Pete Williams, *Wells Fargo to pay $3 billion over fake account scandal*, NBC News (Feb. 21, 2020), https://www.nbcnews.com/news/all/wells-fargo-pay-3-billion-over-fake-account-scandal-n1140541.

[34] *Requirements for a forbearance plan*, Freddie Mac (Dec. 1, 2018), https://guide.freddiemac.com/app/guide/section/9203.13.

[35] *See Mortgage Forbearance Cares Act Video Transcript*, CFPB (Apr. 2, 2020), https://files.consumerfinance.gov/f/documents/mortgage-forbearance-cares-act_video-transcript.pdf.

22

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

92.     Since the passage of the CARES Act in late March 2020, millions of homeowners across the country attempted to obtain information from their mortgage servicers and lenders as to the specifics of their COVID-19 forbearance program.[36]

93.     As numerous media reports have detailed, Wells Fargo unilaterally put borrowers into their mortgage forbearance programs despite receiving no request from the borrower and/or having no clear indication of borrowers' consent.[37] Thousands of homeowners were put into mortgage forbearance programs they did not request or had their forbearance period extended for an additional period of time without their consent, causing substantial problems for those homeowners.

94.     As experienced by Plaintiffs, and as attested to in consumer complaints from across the nation, Wells Fargo automatically placed borrowers in forbearance when they contacted the bank by phone or online to merely inquire about their options.

95.     As one consumer told the CFPB, a Wells Fargo employee admitted "that the system is like a 'hair trigger'" automatically placing loans into forbearance, "even though I did nothing to start a forbearance."[38]

96.     In an interview with Fortune Magazine, the Chief Executive Officer of Wells Fargo, Charles Scharf, explained, regarding the forbearance program, that "every institution makes mistakes."[39] The forbearance program was in fact a series of mistakes: placing borrowers into unrequested forbearance; making it extremely difficult for borrowers to make payments while in a forbearance;

---

[36] *See* Anna Bahney, *Homeowners are getting mortgage relief they didn't want*, CNN (May 20, 2020), https://www.cnn.com/2020/05/20/success/mortgage-forbearance-homeowner-complaints-coronavirus/index.html.

[37] *See* Diana Olick, *Some homeowners are getting mortgage bailouts by mistake, and it's keeping them from refinancing*, CNBC (May 12, 2020), https://www.cnbc.com/2020/05/12/coronavirus-some-homeowners-getting-mortgage-bailouts-by-mistake.html.

[38] *Consumer Complaint 3663700*, CFPB (May 21, 2020), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3663700.

[39] Rey Mashayekhi, *Can anyone fix Wells Fargo?*, Fortune (Feb. 3, 2021), https://fortune.com/longform/fixing-wells-fargo-charles-scharf-ceo-regulatory-issues-privacy-fake-account-fraud-scandal-covid/.

23

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

providing inaccurate and misleading information to borrowers considering forbearances; improperly and inaccurately reporting to credit reporting agencies that borrowers who never requested a forbearance were in such a plan; and improperly extending forbearances even when a borrower requested to end a forbearance.

97. These "mistakes" were widespread. The CFPB's database of consumer complaints lists numerous examples of similar complaints. These are a sample:

> Due to a job loss, I reached out to Wells Fargo and asked for information on their Covid-19 mortgage relief program. To clarify, I only asked for information on the program. The representative on the phone stated that an information packet would be mailed to me. About a week later, a letter arrived from Wells Fargo stating that they are "confirming short term payment relief for the account." This was not what I had requested. In addition, the letter states "We won't report this account to consumer reporting agencies." It has now come to light that Wells Fargo has put a forbearance on the mortgage, preventing any ability to refinance.[40]

> Wells Fargo put my account in forbearance when I didn't request it. After talking to multiple individuals on the phone I was told that if you click the "more info" button on the site that you will be automatically enrolled without asking.[41]

> Wells Fargo will NOT allow us to end our forbearance. We have spent over 7 hours trying to reach them to resolve this.[42]

> [W]e started getting email about COVID-19 relief from Wells Fargo, regarding mortgage assistance. I sent them an email for more information. . . . I tried to pay my house note on the WF app, as I have always done. The app advised me that I did not have an active account, that's when we called to make the payment. We were told that our loan was in forbearance and we could make a payment, but it would not post to the loan until after the forbearance period was over.[43]

---

[40] *Consumer Complaint 3658898*, CFPB (May 19, 2020), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3658898.

[41] *Consumer Complaint 3751149*, CFPB (July 17, 2020), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3751149.

[42] *Consumer Complaint 3749254*, CFPB (July 16, 2020), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3749254.

[43] *Consumer Complaint 3739887*, CFPB (July 10, 2020), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3739887.

24

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

I contacted my mortgage company WELLS FARGO to inquire about what types of services were available IF my renter's were unable to make their payment due to covid. It was for an inquiry purpose and I was told that I would receive a letter regarding any programs available. . . . I did in fact receive a letter and in that letter it stated my mortgage was placed in forbearance! I did not request any forbearance. Recently I was notified by a lender that it showed on my credit report and have been trying to have it removed since then.[44]

Wells Fargo put me into CARES act forbearance without my consent. I was unable to make a payment online like I usually do. I called and was on hold for an hour but finally was able to talk to a rep . . . . I told them they put me into forbearance without my consent. He apologized and said that the system is like a "hair trigger" even though I did nothing to start a forbearance, I've never missed a payment, have no reason to apply for forbearance and am able to make payments.[45]

Wells Fargo has placed or enrolled me in forbearance without my permission. This has negatively impacted me as . . . has placed my home equity mortgage application in denial status because of this.[46]

I did not sign anything to agree to forbearance and subsequent calls to them I stressed that I'm paying my mortgage and don't want a forbearance. Instead they listed it on my credit without authorization. When I called them they said it was an error n they are working on it. They ruined my wife and my credit.[47]

---

[44] *Consumer Complaint 3661764*, CFPB (May 21, 2020), https://www.consumerfinance.gov/data-research /consumer-complaints/search/detail/3661764.

[45] *Consumer Complaint 3663700*, CFPB (May 21, 2020), https://www.consumerfinance.gov/data-research /consumer-complaints/search/detail/3663700.

[46] *Consumer Complaint 3669074*, CFPB (May 26, 2020), https://www.consumerfinance.gov/data-research /consumer-complaints/search/detail/3669074.

[47] *Consumer Complaint 3662758*, CFPB (May 21, 2020), https://www.consumerfinance.gov/data-research /consumer-complaints/search/detail/3662758.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

> I called Wells Fargo, and asked what relief they could provide due to Covid-19. . . . I am very familiar with how a forbearance versus a deferment works. I was adamant if all they could offer me was a forbearance that I was not interested and I was assured by the Wells Fargo rep that they would just put the 3 payments at the back end of the loan and it was not a forbearance so I agreed. Yesterday . . . I received a notice from Wells Fargo asking If I need to extend my forbearance or discuss repayment options for the missed payments. I am livid![48]

98.    A media report details Wells Fargo's monitoring of the Chapter 13 bankruptcy dockets of its debtor clients and unilateral placement of them into its mortgage forbearance program.[49]

99.    That article details the plight of numerous borrowers in Chapter 13 bankruptcy who had been unwittingly enrolled in Wells Fargo's mortgage forbearance program:

> None of the borrowers in the lawsuit who were contacted by NBC News told the bank that they'd been affected by COVID-19, and *none had requested the bank's assistance because of it. Nor had they requested loan modifications when Wells Fargo claimed they wanted forbearance.* In addition, none of the borrowers or their attorneys say they were contacted by Wells Fargo.

> Asked about the discrepancies, Wells Fargo said that because it had seen references to COVID-19 in the borrowers' court filings, it provided forbearance.[50]

100.    When reached for comment, Wells Fargo did not deny the practice of unilaterally enrolling unwitting persons to its mortgage forbearance program. It stated, "[i]n the early days of the pandemic, we provided immediate payment relief to customers in bankruptcy if a review of their court filings indicated they were impacted by COVID-19 or if they had a loan modification review in process."[51]

---

[48] *Consumer Complaint 3707815*, CFPB (June 20, 2020), https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3707815.

[49] *See* Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him*, NBC News (July 16, 2020), https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

[50] *Id*. (emphasis added).

[51] *Id.*

26

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

101.    Wells Fargo's blunder is not an inconsequential administrative glitch. Rather, forbearances can have grave impacts on a borrower's credit history and access to credit.

102.    As Senators Warren and Schatz wrote in a July 29, 2020 letter to WFC Chief Executive Officer and President, Charles Scharf, the bank was "putting consumers at risk of greater financial hardship amidst one of the worst economic downturns in our country's history."[52]

103.    In its first response to the Senators' letter, sent on August 12, 2020, Wells Fargo admitted putting borrowers into forbearance when they had only "made an inquiry or expressed hardship but had not explicitly requested a forbearance."[53] In its subsequent response to the Senators' letter, sent on September 4, 2020, Wells Fargo identified that over 821,000 forbearances in connection with federally-backed loans had been granted since March 9, 2020.[54] In addition, Wells Fargo identified five scenarios in which it admitted its practice was to place borrowers into unrequested forbearances.[55]

104.    First, Wells Fargo placed borrowers into forbearance for borrowers in active bankruptcy proceedings, without any borrower request. Second, Wells Fargo placed borrowers into forbearance when a customer contacted the bank via e-mail or phone regarding a COVID-19 hardship, regardless of whether the borrower requested forbearance. Third, the bank automatically placed borrowers into forbearance when the borrower was in the process of seeking a loan modification. Fourth, the bank automatically placed borrowers into forbearance if the borrower had been denied a forbearance before

---

[52] Letter from Senators Elizabeth Warren & Brian Schatz, U.S. Senate, to Charles W. Scharf, Chief Exec. Off. & President Wells Fargo & Co. at 1, (July 29, 2020), https://www.warren.senate.gov/imo/media/doc/2020.07.29%20Letter%20to%20Wells%20Fargo%20on%20Forbearance%20Filings.pdf.

[53] Letter from Kristy Fercho, Exec. Vice President Wells Fargo & Co., to Senators Elizabeth Warren & Brian Schatz, U.S. Senate at PDF p. 4 (Sept. 4, 2020), https://www.warren.senate.gov/imo/media/doc/WF_2020.pdf.

[54] *Id.* at PDF p. 1.

[55] *Id.* at PDF p. 5.

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

the COVID-19 epidemic. Fifth, Wells Fargo placed mortgage and home equity accounts into forbearance when the borrower had another mortgage-linked account placed into forbearance.[56]

105. In the second letter sent on September 4, 2020, Wells Fargo provided updates on the bank's attempt to contact borrowers.[57] Wells Fargo identified 904 accounts held by customers in active bankruptcy for whom forbearance was granted without a borrower request.[58] The bank attempted to contact each borrower, to confirm whether they wanted the forbearance assistance, and were able to contact 699 of the borrowers.[59] Of those 699 borrowers, Wells Fargo confirmed that 344 did not want forbearance confirmed that they did not—almost exactly 50%.[60]

### 2. Wells Fargo's Misleading and Inaccurate Representations Led to Hundreds of Thousands of Borrowers Being Placed in Forbearances They Did Not Knowingly Request.

106. Borrowers in the so-called "business decision groups" were not the only ones placed into forbearances that they did not knowingly request. As detailed above, accepting a forbearance is an important financial decision. Federal loan servicers are thus generally required, under RESPA, to provide adequate disclosures for borrowers contemplating a forbearance. *See* 12 C.F.R. § 1024.41(c). However, as Plaintiffs' experiences demonstrate, borrowers were placed into unwanted forbearances in response to misleading prompts after Wells Fargo representatives and automated messages steered the borrowers into payment deferrals, or when they were requesting for more information about their options for mortgage assistance.

107. Wells Fargo has acknowledged that merely inquiring about forbearance options should not result in a borrower's unwitting entry into the program. Specifically, Tom Goyda, a Wells Fargo

---

[56] *Id.*
[57] *Id.* at PDF pp. 1–2.
[58] *Id.* at PDF p. 1.
[59] *Id.* at PDF p. 2.
[60] *Id.*

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

consumer lending spokesperson admitted that "[j]ust asking about forbearance should not result in a forbearance being applied."[61] Charles Scharf, the CEO of Wells Fargo recently stated, regarding the involuntary forbearance program, that "every institution makes mistakes."[62] This "mistake" came at the expense of the borrowers that Congress intended to protect through the passage of the CARES Act, and generated potentially billions of dollars of profits for Wells Fargo.

108.    Some borrowers were placed into forbearances based upon phone calls with Wells Fargo representatives. Others were placed into forbearances after utilizing automated systems established by Wells Fargo. For many borrowers, these forbearances were not the result of a valid request.

### a.  Misleading Phone Calls

109.    After the CARES Act was passed, the CFPB advised borrowers to contact their mortgage servicer to learn about potential relief, noting that the "decision to request forbearance should be considered carefully."[63]

110.    Hundreds of thousands of borrowers with mortgage loans serviced by Wells Fargo called the bank to inquire about available relief.

111.    However, many borrowers who merely called to learn more information were placed into forbearances they never asked for. In some instances, as with Mr. and Mrs. Robinson, the borrower merely requested more information. The customer service representative offered to send a letter with

---

[61] *See* Anna Bahney, *Homeowners are getting mortgage relief they didn't want*, CNN (May 20, 2020), https://www.cnn.com/2020/05/20/success/mortgage-forbearance-homeowner-complaints-coronavirus/index.html.

[62] Rey Mashayekhi, *Can anyone fix Wells Fargo?*, Fortune, (Feb. 3, 2021), https://fortune.com/longform/fixing-wells-fargo-charles-scharf-ceo-regulatory-issues-privacy-fake-account-fraud-scandal-covid/.

[63] *Consumer Relief Guide – Your Rights to Mortgage Payment Forbearance and Foreclosure Protection Under the Federal CARES Act* at 1, CFPB, https://files.consumerfinance.gov/f/documents/cfpb_csbs_consumers-forbearance-guide_2020-05.pdf (last visited May 18, 2023).

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

1    additional information—without disclosing the fact that merely sending the letter would automatically

2    place the borrower into a forbearance.

3          112.    In addition, while discussing forbearances, Wells Fargo's customer service

4    representatives did not consistently advise the borrower of the potential negative consequences of being

5    placed into a forbearance.

6          113.    For a period of time, the applicable script did not contain any disclosures of the negative

7    consequences of a forbearance. While some disclosures were added, others—including disclosures of

8    known damages to credit scores—were never included. Nor were disclosures ever provided regarding

9    the known impact of being placed into a forbearance on a borrowers' eligibility to remove PMI.

10          114.    What's more, Wells Fargo's customer services representatives did not consistently

11    provide borrowers with disclosures about the limitations on refinancing or securing new credit that

12    would result from being placed into a forbearance. Nor did they consistently provide borrowers with

13    information about the negative consequences on borrowers' ability to access existing lines of credit.

14          115.    Most egregiously, in the vast majority of instances the borrowers' intent to be placed into

15    a forbearance was not confirmed and documented.

16          116.    Thus, placing borrowers into a forbearance based on a phone conservation in which the

17    borrower was misled regarding the negative consequences of being placed into a forbearance and

18    without documented confirmation of the borrowers' intent to accept a forbearance is another instance of

19    Wells Fargo placing borrowers into forbearances without a valid request.

20          **b. Misleading Interactive Voice Response System**

21          117.    Wells Fargo implemented an interactive voice response ("IVR") system in April 2020,

22    ostensibly to address borrowers' questions concerning relief available to them in the early days of the

23    pandemic.

24

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

118. The IVR system used a series of recorded messages to justify placing borrowers into forbearances. Rather than reach quality first person contact and confirming the borrowers' intent, Wells Fargo automatically placed borrowers into forbearances based upon their responses to the recorded messages.

119. However, these messages did not adequately apprise borrowers that the relief they were requesting was a forbearance, or of the negative consequences of being placed into a forbearance.

120. For a period of time, the IVR system only used the terms "payment assistance" or "suspension of payments," and not the term "forbearance."

121. Even after the IVR system included the term "forbearance," it misleadingly omitted critical information about what a forbearance was and its impact on a borrower.

122. When it was initially deployed, Wells Fargo's IVR system did not apprise borrowers that the forbearance would be reported to the credit reporting agencies, or the consequences of that reporting.

123. ███████████████████████████████████████
███████████████████████████

124. ███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████

125. Likewise, despite knowing that being placed into a forbearance could impact a borrowers' ability to refinance, the IVR system initially contained no information about the impact of accepting a "payment suspension" on a borrower's ability to refinance.

126. When information related to refinancing was added to the IVR system, it remained misleading, in that it only referred to restrictions on refinancing with Wells Fargo, and not other lenders. Even the information Wells Fargo communicated regarding its own policies for refinancing after a forbearance was misleading and inaccurate.

31

127. Similarly, the IVR system initially contained no information about the impact that being placed in a forbearance would have on a borrowers' ability to secure additional lines of consumer credit, and when those advisements were added they were incomplete and misleading.

128. The IVR system initially contained no information about the impact that being placed in a forbearance would have on a borrowers' ability to access existing credit, such as a Wells Fargo Home Equity Line of Credit.

129. The IVR system likewise misleadingly communicated that borrowers would have the option to add unpaid amounts to the end of the loan, or to extend the term of the loan, even though those options would not be available for all borrowers.

### c. Misleading Online Tool

130. In April 2020, Wells Fargo implemented a tool for borrowers to request information about "payment assistance" online, omitting the term "forbearance." When a borrower viewed their mortgage account on Wells Fargo's website, a new banner was added that asked if borrowers needed payment assistance due to COVID-19, inviting them to request a payment suspension by clicking on a button.

131. The word "forbearance" was not used on the banner routing borrowers to the online tool, nor were any disclosures provided about the potential negative consequences associated with having a loan in a forbearance.

132. Nor, when originally implemented, did the online tool itself use the word "forbearance" or provide any disclosures to borrowers about the negative consequences associated with having a loan in a forbearance.

133. For a period of time, the online tool only used the terms "payment assistance," "payment suspension," or "suspension of payments." Even after the online tool included the term "forbearance," it misleadingly omitted critical information about what a forbearance was and its impact on a borrower.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

134. When it was initially deployed, Wells Fargo's online tool did not apprise borrowers that the forbearance would be reported to the credit reporting agencies, or the consequences of that reporting.

135. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████

136. Likewise, despite knowing that being placed into a forbearance could impact a borrowers' ability to refinance, the online tool initially contained no information about the impact of "payment suspension" on a borrower's ability to refinance.

137. When information related to refinancing was added to the online tool, it remained misleading, in that it only referred to restrictions on refinancing with Wells Fargo and not other lenders. Even the information communicated regarding Wells Fargo's own policies for refinancing after a forbearance was misleading and inaccurate.

138. Similarly, the online tool initially contained no information about the impact that being placed in a forbearance would have on a borrowers' ability to secure additional lines of consumer credit, and when those advisements were added they were incomplete and misleading.

139. Likewise, the online tool initially contained no information about the impact that being placed in a forbearance would have on a borrowers' ability to access existing credit, such as a Wells Fargo Home Equity Line of Credit.

140. As well, the online tool misleadingly communicated that all borrowers would have the option to add unpaid amounts to the end of the loan, or to extend the term of the loan, even though those options would not be available for all borrowers.

141.    Thus, neither utilization of the online tool nor the IVR system produced valid requests for forbearances. Wells Fargo's placement of borrowers into forbearances based on these faulty systems was another instance of borrowers being placed into forbearances without a valid request.

142.    In response to Senators Warren and Schatz' inquiry, Wells Fargo's spokespeople have declined to say whether the bank has benefited financially from placing borrowers into unrequested forbearances. But upon information and belief, Wells Fargo stands to gain a tremendous windfall based on these practices.[64]

### 3.    The Faulty Forbearance Program Led to Billions of Dollars in Profits for Wells Fargo.

143.    Placing borrowers into forbearances was not without consequences for the borrowers. It frustrated borrowers' ability to refinance their mortgages during a time of historically low interest rates. It rendered borrowers ineligible for removal of PMI. It reduced borrowers' access to existing lines of credit, and it destroyed their ability to secure new lines of consumer credit. It also led to billions of dollars in profits for Wells Fargo.

### a.    Wells Fargo's Misconduct Rendered Billions of Dollars in Loans Eligible for Highly Lucrative Voluntary Repurchase.

144.    Wells Fargo performs multiple roles in America's housing finance system. This case is primarily concerned with Wells Fargo's role as a mortgage servicer, in which it receives a fee for acting as an intermediary between the loan holder and the borrower, performing the day-to-day administrative tasks associated with the lending side of a mortgage loan. The majority of first lien mortgages in America are federally backed, meaning that the loan has been securitized by Fannie Mae, Freddie Mac, or Ginnie Mae, government sponsored mortgage companies ("GSMC's"). Wells Fargo acts as loan servicer for billions of dollars' worth of such loans.

---

[64] *See* Joe Light, *Banks Uncover Loophole to Buy Loans at Below-Market Prices*, Bloomberg (Aug. 20, 2020) https://www.bloomberg.com/news/articles/2020-08-20/banks-poised-for-mortgage-bond-windfall-that-may-burn-investors.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

145.     Both Fannie Mae and Freddie Mac are government-sponsored private corporations with congressional charters. They provide liquidity to the housing finance market by purchasing mortgages from lenders and guaranteeing the default risk linked to their issuances of MBS tied to those loans. Likewise, Ginnie Mae is a federal government agency that guarantees MBS which are issued by program participants (like Wells Fargo) for loans linked to mortgages whose default risks are guaranteed by the FHA, VA, and USDA. Ginnie Mae guarantees MBS investors timely principal and interest payments for those investments.

146.     Wells Fargo acts as loan servicer for loans that have been securitized by all three entities, and in exchange, is paid servicing fees. In this role, Wells Fargo forwards principal and/or interest payments to the GSMC's, or the investors, depending upon the remittance types of the underlying servicing contracts.

147.     For the vast majority of Wells Fargo's GSMC servicing contracts, the obligation to advance monthly principal and/or interest payments for pooled loans exists even if the borrower does not pay the bank.

148.     For Fannie Mae loans, a loan servicer has the option to voluntarily repurchase a mortgage loan from the MBS pool when the loan has four consecutive payments past due, cutting off the advancement risk.[65]

---

[65] *A1-3-01: Requirements for Voluntary Repurchase*, Fannie Mae (Oct. 13, 2021), https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-A-Doing-Business-with-Fannie-Mae/Subpart-A1-Contractual-Obligations/Chapter-A1-3-Repurchases-Indemnifications-and-Make-Whole/A1-3-01-Requirements-for-Voluntary-Repurchase/1581707431/A1-3-01-Requirements-for-Voluntary-Repurchase-10-13-2021.htm.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

149. Likewise, for Freddie Mac Loans, a servicer may request to voluntarily repurchase the GSE's interest in a mortgage, a request that is generally granted for mortgages that are 90 or more days delinquent.[66]

150. For Ginnie Mae loans, the loan servicer has the option to repurchase delinquent loans issued on or after January 1, 2003, so long as the borrower fails to make payment for three consecutive months.[67]

151. After repurchasing, the servicer's obligation to advance principal and interest payments ends. In addition, the loan servicer has more flexibility to negotiate workout options with the borrowers to preserve the mortgage, or, if loss mitigation fails, foreclose.

152. Placing loans into forbearances led to the loans being eligible for exercising this option (called "early pool buyout," or "EPBO"), because it led to missed payments.

153. Being placed into a forbearance made a loan more likely to become delinquent for many reasons. First, it removes the obligation to pay, making it more likely that a borrower would miss payments they otherwise would have made.

154. Second, Wells Fargo obstructed borrowers from making payments using their preferred and common method of payment. Borrowers that had established automatic payments, or ACH, had those automatic payments automatically terminated after being placed into forbearances. Coupled with misleading communications sent to borrowers indicating that if a forbearance was not right for them

---

[66] *Repurchases requested by the Seller/Servicer*, Freddie Mac (Aug. 17, 2016), https://guide.freddie mac.com/app/guide/section/3602.4.

[67] *A1-3-01: Requirements for Voluntary Repurchase*, Fannie Mae (Oct. 13, 2021), https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-A-Doing-Business-with-Fannie-Mae/Subpart-A1-Contractual-Obligations/Chapter-A1-3-Repurchases-Indemnifications-and-Make-Whole/A1-3-01-Requirements-for-Voluntary-Repurchase/1581707431/A1-3-01-Requirements-for-Voluntary-Repurchase-10-13-2021.htm.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

they could continue making payments as normal, many borrowers placed into unrequested forbearances were not aware that they had missed payments.

155.   In addition, for a period of time, borrowers in forbearances were unable to make payments online or through Wells Fargo's mobile payment app. At the same time, there were widespread branch closures and limited local branch hours, due to the COVID-19 epidemic. And borrowers who attempted to make payments through the phone experienced extraordinarily long wait times. Thus, placing a borrower into a forbearance often led to the loan becoming delinquent.

156.   Many of these loans were, before Wells Fargo's misconduct, performing. They generally represent a low risk of falling into foreclosure, as Wells Fargo itself recognized in an earnings call. Mike Santomassimo, Wells Fargo's Senior Executive Vice President and CFO stated that for loans that had already exited their COVID-19 forbearance plans, "90% of the balances [are] current as of the end of the year."[68]

157.   Once a voluntarily repurchased loan becomes reperforming, it can either be sold in the non-agency secondary mortgage market, held by the bank/servicer (who profits based on the spread between the servicing costs and the loan's interest), or resold into the GNMA pools. If resold in the GNMA pools, the resale price is generally substantially higher than par. For instance, the average trading price for a Ginnie Mae MBS with a 3.5% coupon was well above the coupon rate from January 2020 to January 2022, with an average trade value from January 2021 to January 2022 of 107. Thus, if a 3.5% loan is purchased at par and resold after it becomes reperforming, the loan servicer stands to make a 7% return.

---

[68] *Wells Fargo (WFC) Q4 2020 Earnings Call Transcript*, Motley Fool (Jan. 15, 2021), https://www.fool.com/earnings/call-transcripts/2021/01/15/wells-fargo-wfc-q4-2020-earnings-call-transcript/.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

158.   On the other side of the voluntary purchase transaction are the MBS investors. When they purchase an MBS at 105 basis points, and part of that pool is bought out at par, the yield of the MBS decreases. In its disclosures to potential investors, GNMA discloses voluntary repurchase as a potential risk to investors. However, in typical years, prepayment rates are stable and tied to the normally occurring delinquencies in the housing market. For instance, on information and belief, in 2017, Wells Fargo voluntary purchased roughly $8.6 billion in loans out of GNMA pools. In 2018, that figure was $7.8 billion, and in 2019 it was $6.2 billion. That changed in 2020. Wells Fargo purchased $30.3 billion in loans out of GNMA pools in 2020, an unprecedented amount. In 2021, Wells Fargo's repurchase rates returned to slightly below normal, $4.6 billion.

159.   Wells Fargo's conduct did not go unnoticed. Industry reports began to circulate in July 2020, as Wells Fargo's unprecedented buyout rate of 99% of eligible loans serviced by the bank was having a dramatic and outsized impact on the overall buyout rate (CBR) for Ginnie Mae backed securities.

160.   Riskspan, a consulting firm in the residential mortgage, MBS trading, and structured finance space, detailed the buyout rate increase in July 2020 and reported that "this increase was driven almost entirely by Wells [Fargo], which accounted for 25% of the servicing in some pools." [69]

161.   American Banker began reporting on Wells Fargo's conduct, with articles titled "*Banks uncover loophole to buy home loans at below market prices*," reporting that in July and August 2020 alone, Wells Fargo bought $19 billion of loans out the Ginnie Mae reserves for $1.5 billion less than the loans' market price.[70] As former Ginnie Mae president Ted Tozer told Bloomberg News, Wells Fargo

---

[69] Don Brown, *Edge: Bank Buyouts in Ginnie Mae Pools*, RiskSpan (July 20, 2020), https://riskspan .com/bank-buyouts-in-ginnie-mae-pools/.

[70] *Banks uncover loophole to buy home loans at below-market prices*, Am. Banker (Aug. 20, 2020), https://www.americanbanker.com/articles/banks-uncover-loophole-to-buy-home-loans-at-below-market-prices.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

and other banks exercising this voluntary repurchase option for loans placed into CARES Act forbearances are "setting themselves up for a huge windfall. It's almost pure profit."[71] While many banks exercised this option, Wells Fargo's repurchasing far exceeded its peers.

162. The Federal Housing Finance Agency ("FHFA"), which regulates the GSEs, anticipated the potential that COVID-19 forbearances could be abused by loan servicers, and issued guidance on March 21, 2020, informing servicers that loans forborne due to COVID-19 would not generally be available for voluntary repurchase, under a national disaster's exception.[72] In that same guidance, FHFA created a new limit on the servicer advance obligations, capping the advance obligations at four months.[73] As discussed below, this created an additional incentive for Wells Fargo to place GSE loans into forbearance, but as a result of this policy, Fannie Mae and Freddie Mac loans did not experience as high of a spike in artificially inflated voluntary repurchases.

163. Ginnie Mae, however, took a different approach. On June 29, 2020, Ginnie Mae issued APM-20-07, a memorandum incorporating new terms into its policies for resecuritizing reperforming loans,[74] due to the recognition that mass early buyouts "could undermine the integrity of the MBS program." [75] Prior to APM-20-07, a loan that had been voluntarily repurchased out of a Ginnie Mae pool and brought back to performing status could be resold into the same pool type it was purchased out of.

---

[71] Joe Light, *Banks Uncover Loophole to Buy Home Loans at Below-Market Prices*, Bloomberg (Aug. 20, 2020), https://www.bloomberg.com/news/articles/2020-08-20/banks-poised-for-mortgage-bond-windfall-that-may-burn-investors.

[72] *FHFA Addresses Servicer Liquidity Concerns, Announces Four Month Advance Obligation Limit for Loans in Forbearance*, FHFA (Apr. 21, 2020), https://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Addresses-Servicer-Liquidity-Concerns-Announces-Four-Month-Advance-Obligation-Limit-for-Loans-in-Forbearance.aspx.

[73] *Id.*

[74] *APM 20-07: Temporary Pooling Restrictions on Re-performing Loans*, Ginnie Mae (June 29, 2020), https://www.ginniemae.gov/issuers/program_guidelines/Lists/MBSGuideAPMsLib/Attachments/10/APM%2020-07.pdf.

[75] Seth D. Appleton, *Housing Analysis & Policy Spotlight*, Ginnie Mae (June 29, 2020), https://www.ginniemae.gov/newsroom/HAPS/Pages/Post.aspx?PostID=39.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

Under the new guidance, reperforming loans will be eligible instead to be sold into new pool types created just for resecuritizing such loans. In addition, the loan must have been current for each of the six months immediately preceding resecuritization, essentially requiring servicers to hold repurchased loans for a longer period of time before profiting.

164. Wells Fargo's plan was to do exactly that—hold the reperforming loans until they could be sold or resecuritized. In its 2020 Q4 earnings call, Wells Fargo's CFO, Mike Santomassimo stated that the bank's mortgage balances would see "headwinds" in 2021, in part due to the "expected sale or resecuritization of loans previously purchased out of agency mortgage securitizations."[76]

165. Mr. Santomassimo was correct—the bank profited tremendously. Based on Wells Fargo's 2021 reporting, the bank profited by at least $789 million on the resecuritization of roughly $13 billion of the $30 billion in 2020 GNMA repurchases. If the remaining $17 billion in GNMA loans repurchased are resecuritized at the same profit rate, that would lead to $1.8 billion in profits from resecuritization alone.

166. Wells Fargo's more recent financial disclosures continue to repeatedly reference the gains made on resecuritization of EPBO loans.[77]

167. Although the underlying regulations may be complicated, the scheme itself is simple and conducted in the open: Place otherwise solvent borrowers into unrequested forbearances, manufacture artificial delinquencies, purchase their loans out of pools at par (less than market value), hold the loans

---

[76] *Wells Fargo (WFC) Q4 2020 Earnings Call Transcript*, Motley Fool (Jan. 15, 2021), https://www.fool.com/earnings/call-transcripts/2021/01/15/wells-fargo-wfc-q4-2020-earnings-call-transcript/.

[77] "Noninterest income decreased 13%, driven by lower results in our affiliated venture capital and private equity businesses; a decline in mortgage banking income on lower originations and gain on sale margins, as well as lower gains from the resecuritization of loans purchased from securitization pools[.] . . . Home lending was down 42% on lower mortgage banking income driven by lower originations and lower revenue from the resecuritization of loans purchased from securitization pools." *Wells Fargo Reports First Quarter 2023 Net Income of $5.0 billion, or $1.23 per Diluted Share* at 2, 4, Wells Fargo (Apr. 14, 2023), https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/earnings/first-quarter-2023-earnings.pdf.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

and profit once the loans exit forbearance (due to the delta between the interest payments on the loan and the cost of servicing), and once eligible for resecuritization, repool the loans for even greater profits.[78]

168. To effectuate this scheme, WFC's loan servicing subsidiary, Wells Fargo Bank, artificially placed the loans into forbearance even when the borrower did not request such relief. But Wells Fargo Bank did not act alone in performing its part in this scheme—it had the assistance of Black Knight Financial Services, Inc. ("Black Knight"), a long-time vendor.

169. Black Knight, a publicly-traded company, provides a platform for mortgage loan servicing and borrower communication application, referred to as MSP and LoanSphere. Wells Fargo's use of these platforms represents a substantial portion of Black Knight's business—in 2016, Black Knight reported to the SEC in relation to a merger that Wells Fargo was its "largest client," and "accounted for approximately 12% of our consolidated revenues" and 15% of the revenues from Black Knight's Technology and Data segment.[79]

170. Black Knight capitalized on the COVID-19 crisis by marketing its MSP platform, distributing a white paper advertising its products as assisting mortgage servicers in establishing

---

[78] Wells Fargo is not the first bank to use GNMA's repurchasing in order to unjustly profit. In 2016, the U.S. Securities and Exchange Commission ("SEC") filed a civil enforcement action under the Securities Act and Exchange Act against First Mortgage Corporation ("FMC"), a privately-held GNMA mortgage issuer which delayed crediting borrower payments in order to render the mortgages eligible for voluntary repurchase. Complaint, *SEC v. First Mortg. Corp.*, No. 2:16-cv-03772-BRO-E (C.D. Cal. May 31, 2016), Dkt. No. 1. The SEC alleged that FMC profited by $7.5 million on a mere 532 transactions, at a profit rate of 7.5%, and ultimately the United States District Court for the Central District of California entered a consent judgment against FMC for $11,784,474.82. Final Judgement as to Defendant FMC at 3, *SEC v. First Mortg. Corp.*, No. 2:16-cv-03772-BRO-E (C.D. Cal. July 20, 2016), Dkt. No. 8.

[79] *Black Knight Financial Services Letter to Shareholders* at 30, SEC (Aug. 25, 2017), https://www.sec.gov/Archives/edgar/data/1704177/000104746917005400/a2233097z424b3.htm.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

forbearance, allowing mortgage servicers to automate the management of forbearance programs.[80] Black Knight gained increased revenue through this churn, assisting Wells Fargo with identifying loans to be placed into forbearance through its automated mortgage servicing program.

171. This enterprise placed mortgages in forbearances without the borrowers' knowledge or consent. Additional predicate violations include false reporting of the loans' status to credit reporting agencies. This false reporting utilized ██████████████████████████ ████████████████████████████████████████████ The specialized COVID-19 forbearance platform facilitated communications to borrowers related to the servicing of COVID-19 forbearance loans and communications with GNMA regarding repurchase and resecuritization.

**b. Wells Fargo's Misconduct Capped Its Principal and Interest Advancement Obligations for Loans That Remain in GSE Pools.**

172. Even for loans that are not voluntarily repurchased for profit, Wells Fargo is incentivized to place GSE loans into forbearance in order to minimize its exposure to servicing requirements obligating Wells Fargo to advance borrowers' delinquent principal and interest payments to the investors in GSE-sponsored trusts when the loan is not paying.

173. Ordinarily, as described above, Wells Fargo's advancement obligations continued for Fannie Mae loans regardless of whether Wells Fargo collected payment from the borrowers, unless and until Wells Fargo either foreclosed on the property or determined that the property's foreclosure value was insufficient to reimburse Wells Fargo for any further advances of monthly principal and interest after satisfying the remaining principal balance of the delinquent loan.

---

[80] Michelle Kersch & Mitch Cohen, *Black Knight Issues White Paper on Managing COVID-19 Challenges for Clients Using MSP Servicing System*, Black Knight (Apr. 13, 2020), https://www.blackknightinc.com/black-knight-issues-white-paper-on-managing-covid-19-challenges-for-clients-using-msp-servicing-system/.

42

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

174. However, exclusively for loans in CARES Act forbearances, Fannie Mae and Freddie Mac have modified those advancement requirements.[81] Servicers of GSE loans, including Wells Fargo, are obliged to only make four monthly advances of principal and interest payments for delinquent loans that have been in a CARES Act forbearance.

175. Thus, the servicing rights associated with loans that have ever been in a CARES Act forbearance are increased in value, as they present a lower risk of loss due to the obligation to make advances while nonperforming for the life of the loan.

### c. Wells Fargo's Misconduct Prevents Runoff for its Mortgage Servicing Rights by Reducing Refinancing Opportunities for Borrowers.

176. For much of the last two years, interest rates were at all-time lows, and many homeowners—such as the Castros, Ms. Delpapa, Ms. Doctor, and Mr. Jacob—sought to take advantage of these historically low rates by refinancing. If an account is placed into a forbearance program, those borrowers cannot typically refinance for many months, even after bringing the account current. As detailed more fully below, by retaining borrowers who might otherwise refinance their mortgages with other institutions, Wells Fargo protected their mortgaging servicing rights – accounts associated with the fees Wells Fargo earns for servicing mortgages.

177. Wells Fargo generates millions of dollars in revenue servicing mortgages. MSRs are the capitalized value of the right to receive future cash flows from the servicing of mortgage loans. In Wells Fargo's 2021 Annual Report, the bank reported MSRs accounts with a fair value of over $6,000,000, recognizing that "MSRs may increase upon repurchase [of loans from GNMA loan securitization pools]."[82]

---

[81] Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him*, NBC News (July 16, 2020), https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

[82] *2021 Annual Report Wells Fargo & Company* at 141, https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2021-annual-report.pdf.

43

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

178. When borrowers refinance a mortgage with a different servicer, the associated MSRs are terminated. Thus, when capitalizing the present value of MSRs, loan servicers adjust for the risk that borrowers will prepay or refinance. This risk of run-off decreases the present value of MSRs. In 2021, despite historically low interest rates and a red-hot real estate market, Wells Fargo's estimate of prepayment rates (one measure of "runoff") for their MSRs portfolio *declined* by 11% compared to the prior year.

179. As the Castros, Ms. Delpapa, and Mr. Jacob experienced, being placed in forbearance is a barrier to refinancing. Before May 19, 2020, a borrower was generally required to wait a year until they could refinance. As told by a Wells Fargo mortgage servicer client, it was virtually impossible to obtain any form of credit for up to a year after a forbearance program concluded:

> [T]he note on his credit report saying the loan is in forbearance makes it impossible for him to refinance. Fannie Mae and Freddie Mac, which, along with the Federal Housing Administration and the Department of Veterans Affairs, fund or insure the vast majority of mortgages from lenders, do not allow borrowers with a loan in forbearance to either refinance or obtain a new loan until one year after the loan payments are up to date again.[83]

180. Even after the FHFA updated guidance relating to borrowers in forbearance,[84] a borrower with a Fannie Mae or Freddie Mac loan will typically have to wait three months after exiting forbearance in order to be able to refinance. Thus, by placing borrowers into unsolicited forbearance, Wells Fargo increased the value of the associated MSRs accounts by reducing the risk of runoff through refinancing.

---

[83] *See* Diana Olick, *Some homeowners are getting mortgage bailouts by mistake, and it's keeping them from refinancing*, CNBC (May 12, 2020), https://www.cnbc.com/2020/05/12/coronavirus-some-homeowners-getting-mortgage-bailouts-by-mistake.html (stating that "It also puts barriers in front of homeowners who could really benefit now from refinancing and saving on their monthly payments. Servicers are swamped with those requests as well. Applications to refinance a home loan are currently up more than 200% from a year ago.").

[84] *Lender Letter (LL-2021-03)*, *Impact of COVID-19 on Originations*, Fannie Mae (updated Feb. 15, 2023), https://singlefamily.fanniemae.com/media/24811/display.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

### d. Wells Fargo's Misconduct Entitles the Bank to Workout Incentive Payments.

181.    By placing borrowers into unrequested forbearances, Wells Fargo was manufacturing delinquencies which it could receive incentive payments for curing. Upon information and belief, for each loan placed into forbearance that Wells Fargo subsequently modifies in accordance with Fannie Mae and Freddie Mac's matrix for loan retention workout options, Wells Fargo receives an incentive fee of up to $1,000.[85]

| Incentive Type | Incentive Amount |
|---|---|
| Repayment Plan | $500<br><br>Effective for all repayment plans with a first payment due date under the repayment plan on or after July 1, 2020 |
| Payment Deferral/COVID-19 Payment Deferral | $500<br><br>Effective immediately for all Payment Deferrals/COVID-19 Payment Deferrals (NOTE: Payment Deferral evaluations do not begin until on or after July 1, 2020) |
| Flex Modification® | $1,000<br><br>Effective for all Flex Modifications completed with a Trial Period Plan effective date on or after July 1, 2020 |

182.    If the borrower enters into a repayment plan, under which the forborne payments are brought current over a period of up to 12 months, the loan servicer is eligible for a $500 incentive payment. Likewise, if the forborne payments are deferred to the back of the loan, the servicer is eligible for a $500 incentive payment. If the loan is modified, to permanently change the payment terms, the servicer is eligible for a $1,000 incentive payment. The below chart, from Freddie Mac Bulletin 2020-21,[86] details those incentives.

---

[85] *See Lender Letter (LL-2020-09)*, Fannie Mae (updated July 15, 2020), https://singlefamily.fanniemae.com/media/23091/display.

[86] *Bulletin 2020-21: Temporary Servicing Guidance Related to COVID-19*, Freddie Mac (June 10, 2020), https://guide.freddiemac.com/app/guide/bulletin/2020-21.

45

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

### e. Wells Fargo's Misconduct Allowed the Bank to Profit from Spread from Servicing Repurchased Loans.

183.    In Wells Fargo's 2021 Annual Report the bank reported that it had interest income associated with loans repurchased from GNMA loan securitization pools of $1.1 billion. In its earning call associated with the Q4 2021 report, Wells Fargo stated that it earned $318 million of interest income associated with EPBO loans in the fourth quarter alone. Meanwhile, Wells Fargo reported the annual cost to service at a mere $91 per loan. Thus, Wells Fargo has earned hundreds of millions of dollars servicing loans that it repurchased, with staggering profit margins. Rather than spend the amount necessary to properly service those loans (for instance, confirming with each borrower whether they in fact had requested a forbearance), Wells Fargo continues to profit at the borrowers' expense.

## C.    Wells Fargo's Misconduct Harmed the Very Consumers That the CARES Act Was Intended to Protect.

184.    These gains come at the expense of borrowers, who were placed into unwanted forbearances or who had forbearance terms extended without their intent. Despite Wells Fargo's protestations in its response to Senators Warren and Schatz, these forbearance plans led to real and substantial damages to borrowers.

185.    As has previously been briefed before this Court, FICO performed an analysis which concluded that the majority of borrowers whose loans were placed into a CARES Act forbearance can expect a resulting decrease in their credit score.[87]

186.    In addition, regardless of any direct impact on borrowers' credit scores, in practical effect a forbearance is such a negative indicia that borrowers are rendered ineligible to refinance and capitalize on record low interest rates, or potentially remove PMI, during the term of the forbearance and for up to a year after the forbearance plan ends.

---

[87] Paul Panichelli, *Simulated FICO Score Impacts due to Mortgage Forbearance*, FICO (Sept. 29, 2020), https://www.fico.com/blogs/simulated-fico-score-impacts-due-mortgage-forbearance.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

187.   The actions taken by Defendants were in direct contravention of the CARES Act requirements that forbearances be provided in response to the request of the borrower, and with an attestation of hardship due to COVID-19. In many instances, the borrowers received no notice that they had been placed in forbearance until several days or weeks later. Even in those instances in which the borrowers received notice prior to the start of the forbearance, it was woefully insufficient under the requirements of RESPA, 12 U.S.C. § 2601 *et seq.*

188.   Many borrowers, unaware that they were in forbearance, continued to make or attempted to make payments on their loans. Upon information and belief Wells Fargo failed to timely credit those payments to borrowers' mortgage loans, instead, holding those payments in separate "unapplied funds" accounts without notifying the borrowers.

189.   Even when Wells Fargo did, internally, credit borrower payments, its failure to report timely payments to the credit reporting agencies during the unauthorized forbearance periods was tantamount to a failure to timely credit, because prospective lenders would not be able to confirm payments by the borrowers by reference to their credit reports. For those borrowers whose loans were owned by Wells Fargo, this failure to timely credit payments constituted an actionable violation of the TILA, 15 U.S.C. § 1601, as detailed *infra*.

190.   Some individuals, such as the Castros, Ms. Doctor, and Mr. Jacob, noticed that their mortgages had been noted as "in forbearance," despite never having requested that relief, and that their credit scores had declined as a result of Wells Fargo's actions. When Mr. Jacob and Ms. Doctor submitted notices of dispute to the credit reporting agencies, upon receipt of the notices of disputes from the credit reporting agencies, Wells Fargo was obligated under FCRA, 15 U.S.C. § 1681i, to adequately investigate and correct the matter. Wells Fargo did not, violating FCRA.

191.   Many borrowers, like Mr. Forsburg, were in the process of seeking a Home Affordable Modification Program ("HAMP") loan modification or had already received such relief. In an article by

47

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

Pulitzer Prize-winning journalist Gretchen Morgenson, writing for NBC News, a Wells Fargo representative explained that it was Wells Fargo's practice to unilaterally place loans of borrowers who were in the modification process into forbearance status under the CARES Act, without such borrowers' prior knowledge or consent.[88] By placing borrowers into forbearance, Wells Fargo risked rendering them ineligible for the HAMP loan modifications that they would otherwise have been eligible to receive.

192.    In Mr. Forsburg's case, Wells Fargo terminated his fully executed modification agreement without notice, telling him he would have to resubmit his modification application after the forbearance period ended.

193.    Tragically, the harms have disproportionately impacted borrowers of color. Borrowers of color were twice as likely to miss mortgage payments during the early months of the pandemic.[89] When borrowers attempted to refinance during the historic low interest rates in 2020, Wells Fargo approved refinancing applications for only 47% of Black homeowners, compared to 72% of White homeowners.[90]

194.    The representative Plaintiffs' experiences further demonstrate some of the harms caused by the unilateral forbearance scheme.

---

[88] Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him*, NBC News (July 16, 2020), https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

[89] *CFPB Issues Reports Detailing Mortgage Borrowers' Continuing COVID-19 Challenges*, CFPB (May 4, 2021), https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-reports-detailing-mortgage-borrowers-continuing-covid-19-challenges/.

[90] Ann Choi *et al.*, *Wells Fargo Faces Persistent Racial Gap in Mortgage Refinancing*, Bloomberg (Mar. 25, 2022), https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-persistent-racial-gap-in-mortgage-refinancing.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

**D.** **Wells Fargo Placed Plaintiffs' Loans in Forbearance Without Their Consent.**

    **1.** **Luis and Marisol Castro, Texas residents**

195. Mr. and Mrs. Castro's mortgage loan, secured by a lien against their homestead property located at 3221 San Marcus Avenue, Dallas, Texas 75228, is a federally related mortgage loan backed by Fannie Mae and serviced by Wells Fargo.

196. Wells Fargo—through parts of its website—conveyed fraudulent, deceptive, or misleading representations in debt collection and in obtaining information from Mr. Castro. Wells Fargo also falsely represented the nature of the services it was rendering with its website.

197. In late March, Mr. Castro went to Wells Fargo's website to pay their April 2020 mortgage payment.

198. While Mr. Castro was on Wells Fargo's website, he noticed a large "box" on the website that referenced COVID-19 and contained a button marked "Get Help Now" for payment assistance.

199. Mr. Castro was curious about what "payment assistance" would involve and clicked on the "Get Help Now" button on Wells Fargo's website, expecting more information about the various payment assistance options that might be available to him.

200. Once Mr. Castro clicked that "Get Help Now" button, Wells Fargo's website displayed a message "congratulating" him.

201. Mr. Castro did not receive any additional information at that time explaining the terms or the consequences of the forbearance program, and Mr. Castro assumed that being automatically enrolled in the program would not be detrimental to him or Mrs. Castro.

202. Despite Wells Fargo placing Mr. and Mrs. Castro's loan account into a forbearance that he did not request, Mr. Castro proceeded to make his April 2020 payment that same day in late March.

203. Wells Fargo accepted Mr. and Mrs. Castro's April 2020 mortgage payment.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

204. In late April, Mrs. Castro went to Wells Fargo's website to make their May 2020 mortgage payment but found that she was unable to log on to make the payment.

205. Later that same day, Mrs. Castro called Wells Fargo and made the May 2020 mortgage payment by phone. Wells Fargo accepted Mr. and Mrs. Castro's May 2020 payment.

206. While speaking with the Wells Fargo representative in connection with their May 2020 mortgage payment, the Wells Fargo representative informed Mrs. Castro that she was unable to make her payment online because their loan was in forbearance status.

207. Mrs. Castro did not understand at the time she was speaking with the Wells Fargo representative that having a loan in forbearance status could be harmful to her credit or otherwise, but Mrs. Castro also did not like being unable to make payments online. Accordingly, during her call in late April 2020, Mrs. Castro asked Wells Fargo's representative to remove whatever it was that was keeping her from making her payments online.

208. Wells Fargo subsequently removed the restriction on Mr. and Mrs. Castro's account that prevented them from making their monthly mortgage payments online, and they have made their June–August 2020 mortgage payments.

209. Wells Fargo did not remove Mr. and Mrs. Castro's mortgage loan from forbearance status in April 2020.

210. In fact, Wells Fargo sent Mr. and Mrs. Castro a letter dated April 16, 2020, regarding the "short-term payment suspension." The April 16, 2020 letter stated: "This payment suspension option is based on an incomplete application for assistance. Other payment assistance options may be available. If you would like a review for all available assistance options, you may submit a complete application, which would include information about your income and expenses. This review is available whether or not you accept this short-term payment suspension. Please contact us for more information."

50

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

211.    The April 16, 2020 letter also stated: "Note: If you find you don't need this short-term payment suspension, please continue to make your normal payments. Take advantage of this payment suspension only when you really need it, because you may need to repay any missed payments at the end of the short-term payment suspension period."

212.    The April 16, 2020 letter did not disclose that the forbearance status of Mr. and Mrs. Castro's mortgage loan account would be reported to the credit reporting agencies or that Wells Fargo would suppress its reporting regarding the payments it was receiving from Mr. and Mrs. Castro during the forbearance period.

213.    In addition, the April 16, 2020 letter, among other things, used false and deceptive means for debt collection and/or in attempt to obtain information from the Castros. Along with the statements concerning collection of the Castros' payments as listed above, Wells Fargo made the following statements:

- "[A]s your account servicer, we are attempting to collect a debt and any information obtained will be used for that purpose";

- "Unless you receive further relief, you'll need to resume your regular mortgage payment schedule beginning on July 1, 2020"; and

- "If you choose to extend your payment suspension period, you will still need to repay all missed payments."

214.    Much of the April 16, 2020 letter discusses the repayment of payments on the Castros' mortgage loan.

215.    The April 16, 2020 letter did not inform the Castros that Wells Fargo placed them into forbearance but instead used the deceptive terms, "short-term payment assistance," and "payment suspension." The April 16, 2020 letter also falsely stated that, "You can end the payment suspension at

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

any time. If you decide to shorten the plan, or if you decide later that this is not the right solution for you, please contact us."

216. In late May 2020, Mr. and Mrs. Castro decided to refinance their mortgage loan. At the time, Mr. and Mrs. Castro did not know or understand that Wells Fargo was reporting their mortgage loan to the credit reporting agencies as in forbearance status.

217. Mr. and Mrs. Castro attempted to obtain a refinance but were unable to close on the refinance of their mortgage loan account in July 2020 because Wells Fargo had reported their mortgage loan account as in forbearance status.

218. Moreover, due to the credit reporting of their loan as in forbearance preventing Mr. and Mrs. Castro from closing their refinance, Mr. and Mrs. Castro incurred a late fee for their July 2020 monthly mortgage payment because they anticipated that they would not have to make a mortgage payment in July 2020 due to their anticipated refinance.

219. The tradelines for Mr. and Mrs. Castro's mortgage loan serviced by Wells Fargo on their TransUnion credit reports indicate in the "Remarks" section of the report that their mortgage loan account is in forbearance. Further, the "Terms" section of the report states "$0 per month for 360 months, Deferred" and Wells Fargo did not report that Mr. and Mrs. Castro made their April–June 2020 mortgage payments.

220. Similarly, the tradelines for Mr. and Mrs. Castro's mortgage loan serviced by Wells Fargo on their Equifax credit reports indicate in the "Comments 2" section that their mortgage loan account was in forbearance in April and May 2020 and the "Payment History" section does not indicate that Mr. and Mrs. Castro made their April–July 2020 monthly mortgage payments. Moreover, the "Terms Frequency" is listed as "DEFERRED" and the "Comments" section states their mortgage loan account is in forbearance.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

221.    The tradeline for Mr. and Mrs. Castro's mortgage loan serviced by Wells Fargo on Mrs. Castro's Experian report states the "Status" of the loan as "Open/Never late. Deferred, payments begin Oct 2020," and states the monthly payment is "$0." Further, the payment history section does not reflect Wells Fargo's receipt of Mr. and Mrs. Castro's April through June 2020 mortgage payments and the "Comment" section states "Account in Forbearance."

222.    Wells Fargo sent Mr. and Mrs. Castro a letter dated July 9, 2020, which informed Mr. and Mrs. Castro that Wells Fargo had extended the forbearance period for another three months. The Castros did not consent to Wells Fargo's extension of the forbearance, which they had not wanted or authorized in the first place.

223.    Mr. and Mrs. Castro then contacted Wells Fargo via phone on multiple occasions in June and July 2020, asking to be removed from the forbearance program.

224.    On a call in late July 2020, Mr. Castro was informed by a Wells Fargo representative that the "Get Help Now" button was placed on Wells Fargo's website due to higher than normal call volume that resulted in five hour wait times before customers could speak to a Wells Fargo representative.

225.    On August 3, 2020, Mr. Castro called Wells Fargo again in a further attempt to get his account removed from forbearance status. He spoke to four different Wells Fargo representatives and none of them were able to remove his loan from forbearance status. Ultimately, a Wells Fargo representative hung up on him.

**2.      Pamela Delpapa, a California resident**

226.    Another one of the many victims of Wells Fargo's Faulty Forbearance Program is Plaintiff Pamela Delpapa. Ms. Delpapa lost her job at a nail salon due to COVID-19.

227.    Concerned about whether she would be able to make her mortgage payments on her Riverside County, California property, she called Wells Fargo—her mortgage servicer—on or about March 17, 2020 to learn about her options.

53

228.    At that point, she was paid in advance for five months; in fact, the Wells Fargo representative she spoke to said she would *not* be a candidate for assistance at this time, but that she should feel free to call back in five months. She relied on this misrepresentation to her detriment.

229.    Unbeknownst to her, after that call Wells Fargo placed her loan in forbearance anyway. She only found out when she called her mortgage broker to refinance her home. Her mortgage broker told her she could not refinance because her loan was in forbearance. She was understandably shocked.

230.    When she called Wells Fargo to complain, a Wells Fargo employee told her that when a borrower calls the bank and pushes the button directing them to information on COVID mortgage options, the bank automatically places those accounts in forbearance.

231.    Ms. Delpapa never requested that her mortgage be placed in forbearance. In a June 2020 letter to her, Wells Fargo admitted it placed her mortgage in forbearance without her consent and without discussing it with her "in detail":

> We found that On March 17, 2020, your account was set up for the 90-day forbearance option that was being offered to our customers. After listening to the phone call between you and our representative, we discovered that you never requested to be placed on the plan nor was the plan discussed with you in detail. On May 21, 2020, we updated the account and removed your account from the forbearance plan as you requested. Additionally we updated our reporting to ensure the forbearance comment was removed.

232.    The bank's letter also conceded that by reporting her mortgage as in forbearance, Wells Fargo may have damaged Ms. Delpapa's ability to get consumer credit, as she experienced firsthand:

> The credit bureaus have independent credit score models. We cannot speculate how any of their proprietary models account for this; however, we do know, generally, those are not used for underwriting of credit. If you apply for credit while on a forbearance plan, however, the lender will see the "account in forbearance" comment on your credit report, and the fact that your account is in forbearance may impact your ability to qualify for new credit or refinance.

233.    Since then, Ms. Delpapa attempted to refinance her loan to capitalize on historically low interest rates. Despite having been prepaid for the period she was in forbearance, that is, despite *not missing a single payment*, she was unable to refinance for months as a result of the forbearance notation.

54

234. This delay in refinancing cost Ms. Delpapa hundreds of dollars, as she remained locked into her higher interest payment with Wells Fargo for months after Wells Fargo represented that they had removed her account from a forbearance plan she never requested.

**3.  Jenna Doctor, a Florida resident**

235. Ms. Doctor's mortgage loan, secured by a lien against her property located at 7 Hitching Post Lane, Casselberry, Florida 32707, is a loan backed by the FHA and serviced by Wells Fargo.

236. Ms. Doctor and her husband are both employed and have been able to continue making their monthly mortgage payments without interruption. Mr. and Mrs. Doctor were current on their mortgage loan.

237. Around the second week of April 2020, Ms. Doctor, using her Wells Fargo online account, reviewed information about Wells Fargo's COVID-19 and CARES Act relief. After reviewing the information, Ms. Doctor elected not to enroll in the forbearance program because Ms. Doctor and her husband were able to continue making their payments and they had no financial need to forgo payments.

238. At no time did Ms. Doctor consent to or request that Wells Fargo place her mortgage loan account in forbearance.

239. However, at some point prior to June 29, 2020, Wells Fargo placed Ms. Doctor's mortgage loan account in forbearance status without Ms. Doctor's knowledge or consent.

240. In the summer 2020, Ms. Doctor was pregnant, with her baby due in late 2020. In June 2020, Ms. Doctor learned that her baby had developed a medical condition that would require treatment, causing Ms. Doctor and her husband to incur additional out-of-pocket medical expenses. Ms. Doctor and her husband also wished to make certain upgrades and improvements to their home prior to the birth of their child.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

241.    On or about June 29, 2020, Ms. Doctor contacted a loan officer at the Fairwinds Credit Union (the "Credit Union"), where Ms. Doctor is a member and account holder. Ms. Doctor sought to obtain a secured loan to cover both the out-of-pocket medical expenses for herself and her unborn child and the improvements to her homestead.

242.    The Credit Union made a "hard inquiry" with Equifax on June 29, 2020. The credit information the Credit Union received in response to its inquiry indicated that Ms. Doctor's mortgage loan was in forbearance.

243.    Also on June 29, 2020, the Credit Union informed Ms. Doctor that it could not extend Ms. Doctor credit because her mortgage loan was in forbearance. Ms. Doctor then informed the Credit Union that she was not in forbearance, that she had made her monthly mortgage payments each month, and that she never requested a forbearance with Wells Fargo.

244.    Prior to June 29, 2020, Ms. Doctor had applied for and received several loans with the Credit Union. Ms. Doctor was informed by the Credit Union that the reason for the decision not to extend credit to Ms. Doctor on June 29, 2020 was because of the reporting or furnishing to the credit reporting agency that her Wells Fargo account was in forbearance for May and June 2020.

245.    During the phone call with Wells Fargo on June 29, 2020, Ms. Doctor was informed that she was automatically put in forbearance, since every Wells Fargo borrower has been affected by COVID-19. The Wells Fargo representative indicated that Ms. Doctor's account was in a forbearance from May 1, 2020 through July 1, 2020, but Ms. Doctor could "opt-out" of the forbearance program. Ms. Doctor demanded that her account be removed from the forbearance program, as she had never requested any forbearance relief with Wells Fargo.

246.    In a letter from Wells Fargo to Ms. Doctor dated July 1, 2020, Wells Fargo confirmed that it "canceled the short-term payment suspension" based on Ms. Doctor's request.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

247.     On July 1, 2020, Ms. Doctor contacted Wells Fargo and spoke with a representative concerning its reporting of the unwanted forbearance to the credit agencies. Wells Fargo refused to change the information it reported regarding Ms. Doctor's account and stated that the account would reflect she had chosen to opt out of the final forbearance month of July 2020.

248.     On July 6, 2020, Ms. Doctor contacted the Credit Union loan officer about the steps she took with Wells Fargo and what she needed to do to move forward with a loan. Ms. Doctor was informed by the Credit Union that her Wells Fargo account was still reported as in forbearance.

249.     On July 6, 2020, Ms. Doctor called Wells Fargo and spoke with a Wells Fargo supervisor. Ms. Doctor explained that she needed the forbearance removed from Wells Fargo's reporting to the credit reporting agencies because continued reporting would result in her being denied a loan with her Credit Union. The Wells Fargo supervisor stated Wells Fargo could only send Ms. Doctor an official "opt out" document.

250.     Also on July 6, 2020, Wells Fargo sent an email to Ms. Doctor attaching a letter dated July 1, 2020, which referenced "Confirming your request to opt out of mortgage payment suspension" and stated that Wells Fargo was returning the account to normal servicing and "reporting payment activity to the consumer reporting agencies."

251.     For the months of April through July 2020, Wells Fargo furnished information to the credit reporting agencies that the status of Ms. Doctor's monthly mortgage payments was paid, paid as agreed, or current. In addition, Wells Fargo furnished information that Ms. Doctor's mortgage loan account was in forbearance for at least May and June 2020.

252.     On July 7, 2020, Ms. Doctor filed a complaint online with the CFPB about Wells Fargo's credit reporting and reporting incorrect information. Specifically, Ms. Doctor complained that Wells Fargo placed her mortgage loan account in forbearance without her knowledge or consent and reported her mortgage loan as in forbearance to the credit reporting agencies, which would prevent Ms. Doctor

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

1    from obtaining credit from her Credit Union until the reference to the forbearance was removed from

2    her credit reports.

3         253.    On or about July 7, 2020, Ms. Doctor disputed with Equifax the reporting of false and

4    incorrect information furnished by Wells Fargo stating that Ms. Doctor's mortgage loan account was in

5    forbearance. On information and belief, Equifax sent notice of Ms. Doctor's disputes to Wells Fargo

6    pursuant to 15 U.S.C. § 1681s-2(b).

7         254.    On or about July 16, 2020, Ms. Doctor complained again about Wells Fargo's credit

8    reporting and, by July 16, 2020, Equifax began a re-investigation of Ms. Doctor's dispute relating to

9    Wells Fargo's reporting of her account as in forbearance.

10        255.    On July 31, 2020, Ms. Doctor sent written disputes to Equifax, Transunion, and Experian.

11    On information and belief, Wells Fargo received notice from each of those credit reporting agencies

12    pursuant to 15 U.S.C. § 1681s-2(b).

13        256.    On or about July 31, 2020, Ms. Doctor received a response from Wells Fargo concerning

14    her complaint with the CFPB regarding Wells Fargo's placement and reporting of her account in a

15    forbearance status. Wells Fargo states that it is "unable to remove the forbearance comment that was

16    previously reported for April 1, 2020, through June 1, 2020." Wells Fargo goes on to state that the

17    "account was last reported to the consumer reporting agencies on July 15, 2020, as current with no

18    forbearance comment."

19        257.    As of August 6, 2020, Ms. Doctor's Equifax report still noted that her mortgage loan

20    account was in forbearance for the months of May and June 2020.

21        258.    In the July 31, 2020 letter, Wells Fargo made the false and/or misleading statement that

22    the forbearance coding "had no impact to your FICO [credit] score." The letter stated that Wells Fargo

23    "did not receive notification from you that you would like to be removed from the [forbearance] plan

24    until June 30, 2020." But Wells Fargo never informed Ms. Doctor that it had placed her account into

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

1  forbearance for the months of May and June 2020. It is also unclear how Ms. Doctor should have been

2  known that her account was in forbearance for the months of May and June 2020, particularly because

3  she received statements from Wells Fargo on May 8, 2020 requesting her mortgage payment by June 1,

4  2020, and again on June 5, 2020 requesting her mortgage payment by July 1, 2020.

5      259.    As a result of Wells Fargo's false and misleading statements and conduct, Ms. Doctor

6  suffered damages, including the inability to secure a loan through the Credit Union on June 29, 2020.

7      **4.    Gerald Forsburg, a Virginia resident.**

8      260.    Mr. Forsburg's mortgage loan, secured by a lien against his property located at 129

9  Shannon Avenue in Mount Jackson, Shenandoah County, Virginia 22842, is a loan backed by the FHA

10  and serviced by Wells Fargo.

11      261.    Mr. Forsburg' personal liability on the mortgage loan secured by the Shannon Avenue

12  property was discharged in a Chapter 7 bankruptcy in 2016, although the remaining unpaid debt on that

13  loan continues to be secured by a lien against the Shannon Avenue property.

14      262.    After his 2016 bankruptcy, Mr. Forsburg's mortgage loan fell into default, and Mr.

15  Forsburg began working with Wells Fargo in an effort to obtain an FHA HAMP loan modification in

16  order to reduce his interest rate and monthly mortgage payment and to catch up on the arrears owing on

17  the mortgage loan.

18      263.    In connection with his mortgage modification efforts, Mr. Forsburg accepted a trial

19  modification plan offered by Wells Fargo, which required Mr. Forsburg to make three monthly

20  payments of $848.53 for January, February, and March 2020 as a precondition to Wells Fargo providing

21  Mr. Forsburg with a final mortgage modification.

22      264.    Mr. Forsburg made each of the trial modification payments under the trial modification

23  plan on time and in full, as required.

24

59

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

265.    On March 11, 2020, Wells Fargo approved Mr. Forsburg's loan for a final FHA HAMP mortgage modification.

266.    The monthly payment under the terms of Mr. Forsburg's modified mortgage loan is $831.75, with the first post-modification installment due May 1, 2020.

267.    Mr. Forsburg was not required to make a monthly payment for April 2020 under the terms of his mortgage modification agreement. Moreover, Mr. Forsburg's modified monthly payment of $831.75 represents substantial savings compared with his pre-modification monthly mortgage payment of approximately $1,052.68. Additionally, the contractual annual interest rate for Mr. Forsburg's modified loan is 3.5%, a significant reduction of the pre-modification interest rate of 4.875%.

268.    Mr. Forsburg's mortgage modification recapitalized $8,648.26 in unpaid amounts, resulting in a $148,633.85 new modified principal balance for his mortgage loan secured by the Shannon Avenue property.

269.    On March 18, 2020, Wells Fargo sent final modification paperwork via FedEx to Mr. Forsburg, with instructions that Mr. Forsburg needed to sign the documents and have them notarized before returning the executed documents to Wells Fargo.

270.    Mr. Forsburg received the FedEx from Wells Fargo with the final modification paperwork on March 19, 2020.

271.    On March 20, 2020, Mr. Forsburg executed the final modification documents before a notary, who notarized Mr. Forsburg's signature and returned the final modification documents to Wells Fargo.

272.    On or about April 2, 2020, Mr. Forsburg attempted to log into Wells Fargo's online payment portal in order to confirm that Wells Fargo had implemented his FHA HAMP mortgage modification and to make his May 1, 2020 modified monthly mortgage payment of $831.75.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

273.     When he attempted to log in to make his mortgage payment on April 2, 2020, Mr. Forsburg received a message from Wells Fargo stating that his mortgage loan had not yet been updated with the terms of his March 11, 2020, Wells Fargo approved, fully executed, final FHA HAMP modification, and Wells Fargo indicated that it would "be in touch" with Mr. Forsburg "soon."

274.     Unbeknownst to Mr. Forsburg, sometime after March 20, 2020 and prior to April 2, 2020, Wells Fargo had placed his original, unmodified loan into a three-month forbearance program, effective as of the mortgage payment due for April 2020.

275.     Mr. Forsburg did not request that his mortgage loan be placed into forbearance prior to April 2020, or at any time thereafter.

276.     Prior to placing Mr. Forsburg's loan into forbearance status for April 2020, Wells Fargo did not inform Mr. Forsburg that placing his loan into forbearance would result in Wells Fargo terminating the final mortgage modification agreement Mr. Forsburg had accepted on March 20, 2020.

277.     Because Mr. Forsburg's loan was in forbearance status, Wells Fargo stopped implementation of the final FHA HAMP mortgage modification that it offered to Mr. Forsburg, which Mr. Forsburg had accepted.

278.     Instead, without notice to Mr. Forsburg, Wells Fargo unilaterally placed Mr. Forsburg's original, unmodified mortgage loan into forbearance status.

279.     As a result, without Mr. Forsburg's prior knowledge or consent, Wells Fargo cancelled the final FHA HAMP modification Mr. Forsburg had accepted on March 20, 2020.

280.     When Mr. Forsburg contacted Wells Fargo by phone to make his May 2020 payment under the newly modified loan terms, he was told that he did not need to make a payment because his loan was in forbearance. Mr. Forsburg was not told at that time that his modification had not been implemented by Wells Fargo.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

281.    As recently as July 21, 2020, a Wells Fargo representative told Mr. Forsburg that Wells Fargo placed all loans that were in the modification process into forbearance status.

282.    Moreover, upon information and belief, after cancelling the modification and placing the loan in forbearance, Wells Fargo has also placed Mr. Forsburg's loan in foreclosure status.

283.    Mr. Forsburg has contacted Wells Fargo multiple times regarding this issue and, despite spending anywhere from 45–90 minutes on the phone, has not received a definitive answer from Wells Fargo regarding this issue. Indeed, Wells Fargo's representatives have given him conflicting information about the status of his mortgage loan after Wells Fargo placed his account in forbearance.

284.    In an article by Pulitzer Prize winning journalist Gretchen Morgenson, writing for NBC News, a Wells Fargo representative explained that it was Wells Fargo's practice to unilaterally place loans of borrowers who were in the modification process into forbearance status under the CARES Act, without such borrowers' prior knowledge or consent.[91]

285.    Wells Fargo's website's "FAQ" section related to COVID-19 and CARES Act forbearance indicates that Wells Fargo cancels pending modification applications for its borrowers when borrowers accept a CARES Act forbearance.[92] Yet, Mr. Forsburg was told by a Wells Fargo representative that Wells Fargo unilaterally placed borrowers with pending loan modifications into forbearances.

286.    Mr. Forsburg had the ability and intention of making the payments required of him under his modified loan terms, as set forth in the final modification documents he executed and returned to Wells Fargo on March 20, 2020.

---

[91] Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him*, NBC News (July 16, 2020), https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

[92] COVID-19 Assistance, Wells Fargo, https://www.wellsfargo.com/mortgage/manage-account/payment-help/coronavirus (last visited May 19, 2023).

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

287. Mr. Forsburg did not want or request a CARES Act forbearance from Wells Fargo.

288. During the unauthorized forbearance period, Mr. Forsburg was prevented from making any payment via Wells Fargo's online payment system, other than payment in the amount of his pre-modification loan; Wells Fargo gives him no option to specify a different payment amount.

289. Wells Fargo's actions in placing Mr. Forsburg's loan in forbearance, without Mr. Forsburg's knowledge or consent, deprived Mr. Forsburg of the opportunity to cure his arrears and lower his interest rate through the modification.

**5.  Samara Green, a Georgia resident**

290. Plaintiff Samara Green has a mortgage serviced by Wells Fargo in Rockdale County, Georgia.

291. On or about June 15, 2020, a representative from Wells Fargo called Ms. Green to address concerns Ms. Green had about her escrow payments. During this call, the Wells Fargo representative talked to Ms. Green about the option of placing her mortgage in forbearance.

292. Ms. Green told the Wells Fargo representative that she was not interested in Wells Fargo's forbearance program.

293. Before the June 15, 2020 phone call, Ms. Green had already made a mortgage payment to Wells Fargo on June 12, 2020.

294. However, unbeknownst to Ms. Green, her June 12, 2020 payment was not timely applied to her mortgage or her escrow account because Wells Fargo placed her mortgage in forbearance without her knowledge or consent.

295. In a letter sent from Wells Fargo to Ms. Green dated June 13, 2020, regarding this forbearance Wells Fargo confirmed that "as your account servicer, we are attempting to collect a debt and any information obtained will be used for that purpose". In addition, the letter contained multiple false and misleading statements.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

296. The June 13, 2020 letter falsely stated that, "You let us know about a financial hardship you're facing as a result of the COVID-19 crisis. To help, we have suspended your mortgage payment for three months." The letter also falsely stated that Ms. Green had accepted the "short-term payment suspension" and that she had "requested payment suspension" when she had not. The letter falsely stated that, "You can end the payment suspension at any time" and failed to inform Ms. Green that Wells Fargo did not timely apply her June 12, 2020 payment. The letter was also false and misleading regarding how Wells Fargo would report her mortgage account with respect to the forbearance.

297. On or around June 26, 2020, Ms. Green called Wells Fargo again to further inquire about fees and the application of escrow payments. During the phone call, the Wells Fargo representative informed Ms. Green that her mortgage had been placed in forbearance.

298. Ms. Green informed the representative that she had never requested nor consented to forbearance on her mortgage, that Wells Fargo had acted without her knowledge or consent, and she demanded that her account be taken out of forbearance. Ms. Green received a letter from Wells Fargo dated July 1, 2020 which memorialized this conversation. As the letter recounted, Wells Fargo placed Ms. Green's mortgage into forbearance though she "did not request this."

299. Wells Fargo admits in the letter that though Ms. Green called Wells Fargo to discuss her escrow account, Wells Fargo instead suspended all her mortgage payments.

300. Wells Fargo never informed Ms. Green, either on the June 26, 2020 phone call or in the June 13, 2020 or July 1, 2020 letters, that Wells Fargo had failed to apply her June 12, 2020 payment to her mortgage or her escrow account.

301. On or about July 15, 2020, Ms. Green went to a Wells Fargo bank branch in order to make another mortgage payment to Wells Fargo.

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

302.     However, when Ms. Green spoke with the Wells Fargo representative at the bank branch, she was told that the amount due on her mortgage was over $3,500, that her prior June payment had not been applied to her mortgage or her escrow, and that her mortgage had been placed in forbearance.

303.     After Ms. Green's visit to the Wells Fargo branch, she immediately called Wells Fargo and spoke to a representative. The Wells Fargo representative confirmed that Ms. Green's mortgage payment had not been applied to her mortgage or her escrow because she had been placed in forbearance. The Wells Fargo representative told Ms. Green that her payment had been placed in an "unapplied fund" and that those payments would be reversed because they could not be applied to her mortgage or escrow while she was in forbearance.

304.     Wells Fargo placed Ms. Green's loan in forbearance without her consent and incorrectly reported this to credit reporting agencies.

305.     Because Wells Fargo failed to timely apply her June 12, 2020 payment, Wells Fargo reported to the Credit Reporting Agencies that Ms. Green was 30 days late on her mortgage for the month of June 2020.

306.     While Wells Fargo did, ultimately, apply the June 12, 2020 payment to her mortgage, they did so months late.

307.     Ms. Green did not request a forbearance of her mortgage loan payment obligations, did not contact Wells Fargo about a forbearance, and she did not—and does not—want a forbearance of her mortgage payment obligations.

**6.     Patrick Healy, a California resident.**

308.     Mr. Healy's residential property located in San Marcos, California, is encumbered by a lien securing repayment of a mortgage that is serviced by Wells Fargo.

309.     In June 2020, Mr. Healy discovered that Wells Fargo had been persistently reporting inaccurate credit information about this mortgage loan account with Wells Fargo. Specifically, Wells

65

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

Fargo had been falsely reporting that his mortgage loan was in forbearance and that no payments had been made on the account for months, at least as of April 2020.

310. In a letter from Wells Fargo dated June 3, 2020, Wells Fargo incorrectly stated that Mr. Healy "had asked for help with [his] mortgage payments because [he] was facing a financial hardship as a result of the [COVID-19] crisis." The letter then went on to say, "To help, we suspended your mortgage payments for three months, but you've still been making your payments."

311. However, Mr. Healy never requested or agreed to a forbearance on his mortgage loan or any type of deferment.

312. During the purported period of forbearance, Mr. Healy has been making each monthly mortgage payment in full and on time, yet Wells Fargo furnished to the credit reporting agencies the indisputably false and inaccurate information that he had not made any recent monthly payments during the several months that his account was wrongfully placed in forbearance.

313. Mr. Healy contacted Wells Fargo about the forbearance status on the loan that he did not request. In response, in a letter from Wells Fargo, dated June 15, 2020, Wells Fargo stated "Thank you for updating us on your situation. We're confirming that we've canceled the short-term payment suspension."

314. In fact, in a letter from Wells Fargo dated July 6, 2020, Wells Fargo admitted that Mr. Healy did not request a forbearance. Specifically, Wells Fargo stated: "We found that when you first spoke with us you requested information about the forbearance plan. We can confirm you did not request or accept the plan at that time and the plan was added to the account in error." The letter further stated in part, "We apologize for any confusion or frustration regarding how your credit report may have been impacted due to the COVID-19 pandemic."

315. Unfortunately, as a result of the false mortgage forbearance reporting by Wells Fargo, Mr. Healy was deprived of a home mortgage refinance loan with another lender who declined to extend

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

1    Mr. Healy credit in light of Wells Fargo's reporting of the account in forbearance with no recent payment
2    made.

3    316.    After the inaccurate credit reporting with Experian was disputed, Experian in response
4    indicated that following their "reinvestigation" of the dispute, "The information you disputed has been
5    updated," and the credit report, generated on June 20, 2020, then showed that the mortgage account was
6    current on payments from January to June 2020.

7    317.    Only after the dispute was corrected was Mr. Healy able to secure new credit that had
8    previously been denied for months.

9    **7.    Brett Jacob, a New York resident.**

10   318.    Plaintiff Brett Jacob has a mortgage serviced by Wells Fargo for a property in Nassau
11   County, New York.

12   319.    On or about March 16, 2020, Mr. Jacob called Wells Fargo and asked that his mortgage
13   payments no longer be automatically debited from his bank account.

14   320.    Mr. Jacob requested that he be permitted to make payments at a time and in a manner of
15   his own choosing. Wells Fargo honored Mr. Jacob's request and, a few days later, Mr. Jacob received a
16   letter from Wells Fargo dated March 20, 2020 confirming that Wells Fargo had "completed your request
17   to suspend your automatic mortgage payments."

18   321.    Wells Fargo's entire forbearance program was an unfair and deceptive business practice.
19   When Wells Fargo agreed to suspend Mr. Jacob's automatic mortgage payments, its representative told
20   Mr. Jacob that Wells Fargo would send him information about possible "payment assistance" during the
21   pandemic. However, unbeknownst to Mr. Jacob, at the time Wells Fargo agreed to suspend Mr. Jacob's
22   automatic payments and send him information, Wells Fargo put Mr. Jacob in forbearance without his
23   knowledge or consent.

24

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

322.     Mr. Jacob received a second letter from Wells Fargo dated March 26, 2020, which was deceptive and misleading. The letter did not inform Mr. Jacob that Wells Fargo placed him into a forbearance, nor does the word "forbearance" appear anywhere in the letter. Instead, the letter used deceptive terms such as "short-term payment relief" and "payment suspension," and stated that his mortgage payments were "suspended" until October 1, 2020.

323.     The March 26, 2020 letter was highly misleading in that it stated that Wells Fargo would not "report a past-due status" for Mr. Jacob's account to the credit reporting agencies, when, in fact, Wells Fargo was reporting that Mr. Jacob's account was in forbearance. The letter also falsely and deceptively stated that, "If you do not need the payment relief, you can continue making the payments as normal and no further action is needed." However, as noted below, Mr. Jacob was not able to continue his normal payments using Wells Fargo's online payment system.

324.     Mr. Jacob never requested that Wells Fargo place his mortgage into forbearance.

325.     Since being placed in forbearance, Mr. Jacob tried to make mortgage payments, but Wells Fargo suspended his ability to make payments through his mobile app.

326.     Further, though Wells Fargo assures its customers otherwise, the forbearance that he did not request is reflected on his credit report. Mr. Jacob filed a written notice of dispute with Experian on September 9, 2020.

327.     After Wells Fargo placed him in forbearance, Mr. Jacob attempted to secure a small-business loan but was denied, at least in part because the lender pulled his credit report and saw that his mortgage had been placed in forbearance.

328.     In addition, Mr. Jacob's attempt to refinance his mortgage and to obtain a lower interest rate on his mortgage was denied because Wells Fargo placed his mortgage into forbearance without his consent.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

329. Wells Fargo placed Mr. Jacob's loan in forbearance without his consent and incorrectly reported this to credit reporting agencies such that it appears on Mr. Jacob's credit report.

330. Mr. Jacob disputed this inaccurate credit reporting with Experian. On information and belief, Experian sent notice of Mr. Jacob's dispute to Wells Fargo pursuant to 15 U.S.C. § 1681s-2(b).

331. Experian added a comment to Mr. Jacob's credit report, generated on September 25, 2020, that opined, "The information you disputed has been verified as accurate; however, information unrelated to your dispute has been updated."

332. Mr. Jacob disputed the forbearance notation, as he had never requested a forbearance. Rather than investigate whether it had erred in placing Mr. Jacob into a forbearance, Wells Fargo merely confirmed to Experian that it *had* placed Mr. Jacob into a forbearance. This paltry investigation is inadequate—akin to a debt collector only investigating whether a disputed debt had been paid, and not whether they had reported it against the right debtor.

333. The credit reporting concerning the forbearance was incorrect, as Mr. Jacob did not request a forbearance of his mortgage loan payment obligations, did not contact Wells Fargo about a forbearance, and did not—and does not—want a forbearance of his mortgage payment obligations.

**8. Charles Johnson, a California resident.**

334. Plaintiff Charles Johnson has a mortgage serviced by Wells Fargo for a property in Riverside County, California.

335. At the end of March 2020, Mr. Johnson called Wells Fargo and asked to be placed into the forbearance program, to receive short-term payment relief for his mortgage account.

336. Per his request, Mr. Johnson's forbearance period was to last three months, from April through June 2020.

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

337. Mr. Johnson received a letter from Wells Fargo dated April 6, 2020 confirming that they had "suspended [his] obligation to make monthly mortgage payments for three months" and that Mr. Johnson needed to resume his "regular mortgage payment schedule beginning on July 1, 2020."

338. Wells Fargo sent Mr. Johnson a letter dated May 26, 2020 informing him that his account was due for two payments "for the month(s) of April 1, 2020 through May 26, 2020."

339. Concerned by this correspondence, Mr. Johnson called Wells Fargo and spoke to a customer representative and asked specifically to be removed from the program when his three-month period ended.

340. He also asked about the process of resuming payments when his forbearance period ended on July 1, 2020.

341. Mr. Johnson did not ask that his forbearance period be extended; in fact, he requested the exact opposite.

342. Despite this conversation, Mr. Johnson received a letter from Wells Fargo dated June 17, 2020, asking Mr. Johnson if he wished to extend his period of forbearance for another three months.

343. Mr. Johnson did not want the period of forbearance be extended, and since he already called Wells Fargo he expected that he would be taken out of the forbearance program.

344. However, in a letter from Wells Fargo dated July 8, 2020, Mr. Johnson was informed that Wells Fargo had yet again "suspended [his] mortgage payments for an additional three months." Mr. Johnson was told that he would not need to resume his mortgage payments until October 1, 2020.

345. Mr. Johnson made a $1,446.80 mortgage payment on or about July 1, 2020 which Wells Fargo accepted.

346. However, Wells Fargo failed to apply Mr. Johnson's July 1, 2020 payment to his mortgage account.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

347. Mr. Johnson made a $1,446.80 mortgage payment on or about August 1, 2020 which Wells Fargo accepted.

348. However, Wells Fargo failed to apply Mr. Johnson's August 1, 2020 payment to his mortgage account, and decrease his principal and interest.

349. Mr. Johnson called Wells Fargo on or about July 16, 2020, told a customer service representative that he never requested that his forbearance period be extended, and requested to be removed from the forbearance program.

350. Wells Fargo did not provide Mr. Johnson with answers to his questions nor was he told that he was removed from the forbearance program.

351. Instead, Mr. Johnson was told to not make a payment on his mortgage and that he would be receiving further correspondence.

352. Mr. Johnson did not receive any further correspondence regarding the status of his mortgage account.

353. Mr. Johnson called Wells Fargo three additional times—on or about August 6th, 7th, and 11th—but Wells Fargo was not able to tell Mr. Johnson that he had been removed from the forbearance program.

354. Because Mr. Johnson's mortgage was placed in an extended forbearance program without his consent and without his knowledge, Wells Fargo incorrectly reported to the credit reporting agencies that his mortgage was in forbearance after July 1, 2020 and until October 1, 2020.

355. Mr. Johnson's credit score dropped by 13 points after July 1, 2020 as a result of Wells Fargo's incorrectly reporting to the credit reporting agencies that his mortgage was in forbearance.

356. Wells Fargo placed Mr. Johnson's loan in a second forbearance without his consent, and incorrectly reported this to credit reporting agencies such that it appears on Mr. Johnson's credit report.

71

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

357.    Wells Fargo also incorrectly reported the total balance of Mr. Johnson's mortgage, failing to account for the payments made for the months of April 2020 and May 2020.

358.    Further, despite placing Mr. Johnson unwillingly into forbearance during these months and taking Mr. Johnson's payments, Wells Fargo reported to the credit reporting agencies that Mr. Johnson's mortgage balance had increased from $141,175 in April 2020 to $143,288 in June 2020.

359.    As such, Mr. Johnson suffered damages to his credit and reputation.

360.    Further, Wells Fargo's extension of Mr. Johnson's forbearance without his request, failure to account for the payments he made, incorrect reporting to the credit bureaus, and to date failure to remedy the issues, are continuously causing Mr. Johnson mental anguish, embarrassment, and stress.

**9.      Barbara Prado, a California resident**

361.    Barbara Prado is a chef by trade. Until September 1, 2020, for eight years, she had been employed as a manager by the Bon Appetit cafe and restaurant chain, including throughout March 2020.

362.    Ms. Prado has two FHA mortgage loans that are serviced by Wells Fargo and are secured by her homestead property, which is located in Fremont, California.

363.    Ms. Prado's primary mortgage loan has an account number ending in 4898 (the "Primary Mortgage Loan").

364.    From April through September 2020, Ms. Prado's monthly payment on her Primary Mortgage Loan has been $1,594.70, which includes principal, interest, and escrow for property taxes and insurance.

365.    Ms. Prado's secondary mortgage loan has an account number ending in 9035 (the "Secondary Mortgage Loan").

366.    The monthly payment on Ms. Prado's Secondary Mortgage Loan is $167.90.

72

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

367.     Prior to April 2020, Ms. Prado had arranged for her payments on the Secondary Mortgage Loan to be automatically drafted from her bank account by Wells Fargo each month in the amount of $200.00, designating the $32.10 surplus to be applied to further reduce the loan's principal balance.

368.     Ms. Prado called Wells Fargo on Saturday, March 28, 2020, to inquire about COVID-19 related payment assistance options with respect to her Primary Mortgage Loan only. Including hold time, Ms. Prado's March 28, 2020 call to Wells Fargo lasted approximately 43 minutes.

369.     Ms. Prado does not recall or believe that she ever requested "forbearance" during her March 28, 2020 call with Wells Fargo and she does not recall authorizing Wells Fargo to place her Primary Mortgage Loan account into forbearance status effective April 1, 2020.

370.     Wells Fargo sent Ms. Prado a letter dated September 4, 2020, in which Wells Fargo asserts that Ms. Prado called Wells Fargo regarding her Primary Mortgage Loan on March 28, 2020, "and stated that [Ms. Prado] would need two months deferred as [she] did not know when [she] would be going back to work."

371.     Wells Fargo's September 4, 2020 letter does not assert that Ms. Prado ever requested "forbearance" as to her Primary Mortgage Loan, nor does it assert that Ms. Prado agreed on March 28, 2020 (or at any other time) to a "payment suspension" that would be immediately effective.

372.     On September 15, 2020, a Wells Fargo representative, Erica Nosbisch, informed Ms. Prado that Wells Fargo placed her Primary Mortgage Loan account into forbearance status on March 30, 2020.

373.     Ms. Prado actually made her monthly mortgage payments on her Primary Mortgage Loan from April through September 2020.

374.     In addition to placing Ms. Prado's Primary Mortgage Loan into forbearance following Ms. Prado's March 28, 2020 call, Wells Fargo placed Ms. Prado's Secondary Loan Account into

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

forbearance status, without Ms. Prado requesting a forbearance on her Secondary Mortgage Loan and without her knowledge or consent.

375.    Wells Fargo's September 4, 2020 letter to Ms. Prado acknowledges that Wells Fargo placed Ms. Prado's Secondary Mortgage Loan into forbearance status without Ms. Prado's consent, "because of the request from [her] on [her Primary Mortgage Loan]. Due to high call volumes, the process was automated and forbearance assistance was provided for all accounts associated with [Ms. Prado's Primary Mortgage Loan]."

376.    For example, Wells Fargo automatically placed Ms. Prado's Secondary Mortgage into forbearance without her requesting the forbearance or even knowing that Wells Fargo had placed her Secondary Mortgage into forbearance. Wells Fargo also cut off the automatic payments on Ms. Prado's Secondary Mortgage without telling Ms. Prado that it was doing so, causing Ms. Prado to become three months behind on her Secondary Mortgage through no fault of her own. Wells Fargo automatically extended the forbearance on Ms. Prado's Secondary Mortgage, even though Ms. Prado did not ask for Wells Fargo to place her Secondary Mortgage into forbearance and did not request that Wells Fargo extend a forbearance that she did not even know about.

377.    The mortgage statements that Wells Fargo sent Ms. Prado seeking collection of the payments on her Secondary Mortgage were deceptive and misleading. They said "You had asked for help with mortgage payments because you were facing a financial hardship as a result of the crisis. To help, we suspended the mortgage payments for a period of time." Ms. Prado did not request that her Secondary Mortgage be placed into forbearance, did not ask for the forbearance to be extended, and asked that her loan be taken out of forbearance. Rather than "helping," Wells Fargo unauthorized forbearance practices caused Ms. Prado's Secondary Mortgage to go three months into default. Another monthly mortgage statement on the Secondary Mortgage stated, "We have received your request for short term payment relief. As requested, we have cancelled your future automatic withdrawals." These

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

1    statements were patently false, as Ms. Prado did not request forbearance for her Secondary Mortgage

2    and never requested that her automatic payments for that loan be stopped.

3        378.    When Wells Fargo placed Ms. Prado's Secondary Mortgage Loan into forbearance

4    status, it also terminated the pre-arranged automatic electronic monthly payments that Ms. Prado had

5    set up with Wells Fargo for her Secondary Mortgage Loan without prior notice to Ms. Prado.

6        379.    Because she had come to expect that the $200 monthly payment on her Secondary

7    Mortgage Loan would be automatically drafted from her bank account each month, Ms. Prado did not

8    notice that her Secondary Mortgage Loan payments to Wells Fargo for April, May, and June 2020 had

9    not been drafted from her account.

10       380.    On June 10, 2020, at her daughter's urging, and with her daughter present, Ms. Prado

11   called Wells Fargo to obtain information about the CARES Act forbearance program.

12       381.    During her June 10, 2020 call, after listening to a Wells Fargo representative's attempt

13   to explain how the forbearance program would work, Ms. Prado informed Wells Fargo that she was not

14   interested in forbearance at that time.

15       382.    The Wells Fargo representative Ms. Prado spoke with on June 10, 2020 did not mention

16   to Ms. Prado that both her Primary Mortgage Loan and her Secondary Mortgage Loan were already, or

17   had already been, in forbearance.

18       383.    On July 9, 2020, Ms. Prado received an email from Wells Fargo informing her that Wells

19   Fargo would be extending the forbearance term on her Secondary Mortgage Loan for an additional 90

20   days.

21       384.    Ms. Prado was alarmed by Wells Fargo's July 9, 2020 email extending the term of the

22   unauthorized forbearance on her Secondary Mortgage Loan.

23       385.    Ms. Prado did not request that Wells Fargo extend the forbearance on her Secondary

24   Mortgage Loan.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

386. On July 9, 2020, Ms. Prado attempted to call Wells Fargo to get information about why Wells Fargo was sending her an email that said her Secondary Mortgage Loan account was in forbearance status. However, she was kept on hold for so long that it was interfering with her work and she ultimately was forced to hang up before she was able to speak with anyone at Wells Fargo.

387. So, after getting off work on July 9, 2020, Ms. Prado went to a Wells Fargo branch bank to seek an explanation for Wells Fargo's email indicating that her Secondary Mortgage Loan was in forbearance.

388. Upon Ms. Prado's arrival at the Wells Fargo branch bank at approximately 4:30pm on July 9, 2020, Ebonique Edogun, a Wells Fargo representative at the Wells Fargo branch banking location, attempted to assist Ms. Prado that evening by trying to call Wells Fargo's mortgage division to obtain information about the forbearance on the Secondary Mortgage Loan.

389. Ms. Edogun's call to Wells Fargo on Ms. Prado's behalf remained on hold past the Wells Fargo branch bank's business hours, until approximately 5:30 p.m. Pacific time. At that point, Ms. Prado asked Ms. Edogun to end the call so they could both go home.

390. The next morning, at approximately 5:30 a.m. Pacific time on July 10, 2020, Ms. Prado again called Wells Fargo to inquire about the July 9, 2020 email regarding extension of the forbearance on her Secondary Mortgage Loan.

391. During the July 10, 2020 call, Ms. Prado first spoke with a Wells Fargo representative named Colleen, who later transferred Ms. Prado's call to a supervisor named Rosemary.

392. While speaking with Colleen during the July 10, 2020 call, Ms. Prado learned, to her surprise, that her Primary Mortgage Loan was also in forbearance status.

393. During the July 10, 2020 call, Ms. Prado also learned that her Secondary Mortgage Loan was three months behind because of the unauthorized forbearance on her Secondary Mortgage Loan

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

1   account and Wells Fargo's undisclosed cancellation of her automatic electronic payment arrangement

2   with Wells Fargo for the Secondary Mortgage Loan.

3     394. While speaking with Rosemary during the July 10, 2020 call, Ms. Prado requested to

4   have the forbearance removed from both loans.

5     395. Rosemary, Wells Fargo's representative, advised Ms. Prado during the July 10, 2020 call

6   that Ms. Prado would be able to defer the missed (forborne) payments on her Secondary Mortgage Loan

7   to the end of her loan, and that this process would be done through correspondence Ms. Prado would

8   receive by mail.

9     396. Later in July, instead of offering to defer the missed (forborne) payments on her

10   Secondary Mortgage Loan, Wells Fargo sent Ms. Prado a letter dated July 13, 2020, informing Ms.

11   Prado that she had an overdue balance on her Secondary Mortgage Loan account and requesting that

12   Ms. Prado call Wells Fargo because "...we want to help you."

13     397. Ms. Prado made her July 2020 Secondary Mortgage Loan payment directly to Wells

14   Fargo in the amount of $200, which Wells Fargo initially accepted and applied to Ms. Prado's Secondary

15   Mortgage Loan account on July 14, 2020, designating $167.90 as the regular payment, and $32.10 as a

16   principal payment, as reflected on the July 14, 2020 statement Wells Fargo sent Ms. Prado.

17     398. Wells Fargo then sent Ms. Prado a second statement in July 2020, dated July 16, 2020,

18   which reverses the $32.10 that Wells Fargo applied as a principal payment on July 14, 2020, and places

19   $32.10 into an unapplied funds account.

20     399. Wells Fargo also sent Ms. Prado a letter dated July 14, 2020, congratulating Ms. Prado

21   because she was once again enrolled in monthly automatic payments for her Secondary Mortgage Loan,

22   beginning August 14, 2020.

23     400. Wells Fargo next sent Ms. Prado a letter dated July 15, 2020 stating that her account was

24   due for "3 payment(s) for the month(s) of May 1, 2020 through July 15, 2020 [sic]." Wells Fargo's July

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

15, 2020 letter offers Ms. Prado various options to "help [her] stay in [her] home," none of which included deferral of her payments to the end of the note, as she had been told previously.

401.   On July 22, 2020, Ms. Prado called Wells Fargo regarding her Secondary Mortgage Loan account because she was confused by Wells Fargo's correspondence, which did not comport with her prior conversation on July 10, 2020 with Wells Fargo's representative, Rosemary, in which Rosemary informed Ms. Prado that the forborne payments on her Secondary Mortgage Loan would be put at the end of her loan.

402.   A Wells Fargo representative named Raphael spoke with Ms. Prado during the July 22, 2020 call. Raphael informed Ms. Prado that he could see no indication in Wells Fargo's system that Ms. Prado had requested forbearance on her Secondary Mortgage Loan and that a Wells Fargo representative named "Tayion Pugh" appeared to be the person who put the process in motion that resulted in Ms. Prado's Secondary Mortgage Loan account being placed into forbearance status. Raphael was not able to explain why the forborne (without authorization) payments on Ms. Prado's loan were not being deferred.

403.   On July 28, 2020, Ms. Prado accessed her Secondary Mortgage Loan account information through Wells Fargo's website in order to determine how much she would need to pay to bring her Secondary Mortgage loan current. According to Wells Fargo's website as of July 28, 2020, Ms. Prado was required to pay $610.40 to bring her loan current at that time.

404.   The next day, July 29, 2020, Ms. Prado went to a Wells Fargo branch bank and paid $610.40, believing that she was bringing her account contractually current.

**10.   Renrick and Vivian Robinson, Texas residents**

405.   The Robinsons' residence, in Grand Prairie, Texas, is encumbered by a VA mortgage, which on information and belief was originated by Wells Fargo, refinanced by Wells Fargo, and is serviced by Wells Fargo.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

406.     On March 20, 2020, Ms. Robinson called Wells Fargo to discuss a potential refinance, to take advantage of the historically low prevailing interest rates. The Wells Fargo representative told her about the forbearance program and asked if she wanted to receive some literature on forbearance relief. Ms. Robinson agreed to accept the literature, but expressly stated that she was not accepting forbearance.

407.     As Wells Fargo explained in a letter sent to the Robinsons months later, the customer service representative added the coding on the Robinsons' loan to have the informational packet sent, however, this also placed their mortgage into forbearance.

408.     When the Robinsons received the information, they reviewed it together. They decided that they did not want or need a forbearance and threw away the notice. However, Wells Fargo had already placed them into a forbearance.

409.     The Robinsons discovered this when Mr. Robinson applied for a personal line of credit from American Express, seeking the travel benefits and perks associated with that credit card. He was denied because he was in forbearance.

410.     Shocked, the Robinsons called Wells Fargo and demanded to be removed from forbearance.

411.     Although Wells Fargo represented that they had been removed, Mr. Robinson's application for the personal line of credit was again denied due to the forbearance code on his credit report. Ultimately, he was only able to secure the personal line of credit after sending verification of his income.

## VI.     CLASS ACTION ALLEGATIONS

412.     Plaintiffs bring this complaint on behalf of themselves and all others similarly situated under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), or alternatively 23(b)(4). The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage into forbearance or continued forbearance without receiving the borrower's request or continued consent for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

413.    In addition, Plaintiffs Delpapa, Healy, Johnson, and Prado seek to represent the following California Class:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in California into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

414.    In addition, Plaintiff Doctor seeks to represent the following Florida Class:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in Florida into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

415.    In addition, Plaintiff Green seeks to represent the following Georgia Class:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in Georgia into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

416.    In addition, Plaintiff Jacob seeks to represent the following New York Class:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in New York into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmance that the borrower is experiencing a financial hardship due to COVID-19.

417.    In addition, Plaintiffs Renrick and Vivian Robinson and Luis and Marisol Castro seek to represent the following Texas Class:

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in Texas into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmation that the borrower is experiencing a financial hardship due to COVID-19.

418. In addition, Plaintiff Gerald Forsburg seeks to represent the following Virginia Class:

> All residential mortgage borrowers for whom Wells Fargo Bank, N.A., placed a residential mortgage secured by real property in Virginia into forbearance or continued forbearance without receiving the borrower's request for a forbearance and affirmation that the borrower is experiencing a financial hardship due to COVID-19.

419. Excluded from the Classes are Wells Fargo's officers, directors and employees; the judicial officers and associated court staff assigned to this case; and the immediate family members of such officers and staff.

420. **Numerosity**: The members of the Classes are so numerous that joinder of all members would be impractical. Wells Fargo is one of the nation's largest home lenders and servicers, and media reports indicate borrowers in at least 14 states have experience non-requested forbearances. The CFPB has documented dozens of complaints. Wells Fargo recently reported to the United States Senate that approximately 1,600 borrowers had called to complain about being placed into unwanted forbearances. Based on the elevated volume of Wells Fargo's borrowers placed into forbearances, when compared to its industry peers, Plaintiffs estimate that hundreds of thousands of forbearances were the result of Wells Fargo's faulty program.

421. **Commonality and Predominance**: Common questions of law and fact predominate over any questions affecting only individual members of the Classes. For Plaintiffs and the Classes, the common legal and factual questions include, but are not limited to the following:

A. Whether Wells Fargo negligently or intentionally enrolled customers in forbearance programs without their consent;

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

B.    Whether Wells Fargo has breached terms implied in its contracts with Plaintiffs and the Class Members;

C.    Whether Wells Fargo's actions or inactions violated the consumer protection statutes invoked herein;

D.    Whether Plaintiffs and the Class members were damaged by Wells Fargo's conduct and, if so, the appropriate amount of damages;

E.    Whether, because of Wells Fargo's misconduct, Plaintiffs and the Classes are entitled to equitable and declaratory relief, and, if so, the nature of such relief.

422.    **Typicality**: The representative Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all the members of the Classes have been injured by the same wrongful practices of Wells Fargo. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Classes and are based on the same legal theories.

423.    **Adequacy**: Plaintiffs will fully and adequately assert and protect the interests of the Classes, and have retained class counsel who are experienced and qualified in prosecuting class actions. None of the Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Classes.

424.    **Predominance and Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class members are likely in the hundreds of millions of dollars, the individual damages incurred by each Class member are too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every member of the Classes could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

425.    Further, individual members of the Classes do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this Action that would preclude its maintenance as a class action. In addition, Wells Fargo has acted or refused to act on grounds generally applicable to the Classes and, as such, final injunctive relief or corresponding declaratory relief with regard to the Class members as a whole is appropriate.

426.    Wells Fargo has, or has access to, address and/or other contact information for the Class members, which may be used to provide notice of the pendency of this Action.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"),
18 U.S.C. § 1961 *et seq.* on Behalf of Plaintiffs and the Nationwide Class**

427.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

428.    This claim is brought by Plaintiffs against WFC and Wells Fargo Bank for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. §§ 1961 *et seq.*

429.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c).

430. At all relevant times, each Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property." *Id.*

431. WFC and Wells Fargo Bank conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), as described herein.

432. Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue under 18 U.S.C. § 1964(c) as they were and are injured in their business and/or property "by reason of" the RICO Act violations described herein.

433. Plaintiffs demand the applicable relief set forth in the Prayer for Relief below.

**A. WFC, Wells Fargo Bank, Black Knight, and Other Vendors Comprised an Enterprise Whose Activities Affect Interstate or Foreign Commerce.**

434. Section 1961(4) defines a RICO enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

435. The following persons constitute an associated in fact enterprise: (1) WFC; (2) Wells Fargo Bank; (3) Black Knight; and (4) other vendors, including (without limitation) InfoEx LLC ("InfoEx") (collectively, "Wells Fargo-Black Knight Mortgage Servicing Enterprise"), which together constitute an association in fact enterprise, the purpose of which is engaging in the various activities involved in Wells Fargo's mortgage servicing operations.

436. The Wells Fargo-Black Knight Mortgage Servicing Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce. In 2020, Wells Fargo began using the Wells Fargo-Black Knight Mortgage Servicing Enterprise to place borrowers into unrequested forbearances.

437. The Wells Fargo-Black Knight relationship forms the core of the Wells Fargo-Black Knight Mortgage Servicing Enterprise.

438.    Black Knight's Mortgage Servicing Platform ("MSP") is the database and integrated software platform through which Wells Fargo manages all aspects of its mortgage servicing business.

439.    MSP is not just software, and Black Knight's role with respect to Wells Fargo's mortgage servicing business is not just that of a software and/or data storage vendor.

440.    In connection with the Wells Fargo-Black Knight Mortgage Servicing Enterprise, Black Knight works with Wells Fargo as a data services and financial analysis provider.

441.    As relevant here, at Wells Fargo's direction, Black Knight created automation for Wells Fargo's forbearance scheme.

442.    Wells Fargo has refused to search for documents related to Black Knight, or other vendors, in connection with the forbearance program. However, documents produced by Wells Fargo in this litigation responsive to other requests elucidate the structure of this enterprise.

443.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

444.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

445. ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████

446. ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████

447. ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████

448. ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████

449. ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████

450. ███████████████████████████████████████
███████████████████████████████████████

451. ███████████████████████████████████████
███████████████████████████████████████████████

86

452.

453.

454.

455.

456.

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**



462.    Black Knight's involvement in Wells Fargo's forbearance scheme was not part of Black Knight's or Wells Fargo's routine business dealings in connection with the Wells Fargo-Black Knight Mortgage Servicing Enterprise.

463.    Upon information and belief, Black Knight was not involved in assisting its mortgage servicing clients—other than Wells Fargo—with placing borrowers' mortgage loans into forbearance without the borrowers' knowledge or consent.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

464. Black Knight's involvement in the Wells Fargo-Black Knight Mortgage Servicing Enterprise with respect to Wells Fargo's forbearance scheme was in furtherance of the affairs of the Wells Fargo-Black Knight Mortgage Servicing Enterprise and did not constitute activity merely in Black Knight's individual capacity in pursuit of its individual self-interest.

465. In the ordinary course of the Wells Fargo-Black Knight Mortgage Servicing Enterprise, Wells Fargo also routinely engaged another third party data services business, InfoEx, to provide data mining and document preparation services for Wells Fargo with respect to Wells Fargo-serviced loans of borrowers in Chapter 13 bankruptcy, including the preparation and filing of payment change notices, post-petition fee notices, and other documents routinely filed in mortgage borrowers' Chapter 13 bankruptcy cases.

466. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

467. InfoEx also participated in the Wells Fargo-Black Knight Mortgage Servicing Enterprise and the forbearance scheme by preparing and filing false notices of forbearance in the Chapter 13 bankruptcy cases of Wells Fargo borrowers whose loans Wells Fargo chose to place into forbearance without their knowledge or consent.

468. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

89

469.    In the context of Wells Fargo's forbearance scheme, InfoEx and Wells Fargo personnel together developed a modified version of an official form used in Chapter 13 bankruptcy cases (pursuant to Bankruptcy Rule 3002.1) for providing notice of monthly mortgage payment changes, which Wells Fargo and InfoEx used to file false notices with bankruptcy courts around the United States, which falsely stated that the borrower had requested forbearance relief for their mortgage loan.

470.    Wells Fargo's and InfoEx's modification of the official bankruptcy form for mortgage payment changes to state that Wells Fargo placed the borrower's mortgage loan into forbearance at the borrower's request was not part of InfoEx's routine business dealings.

471.    InfoEx's involvement in Wells Fargo's forbearance scheme was not part of its routine business dealings in connection with the Wells Fargo-Black Knight Mortgage Servicing Enterprise.

472.    Upon information and belief, InfoEx was not involved in assisting its mortgage servicing customers—other than Wells Fargo—with filing false forbearance notices in borrowers' Chapter 13 bankruptcy cases.

473.    InfoEx's involvement in the Wells Fargo-Black Knight Mortgage Servicing Enterprise with respect to Wells Fargo's forbearance scheme was in furtherance of the affairs of the Wells Fargo-Black Knight Mortgage Servicing Enterprise and did not constitute activity merely in InfoEx's individual capacity in pursuit of its individual self-interest.

474.    Wells Fargo directed the affairs of the Wells Fargo-Black Knight Mortgage Servicing Enterprise with respect to Wells Fargo's forbearance scheme.

475.    Through the Wells Fargo-Black Knight Mortgage Servicing Enterprise, Wells Fargo Bank directed Black Knight and InfoEx specifically to identify loans to be placed into unsolicited forbearance.

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

476.    While all Wells Fargo-Black Knight Mortgage Servicing Enterprise members participate in and are part of the Wells Fargo-Black Knight Mortgage Servicing Enterprise, they each also exist as separate and distinct entities apart from the Enterprise.

477.    WFC is a diversified financial services company organized under the laws of Delaware and registered as a financial holding company and a bank holding company under the Bank Holding Company Act of 1956, as amended.

478.    WFC provides banking, investment and mortgage products and services, as well as consumer and commercial finance through banking locations, ATMs, the internet and mobile banking.

479.    WFC conducts substantially all of its operations through its subsidiaries, including but not limited to Wells Fargo Bank, although WFC is a separate and distinct legal entity from its subsidiaries, including Wells Fargo Bank.

480.    A significant source of the funds WFC uses to pay dividends on its common and preferred stock and debt service on its debt is dividends from WFC's subsidiaries, including dividends from Wells Fargo Bank generated by the Wells Fargo Enterprise's forbearance scheme and Wells Fargo's capital markets business's conversion of unrequested forbearance into illicit profit vehicles.

481.    WFC uses funds it obtains from Wells Fargo Bank, including funds generated in connection with the Wells Fargo-Black Knight Mortgage Servicing Enterprise, including funds generated by the forbearance scheme, to satisfy WFC's financial obligations, including payments of principal and interest on WFC's debt.

482.    The Wells Fargo-Black Knight Mortgage Servicing Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity, namely the Wells Fargo-Black Knight Executive Board, Relationship Council, and Operating Teams, as well as Wells Fargo's and Black Knight's relationships with InfoEx and other vendors involved with various aspects of the Wells Fargo-Black Knight Mortgage Servicing Enterprise.

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

**B.  The Enterprise Committed Thousands of Predicate Acts.**

483.  Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). 18 U.S.C. § 1961(1). As set forth herein, Defendants have engaged, and continue to engage, in conduct violating each of these laws in order to effectuate their scheme.

484.  As alleged herein, for the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the United States Postal Service ("USPS"), caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the USPS or commercial interstate carriers, including but not limited to serving through the mail correspondence with some borrowers and correspondence regarding proposed loan retention workout options with respect to accounts placed into unauthorized forbearance status.

485.  For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, including but not limited to loan data, proposed post-forbearance workout terms and agreements, false forbearance notices, false reporting to the GSMC's, as well as to the SEC, Board of Governors of the Federal Reserve System, and the Office of the Comptroller of the Currency, among others, regarding loans Wells Fargo subjected to its forbearance scheme, as well as related email correspondence, monthly mortgage statements and online account information, and phone correspondence.

486.  The matter and things sent by Defendants via the USPS, commercial carrier, wire, or other interstate electronic media included, inter alia: false reports to credit reporting agencies that borrowers requested forbearance and/or failure to report and/or disclose payment receipts; false,

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

deceptive and misleading written correspondence with borrowers; email correspondence; misleading websites and mobile device electronic user interfaces that placed borrowers into forbearance with the click of a single button without warning or explanation, as well as other data used to place accounts into forbearance status and/or to inform third-parties of borrowers' loans that Wells Fargo placed into forbearance status without borrowers' consent; agreements; monthly mortgage statements; investor reporting; correspondence; and payments.

487. Other matter and things sent through or received via the USPS, commercial carrier, wire, or other interstate electronic media by Defendants include information or communications in furtherance of or necessary to effectuate the scheme.

488. Defendants' misrepresentations, acts of concealment, and failures to disclose were knowing and intentional and made for the purpose of deceiving borrowers, the GSEs, investors in GSE-backed trusts, the credit markets, equity and debt investors in Wells Fargo, and other persons, regulators, and entities to conceal or perpetuate Wells Fargo's unlawful scheme.

489. Because this is a class action, and there were numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all details of the scheme with particularity. Therefore, Plaintiffs cannot plead the precise dates of all of Defendants' use of the U.S. mail and interstate wire facilities, and corresponding acts of mail and wire fraud, as this information cannot be alleged without access to Defendants' records.

490. Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and that the GSMCs, their investors, Defendants' debt and equity investors, the credit reporting agencies, and participants in credit markets that rely on the integrity of credit information, as well as the Plaintiffs and the other members of the Class, relied upon or were injured by their and others' reliance upon the Defendants' misrepresentations and omissions. Had the GSMCs and their investors, Wells Fargo's debt and equity investors, the participants in the credit

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

markets, and Plaintiffs and other members of the Class, known that Wells Fargo's placement of loans into forbearance status without borrower authorization was used as a profit center and/or unlawful loss mitigation hedge, rather than to effectuate bona fide requested and agreed-to forbearance plans, they would have immediately halted Defendants' misconduct.

**C.      Pattern of Racketeering Activity.**

491.    Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past four years.

492.    Defendants began placing of borrowers' mortgage loans into unauthorized forbearances in March 2020, which is within four years of Plaintiffs' filing of their original complaint in this case.

493.    Each Defendant has committed numerous acts of racketeering activity. Racketeering activities include delivering false and misleading communications to borrowers via mail or wire; false and misleading communications to government sponsored entities like Ginnie Mae, involving the exercise of the early pool buyout option and resecuritization of loans that would never have been non-performing but for Wells Fargo's unlawfully placing them into forbearances; and false and misleading communications to credit reporting agencies. These communications continue to this day.

494.    Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and the other Class members.

495.    The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). Wells Fargo continues to profit, by resecuritizing billions of dollars in illicitly repurchased GNMA loans, and reaping the windfalls associated with servicing and holding those loans up until they are resecuritized.

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

496. As a direct and proximate result, Plaintiffs and Class members have been injured in their business or property or both by the predicate acts, which make up Defendants' patterns of racketeering activity.

497. Plaintiffs were injured by Wells Fargo's material omissions of fact and fraudulent placement of their loans into forbearance status, including credit damage, loss of access to credit markets and/or home equity lines of credit, an inability to refinance and costs associated with delayed refinancing, reputational damage, frustration, outrage, and various out-of-pocket costs, and other pecuniary damages and general damages.

## SECOND CAUSE OF ACTION

### Violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* on Behalf of Plaintiffs and the Nationwide Class

498. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

499. TILA requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights. In 2010, the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") amended TILA to, among other things, require servicers to promptly credit mortgage payments. 15 U.S.C. § 1639f.

500. This requirement is implemented through Regulation Z, which states that:

> In connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall . . . (f)ail to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency[.]

12 C.F.R. § 226.36(c)(1)(i).

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

501. The Dodd–Frank Act amendments to TILA also mandate that servicers credit periodic payments on consumer credit transactions secured by a consumer's principal dwelling as of the date of receipt. 15 U.S.C. § 1639f(a).

502. As demonstrated through the experiences of the Castros, Ms. Green, Ms. Doctor, Mr. Forsburg, and Mr. Johnson, Wells Fargo failed to timely credit payments.

503. In some instances, Wells Fargo reversed payments. In others, Wells Fargo accepted the payments, but did not credit those payments to the mortgage account. Instead, the payments were held, without the borrowers' knowledge or consent, in "unapplied funds" accounts.

504. Wells Fargo's failure to timely credit resulted in negative credit reporting, as Wells Fargo continued to report the borrowers as "in forbearances," despite their never having asked for that relief, and failed to report those payments.

505. Because being in a forbearance is a significant indicator of a lack of creditworthiness, the failure to timely credit and negative credit reporting resulted in concrete harms, such as the inability to refinance, the inability to secure additional lines of credit, damage to credit scores, and reputational harm.

506. For some borrowers, like Mr. Forsburg, the failure to timely credit a payment resulted in the denial of a HAMP modification agreement.

507. TILA provides a private right of action for violations of these provisions. 15 U.S.C. § 1640(a). This cause of action extends to suits against entities who violate the provisions of TILA and who, at some point, owned the loan obligation. 15 U.S.C. § 1641(f). On information and belief, Wells Fargo voluntarily repurchased tens of billions of dollars of loans that had been placed into fraudulent forbearance, subjecting them to liability for TILA servicing violations for those loans.

508. Plaintiffs are entitled to actual damages under 15 U.S.C. § 1640(a)(1), statutory damages under 15 U.S.C. § 1640(a)(2)(B), and attorneys' fees, under 15 U.S.C. § 1640(a)(3).

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

**THIRD CAUSE OF ACTION**

**Violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*
on Behalf of Plaintiffs and the Nationwide Class**

509.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

510.    The residences secured by the mortgages in question were the principal residences of Plaintiffs.

511.    RESPA, and the accompanying Regulation X, impose requirements on loan servicers who receive incomplete applications for loan modification. 12 C.F.R. § 1024.41. Borrowers' inquiries into forbearance are incomplete applications for loan modification, even where those communications are not requests for forbearances.[93]

512.    Generally, loan servicers are not to "evade the requirement to evaluate a complete loss mitigation application for all loss mitigation options available to the borrower by offering a loss mitigation option based upon" an incomplete application. 12 C.F.R. § 1024.41(c)(2)(i). However, upon receipt of an incomplete application, a loan servicer may nonetheless offer a short-term payment forbearance program based on that application. 12 C.F.R. § 1024.41(c)(2)(iii). "Promptly after offering" a forbearance program, unless the borrower rejects the offer, "the servicer must provide the borrower a written notice stating [1] the specific payment terms and duration of the program or plan, [2] that the servicer offered the program or plan based on an evaluation of an incomplete application, [3] that other loss mitigation options may be available, and [4] that the borrower has the option to submit a complete loss mitigation application to receive an evaluation for all loss mitigation options available to the borrower regardless of whether the borrower accepts the program or plan." *Id.*

---

[93] *Lender Letter (LL-2020-02)*, Fannie Mae (updated Dec. 9, 2020), https://singlefamily.fanniemae.com/media/22261/display.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

513. "This requirement applies with respect to every such short-term payment forbearance program offered, including each successive program renewal or extension".[94]

514. Several Plaintiffs did not receive a notification letter from Wells Fargo until several days or even weeks after their mortgage loans were already placed in a forbearance. The table below reflects the timeline in which Wells Fargo first sent Plaintiffs Castro, Delpapa, Green, Johnson, and Prado a notification letter indicating that their mortgage was placed in forbearance or that forbearance was extended:

| Plaintiff | Start of Forbearance | Date of Notification Letter | Difference in Number of Days |
|---|---|---|---|
| Castro | Approx. April 1, 2020 (initial forbearance) | April 16, 2020 | 15 days |
| Castro | Approx. July 1, 2020 (extended forbearance) | July 9, 2020 | 8 days |
| Delpapa | Approx. March 17, 2020 | March 30, 2020 | 13 days |
| Green | Approx. June 1, 2020 | June 13, 2020 | 12 days |
| Johnson | Approx. April 1, 2020 (initial forbearance) | April 6, 2020 | 5 days |
| Johnson | Approx. July 1, 2020 (extended forbearance) | July 8, 2020 | 7 days |
| Prado | Approx. July 1, 2020 (extended forbearance) | July 8, 2020 | 7 days |

515. Thus, the mortgage loans of Plaintiffs Castro, Delpapa, Green, Johnson, and Prado were actually placed into a forbearance (or had a forbearance extended) prior to written notification by Wells

---

[94] *Protections for Borrowers Affected by the COVID-19 Emergency Under the Real Estate Settlement Procedures Act (RESPA), Regulation X* at p. 61 n.99, CFPB (Aug. 31, 2021), https://files. consumerfinance.gov/f/documents/cfpb_covid-mortgage-servicing_final_rule_2021-06.pdf (citing 78 Fed. Reg. 60381, 60401 (Oct. 1, 2013)).

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT Case No. 3:20-cv-06009-JD**

Fargo of an offer of forbearance. Further, Wells Fargo's notification letters to these Plaintiffs were not "promptly" sent, since most of the notices are dated one or more weeks after the loans were already placed into a forbearance, in contravention to RESPA.

516.     Although Wells Fargo provided advance notice to Plaintiffs Doctor, Forsburg, Healy, Jacob, and Prado (as to the initial forbearance only) that their mortgage loans were scheduled to be placed in a forbearance, as opposed to an offer of forbearance, most of these Plaintiffs would have had little time to act on the notice before the forbearance took effect. Indeed, Plaintiffs Prado and Healy were given only approximately one (1) days' notice, Plaintiffs Robinson were given only approximately four (4) days' notice, and Plaintiff Jacob was given only approximately five (5) days' notice. Plaintiff Doctor was given approximately eight (8) days' notice, and Plaintiff Forsburg was provided with approximately ten (10) days' notice with regard to the initial forbearance.

517.     Each of the notices sent by Wells Fargo to Plaintiffs was woefully inadequate. First, they did not provide any timeline for acceptance. Instead, the notice informed the borrowers in similar fashion that the bank was "confirming short-term payment relief for this account" (as was the case for the letter April 6, 2020 Letter to Plaintiff Johnson and March 27, 2020 letter to Plaintiffs Robinson); "You have payment suspension for this account" (as was the case for the April 16, 2020 letter to Plaintiffs Castro) (Exhibit 1: Letter to Plaintiffs Castro, attached hereto); or "You've got short-term payment suspension for your mortgage" (as was the case for the June 13, 2020 letter to Plaintiff Green) (Exhibit 2: Letter to Plaintiff Green, attached hereto)—relief that had been unilaterally imposed by the bank.

518.     Second, the notice stated that borrowers could terminate the forbearance either by continuing to make payments, or by contacting Wells Fargo. For example, the letter to Plaintiff Prado dated March 31, 2020 stated in part: "If you find you do not need the payment relief, you can continue to make the payments as normal and no further action is needed," and "If you don't think this short-term payment relief is right for you, please contact us." (Exhibit 3: Letter to Plaintiff Prado, attached hereto).

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

However, as Plaintiff Johnson discovered, this was not so. Instead of shortening or canceling forbearance plans after receiving payments or requests to terminate, forbearance plans were *extended*, in direct contravention to the CARES Act.

519.    As to Plaintiff Jacob, Wells Fargo's December 16, 2020 letter, rather than affirmatively seeking or obtaining customer consent to a forbearance extension, state: "**If we don't hear from you by the end of this month, payment suspension will continue**."

520.    The CARES Act expressly states, in a subsection titled "Requirements for Servicers," that a forbearance "may be extended for an additional period of up to 180 days **at the request of the borrower**, provided that, the borrower's request for an extension is made during the covered period, and, at the borrower's request, **either the initial or extended period of forbearance may be shortened.**" Section 4022(c)(1) of the CARES Act, Pub. L. No. 116-136, 134 Stat. 281, 490 (2020) (codified at 15 U.S.C. § 9056(c)(1)) (emphasis added).

521.    In addition, as alleged above, Fannie Mae's Evaluation Notice template[95] includes the following sections regarding the impacts of forbearance:

We will not pursue foreclosure during the forbearance plan term.  However, the terms of your mortgage remain unchanged. By not making your mortgage payments during the plan's term you will become more delinquent and your credit score may be impacted. For more information refer to the **Additional Forbearance Plan Information and Legal Notices**.

---

[95] *See Lender Letter (LL-2020-02)*, Fannie Mae (updated Dec. 9, 2020), https://www.fanniemae.com/content/guide_exhibit/evaluation-model-clauses.doc?_ga=2.164494463.1758278425.1684438347-553886063.1684438347. The Evaluation Notice template provided by Fannie Mae is optional, though "it reflects a minimum level of information that the servicer must communicate and illustrates a level of specificity that complies with the requirements of this Guide." *Servicing Guide Fannie Mae Single Family* at 309 (D2-2-05, Receiving a Borrower Response Package (06/09/2021)), Fannie Mae (Aug. 10, 2022), https://singlefamily.fanniemae.com/media/31901/display.

100

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

and



**Additional Forbearance Plan Information and Legal Notices**

**Credit Reporting**:
- We will continue to report the delinquency status of your mortgage as well as your entry into a forbearance plan to credit reporting agencies in accordance with applicable law.
- **CREDIT REPORTING AGENCIES MAY CONSIDER THE ENTRY INTO A FORBEARANCE PLAN AS AN INCREASED CREDIT RISK. HOWEVER, A FORECLOSURE WOULD HAVE A MORE NEGATIVE IMPACT TO YOUR CREDIT SCORE.**

522.    Third, Wells Fargo's notice to the Castros dated April 16, 2020, to Plaintiff Delpapa dated March 30, 2020, to Plaintiff Doctor dated April 22, 2020, to Plaintiff Forsburg dated April 21, 2020, to Plaintiff Green dated June 13, 2020, Plaintiff Healy dated March 31, 2020, to Plaintiff Jacob dated March 26, 2020, to Plaintiff Johnson dated April 6, 2020, to Plaintiff Prado dated March 31, 2020, and to the Robinsons dated March 27, 2020 provided no warnings about the potential credit impacts of being placed in forbearance.

523.    The CARES Act does contain an amendment to the notice requirements of Regulation X, granting greater flexibility to loan servicers, but only with regard to deferrals, not forbearances. *See* 12 U.S.C. § 1024.41(c)(2)(v). Congress thus made a clear distinction between a loan deferral, and forbearance. The latter is an important financial decision that borrowers should make for themselves, and only when armed with all the necessary information.

524.    As to Plaintiff Prado, Wells Fargo placed the loan in a forbearance, later apologizing in a letter dated September 4, 2020, "for any confusion or frustration [Plaintiff Prado] experienced by being placed into a COVID-19 forbearance", after expressly acknowledging that Plaintiff Prado had merely called to inquire on March 28, 2020 about a potential "deferral" of two months.

525.    Fourth, the initial letters sent to Plaintiff Delpapa dated March 30, 2020, and to Plaintiff Prado dated March 31, 2020, for example, did not even mention the word "forbearance" but rather vaguely referred to "short-term payment relief." *See, e.g.*, Exhibit 3: Letter to Plaintiff Prado.

101

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

526. Fifth, not only did Wells Fargo omit the above-mentioned warnings when sending notices to borrowers after placing them in unwanted forbearance plans, when those borrowers contacted Wells Fargo about this misconduct, the bank provided assurances which this Court has already instructed them to correct about the absence of credit harm from being placed into a forbearance. Indeed, on December 3, 2020, this Court ordered Wells Fargo to send "corrective notices to all putative class members to whom they sent a letter that FICO scores are not affected by 'Account in Forbearance' codes," and to "advise the recipients of the updated FICO guidance regarding the effect of forbearances on FICO scores." Dkt. No. 61; *see also* H'rg Tr. 14:10-17 (Dec. 3, 2020). As Plaintiffs Delpapa, Jacob, and Johnson learned, being placed into forbearance had a serious and negative impact on their credit score and creditworthiness.

527. Wells Fargo's failure to provide accurate information when making an offer of forbearance caused concrete harms. Some borrowers, like the Robinsons, understood that by not affirmatively accepting the forbearance plan they would not be placed in a forbearance. Others were misled as to their ability to terminate the forbearance, and the impact it would have on their ability to refinance.

528. Had Wells Fargo provided timely, adequate and accurate information about the potential negative consequences of being placed into a forbearance including potential harm to credit score, the borrowers would have been able to more expeditiously resolve their unwanted forbearances and become eligible to refinance sooner.

529. RESPA contains a private right of action for violations of this provision. 12 C.F.R. § 1024.41(a) ("A borrower may enforce the provisions of this section [Regulation X] pursuant to section 6(f) of RESPA (12 U.S.C. § 2605(f).")). Plaintiffs allege a violation of Regulation X for the proposed Nationwide class, as the notices sent by Wells Fargo to Plaintiffs and other borrowers were inadequate, inaccurate, and/or not prompt.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

530.    Plaintiffs are entitled to actual and statutory damages under 12 U.S.C. § 2605(f) and attorneys' fees under 12 U.S.C. § 2605(f)(3).

## FOURTH CAUSE OF ACTION

**Violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*
on Behalf of Plaintiffs and the Nationwide Class**

531.    Plaintiffs repeat and reallege the allegations in this Complaint.

532.    Plaintiffs Jacob and Doctor are "consumers" as that term is defined by 15 U.S.C. § 1681a(c).

533.    Wells Fargo is a "furnisher" of consumer information as defined by 12 C.F.R. § 1022.41(c) and as described throughout the FCRA, as Wells Fargo regularly reports consumer account information to the credit reporting agencies for inclusion in credit reports.

534.    Wells Fargo willfully violated 15 U.S.C. § 1681s-2(b) by failing to adequately investigate and correct inaccurate credit reporting information with the credit reporting agencies following Plaintiffs Doctor and Jacob's formal reinvestigation requests with the credit reporting agencies under 15 U.S.C. § 1681i. Alternatively, Wells Fargo negligently violated 15 U.S.C. § 1681s-2(b) by failing to adequately investigate and correct inaccurate credit reporting information with the credit reporting agencies following Plaintiffs Doctor's and Jacob's formal reinvestigation requests with the credit reporting agencies under 15 U.S.C. § 1681i.

535.    Plaintiffs and the putative Class members in this case have had their credit information compiled and furnished by Wells Fargo regarding their mortgage loans indicating falsely that Plaintiffs' and the putative Class members' loans are in forbearance when Plaintiffs and the putative Class members did not request forbearance.

103

536.     Wells Fargo knew, or should have known, that Plaintiffs and the Class members did not request or affirmatively consent to the mortgage loan forbearances that Wells Fargo reported to the credit reporting agencies.

537.     Despite the fact that Wells Fargo knew or should have known that it placed borrowers into mortgage forbearances that they did not request or consent to, Wells Fargo had a policy of reporting the forbearance in the comments section of Plaintiffs' and the Class members' credit reports.

538.     Plaintiff Jacob submitted a dispute letter to Experian on September 9, 2020, disputing Wells Fargo's reporting of his mortgage loan account as "in forbearance" when Plaintiff Jacob never requested or authorized such forbearance.

539.     Wells Fargo received notice of Plaintiff Jacob's dispute from the credit reporting agencies and failed to reasonably investigate the dispute.

540.     Wells Fargo failed to conduct and report the results of a complete investigation into each dispute raised by Mr. Jacob. Wells Fargo failed to promptly delete, modify, or block reporting of inaccurate, incomplete, or unverifiable information in response to each dispute raised by Mr. Jacob.

541.     Wells Fargo has breached its duties as set forth in 15 U.S.C. § 1681s-2(a) by failing to adequately investigate and fully correct inaccurate credit reporting information with the credit reporting agencies following Mr. Jacob's dispute of the credit reporting errors.

542.     Mr. Jacob has incurred actual damages and has suffered physically, mentally, and emotionally as a result of Wells Fargo's willful violations of the FCRA.

543.     Plaintiff Doctor likewise submitted dispute letters to Equifax on July 7, 2020 and July 16, 2020.

544.     Wells Fargo received notice of these disputes from the credit reporting agencies and failed to conduct and report the result of a complete investigation into Ms. Doctor's dispute. Wells Fargo

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

continued to misleadingly report Ms. Doctor as in a "forbearance", despite the fact that she had never requested to be placed in such a program.

545.    Being reported as in a "forbearance" communicates to potential creditors or third-parties that a borrower has experienced a financial hardship, and results in an abridgement of the borrowers' ability to access new credit, such as refinancing their mortgages to receive a lower interest rate, or to borrower against the equity in their homes.

546.    Ms. Doctor experienced actual damages as a result of Wells Fargo's continued inaccurate reporting, including her inability to access credit, time spent attempting to rectify Wells Fargo's inaccurate reporting, and emotional and mental distress and anguish,

547.    Based on Wells Fargo's violations of 15 U.S.C. § 1681s-2(b), Plaintiffs and the Class members are entitled to actual damages, costs, and attorneys' fees pursuant to 15 U.S.C. § 1681o.

548.    Moreover, as a result of each and every negligent violation of the FCRA, Plaintiffs and the Class are entitled to statutory damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681o.

549.    Plaintiffs and the Class members are also entitled to statutory damages, punitive damages, and reasonable attorneys' fees for each and every of Wells Fargo's willful violation of the FCRA pursuant to 15 U.S.C. § 1681n(a).

**FIFTH CAUSE OF ACTION**

**Breach of Implied Covenant of Good Faith and Fair Dealing
on Behalf of Plaintiffs Delpapa, Healy, Johnson, and Prado, and the
Proposed California Subclass**

550.    Plaintiffs Delpapa, Healy, Johnson, and Prado bring this claim on behalf of themselves and the proposed California Subclass.

105

551.    Plaintiffs Delpapa, Healy, Johnson, and Prado, the California Subclass, and Wells Fargo were parties to contracts, referred to as Deeds, Deeds of Trust, or Securities (collectively, "Deed" or "Deeds"). Wells Fargo may be either a signatory to those contracts as the mortgage lender or an assignee of that contract as mortgage servicer. For instance, in Ms. Delpapa's case, Wells Fargo, as the successor loan servicer, assumed the obligations of the original lender in her Deed:

> with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

552.    In addition to the above language contained in the deeds, some borrowers, had HAMP agreements with Wells Fargo, which Wells Fargo violated by unilaterally changing those terms.

553.    Every contract contains an implied covenant of good faith and fair dealing. The implied covenant obligates the parties to cooperate so that each party may obtain the full benefit of performance of the contract. The duty of good faith and fair dealing means that parties may not interfere with or fail to cooperate in the other party's performance. Neither party may engage in conduct that impairs or prevents the other party from enjoying the benefits of the contract or engage in conduct that prevents the other party from performing under the contract.

554.    As a loan servicer, Wells Fargo assumed the loan servicing obligations in the Deed, and the duty to discharges those duties in good faith. In particular, Wells Fargo has a duty under the Deed to apply payments it receives from borrowers to interest, principal, and escrow items, in that order. Borrowers are obliged to timely pay the amounts due for those items. These duties are described in the "Uniform Covenants" section of the Deeds:

> UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
> 1.     **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and

106

this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.    Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied

107

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

555. By placing the Class members in forbearance without their consent, Wells Fargo frustrated and interfered with Class members' ability to perform under the Deeds and failed to cooperate with the Class members' performance of their contracts. *Harvey v. Bank of Am., N.A.*, No. 12-3238 SC, 2013 WL 632088, at *2-3 (N.D. Cal. Feb. 20, 2013) (By "frustrating" the borrowers' obligation to pay, the defendant's conduct gave rise to a claim for breach of the implied covenant.).

556. No reasonable party would expect that Wells Fargo would put their mortgage into forbearance without their consent.

557. Wells Fargo likewise engaged in conduct that was contrary to the spirit of the contracts and the Class members' rights thereunder. Wells Fargo lacked diligence in performing its duties, acted recklessly in its servicing of the Class members' mortgages, and abused its power by placing loans in forbearance without consent for its own interest.

558. By its actions, Wells Fargo engaged in conduct that was contrary to the spirit of the contracts, lacked diligence and constituted an abuse of its power.

559. As a result of Wells Fargo's breaches of the covenant of good faith and fair dealing, Plaintiffs Delpapa, Healy, Johnson, and Prado, and the proposed California Subclass were injured. Their damages include, but are not limited to, damage to their credit including increased borrowing costs, increased interest accrued as a result of the forbearance, and an inability to refinance or secure additional lines of credit.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

**Breach of Implied Covenant of Good Faith and Fair Dealing
on Behalf of Plaintiff Doctor and the Proposed Florida Subclass**

560.   Plaintiff Doctor brings this claim on behalf of herself and the proposed Florida Subclass.

561.   Plaintiff Doctor, the Florida Subclass, and Wells Fargo were parties to contracts, referred to as Mortgages, Deeds of Trust, or Securities (collectively, "Deed" or "Deeds"). Wells Fargo may be either a signatory to those contracts as the mortgage lender or an assignee of that contract as a successor mortgage servicer. For instance, in Ms. Doctor's case, Wells Fargo, as the successor loan servicer, assumed the obligations of the original lender in her Mortgage, as the Uniform Fannie/Freddie Florida Mortgage provides that "The term 'Lender' includes any successors and assigns of Lender."

562.   Those Deeds for GSE-backed loans are substantially identical for all borrowers in material respects.

563.   Every contract contains an implied covenant of good faith and fair dealing. The implied covenant obligates the parties to cooperate so that each party may obtain the full benefit of performance of the contract. The duty of good faith and fair dealing means that parties may not interfere with or fail to cooperate in the other party's performance. Neither party may engage in conduct that impairs or prevents the other party from enjoying the benefits of the contract or engage in conduct that prevents the other party from performing under the contract. The covenant is intended to protect the reasonable expectations of the parties in light of their express agreement. *Ins. Concepts & Design, Inc. v. HealthPlan Servs.*, 785 So. 2d 1232, 1234 (Fla. Dist. Ct. App. 2001).

564.   As a loan servicer, Wells Fargo assumed the loan servicing obligations in the deed, and the duty to discharges those duties in good faith. In particular, Wells Fargo has a duty under the Deed to apply payments it receives from borrowers to interest, principal, and escrow items, in that order. Borrowers are obliged to timely pay the amounts due for those items. These duties are described in the "Uniform Covenants" section of the mortgages:

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**

Borrower will pay each Periodic Payment when due. Borrower will also pay any prepayment charges and late charges due under the Note, and any other amounts due under this Security Instrument. Payments due under the Note and this Security Instrument must be made in U.S. currency. If any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (d) Electronic Fund Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 16. Lender may accept or return any Partial Payments in its sole discretion pursuant to Section 2.

Any offset or claim that Borrower may have now or in the future against Lender will not relieve Borrower from making the full amount of all payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Acceptance and Application of Payments or Proceeds.**
**(a) Acceptance and Application of Partial Payments.**

Lender may accept and either apply or hold in suspense Partial Payments in its sole discretion in accordance with this Section 2. Lender is not obligated to accept any Partial Payments or to apply any Partial Payments at the time such payments are accepted, and also is not obligated to pay interest on such unapplied funds. Lender may hold such unapplied funds until Borrower makes payment sufficient to cover a full Periodic Payment, at which time the amount of the full Periodic Payment will be applied to the Loan. If Borrower does not make such a payment within a reasonable period of time, Lender will either apply such funds in accordance with this Section 2 or return them to Borrower. If not applied earlier, Partial Payments will be credited against the total amount due under the Loan in calculating the amount due in connection with any foreclosure proceeding, payoff request, loan modification, or reinstatement. Lender may accept any payment insufficient to bring the Loan current without waiver of any rights under this Security Instrument or prejudice to its rights to refuse such payments in the future.

**(b) Order of Application of Partial Payments and Periodic Payments.**

110

Except as otherwise described in this Section 2, if Lender applies a payment, such payment will be applied to each Periodic Payment in the order in which it became due, beginning with the oldest outstanding Periodic Payment, as follows: first to interest and then to principal due under the Note, and finally to Escrow Items. If all outstanding Periodic Payments then due are paid in full, any payment amounts remaining may be applied to late charges and to any amounts then due under this Security Instrument. If all sums then due under the Note and this Security Instrument are paid in full, any remaining payment amount may be applied, in Lender's sole discretion, to a future Periodic Payment or to reduce the principal balance of the Note.

If Lender receives a payment from Borrower in the amount of one or more Periodic Payments and the amount of any late charge due for a delinquent Periodic Payment, the payment may be applied to the delinquent payment and the late charge.

When applying payments, Lender will apply such payments in accordance with Applicable Law.[96]

565. By placing the Class members in forbearance without their consent, Wells Fargo frustrated and interfered with Class members' ability to perform under the Deeds and failed to cooperate with the Class members' performance of their contracts.

566. No reasonable party would expect that Wells Fargo would put their mortgage into forbearance without their consent.

567. Wells Fargo likewise engaged in conduct that was contrary to the spirit of the contracts and the Class members' rights thereunder. Wells Fargo lacked diligence in performing its duties, acted recklessly in its servicing of the Class members' mortgages, and abused its power by placing loans in forbearance without consent for its own interest.

568. By its actions, Wells Fargo engaged in conduct that was contrary to the spirit of the contracts, lacked diligence and constituted an abuse of its power.

---

[96] *Florida-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010: Mortgage*, Freddie Mac (July 2021), https://sf.freddiemac.com/docs/doc/uniform-instruments/form-3010-florida_mortgage_07.2021.docx.

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

569.    As a result of Wells Fargo's breaches of the covenant of good faith and fair dealing, Plaintiff Doctor and the proposed Florida Subclass were injured. Their damages include, but are not limited to, damage to their credit including increased borrowing costs, increased interest accrued as a result of the forbearance, and an inability to refinance or secure additional lines of credit.

### Breach of Implied Covenant of Good Faith and Fair Dealing
### on Behalf of Plaintiff Green and the Proposed Georgia Subclass

570.    Plaintiff Green brings this claim on behalf of herself and the proposed Georgia Subclass.

571.    Plaintiff Green, the Georgia Subclass, and Wells Fargo were parties to contracts, referred to as Mortgages, Deeds of Trust, or Securities (collectively, "Deed" or "Deeds"). Wells Fargo may be either a signatory to those contracts as the mortgage lender or an assignee of that contract as a successor mortgage servicer. For instance, in Ms. Green's case, Wells Fargo, as the successor loan servicer, assumed the obligations of the original lender in her Mortgage, as the Uniform Fannie/Freddie Georgia Security Deed provides that "[t]he term 'Lender' includes any successors and assigns of Lender."[97]

572.    In particular, Wells Fargo has a duty under the Deed to apply payments it receives from borrowers to interest, principal, and escrow items, in that order. Borrowers are obliged to timely pay the amounts due for those items. These duties are described in the "Uniform Covenants" section of the mortgages:

> **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
> Borrower will pay each Periodic Payment when due. Borrower will also pay any prepayment charges and late charges due under the Note, and any other amounts due under this Security Instrument. Payments due under the Note and this Security Instrument must be made in U.S. currency. If any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the

---

[97] *Georgia-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3011: Security Deed*, Freddie Mac (Feb. 2022), https://sf.freddiemac.com/docs/doc/uniform-instruments/form-3011-georgia_security-deed_07.2021.docx.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (d) Electronic Fund Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 16. Lender may accept or return any Partial Payments in its sole discretion pursuant to Section 2.

Any offset or claim that Borrower may have now or in the future against Lender will not relieve Borrower from making the full amount of all payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Acceptance and Application of Payments or Proceeds.**
**(a) Acceptance and Application of Partial Payments.**

Lender may accept and either apply or hold in suspense Partial Payments in its sole discretion in accordance with this Section 2. Lender is not obligated to accept any Partial Payments or to apply any Partial Payments at the time such payments are accepted, and also is not obligated to pay interest on such unapplied funds. Lender may hold such unapplied funds until Borrower makes payment sufficient to cover a full Periodic Payment, at which time the amount of the full Periodic Payment will be applied to the Loan. If Borrower does not make such a payment within a reasonable period of time, Lender will either apply such funds in accordance with this Section 2 or return them to Borrower. If not applied earlier, Partial Payments will be credited against the total amount due under the Loan in calculating the amount due in connection with any foreclosure proceeding, payoff request, loan modification, or reinstatement. Lender may accept any payment insufficient to bring the Loan current without waiver of any rights under this Security Instrument or prejudice to its rights to refuse such payments in the future.

**(b) Order of Application of Partial Payments and Periodic Payments.**

Except as otherwise described in this Section 2, if Lender applies a payment, such payment will be applied to each Periodic Payment in the order in which it became due, beginning with the oldest outstanding Periodic Payment, as follows: first to interest and then to principal due under the Note, and finally to Escrow Items. If all outstanding Periodic Payments then due are paid in full, any payment amounts remaining may be applied to late charges and to any amounts then due under this Security Instrument. If all sums then due under the Note and this Security Instrument are paid in full, any remaining payment amount may be

113

applied, in Lender's sole discretion, to a future Periodic Payment or to reduce the principal balance of the Note.

If Lender receives a payment from Borrower in the amount of one or more Periodic Payments and the amount of any late charge due for a delinquent Periodic Payment, the payment may be applied to the delinquent payment and the late charge.

When applying payments, Lender will apply such payments in accordance with Applicable Law.[98]

573. By placing the Class members in forbearance without their consent, Wells Fargo frustrated and interfered with Class members' ability to perform under the Deeds and failed to cooperate with the Class members' performance of their contracts. *See Babalola v. HSBC Bank, USA, N.A.*, 324 Ga. App. 750, 755, 751 S.E.2d 545, 550 (Ga. Ct. App. 2013) (loan servicer's failure to comply with security deed provisions sufficient to support claim for breach of contract brought by mortgagor).

574. No reasonable party would expect that Wells Fargo would put their mortgage into forbearance without their consent.

575. Wells Fargo likewise engaged in conduct that was contrary to the spirit of the contracts and the Class members' rights thereunder. Wells Fargo lacked diligence in performing its duties, acted recklessly in its servicing of the Class members' mortgages, and abused its power by placing loans in forbearance without consent for its own interest.

576. By its actions, Wells Fargo engaged in conduct that was contrary to the spirit of the contracts, lacked diligence and constituted an abuse of its power.

577. As a result of Wells Fargo's breaches of the covenant of good faith and fair dealing, Plaintiff Green and the proposed Georgia Subclass were injured. Their damages include, but are not limited to, damage to their credit including increased borrowing costs, increased interest accrued as a result of the forbearance, and an inability to refinance or secure additional lines of credit.

---

[98] *Id.*

114

**SIXTH CAUSE OF ACTION**

**Unjust Enrichment (Proposed Nationwide Class Applying California Law)**

578.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

579.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

580.    California law can be properly applied to this proposed Nationwide Class, notwithstanding *Mazza v. American Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012).[99] "Subject to constitutional limitations and the forum state's choice-of-law rules, a court adjudicating a multistate class action is free to apply the substantive law of a single state to the entire class." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 561 (9th Cir. 2019).

581.    This Court sits in diversity jurisdiction over the unjust enrichment claim. Thus, California's choice of law rules govern this Action.

582.    Under California's choice of law rules, the class action proponent bears the initial burden to show that California has "significant contacts" with the claims to render application of California law constitutional. *Wash. Mut. Bank v. Superior Ct.*, 24 Cal. 4th 906, 921, 103 Cal. Rptr. 2d 320, 15 P.3d 1071 (Cal. 2001). Once the class action proponent makes this showing, the burden shifts to the other side to demonstrate "that foreign law, rather than California law, should apply to class claims." *Id.*

583.    Wells Fargo has constitutionally sufficient contacts with California as their corporate headquarters is located in San Francisco and a substantial percentage ████ of the properties placed into forbearances are located in California. *See Mazza*, at 590 (finding constitutionally sufficient contacts

---

[99] Further, *Mazza* has been overruled by *Olean Wholesale Grocery Cooperative v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 (9th Cir. 2022), *cert. denied sub nom. StarKist Co. v. Olean Wholesale Grocery Cooperative*, 214 L. Ed. 2d 233, 143 S. Ct. 424 (2022).

115

where defendants' corporate headquarters is located in California and one-fifth of the proposed class members were in California).

584.    As the application of California law is constitutional, Defendants have the burden of demonstrating that foreign law should apply, through the three-step governmental interest test. *Gardner v. StarKist Co.*, No. 19-CV-02561-WHO, 2020 WL 6136091, at *6 (N.D. Cal. Oct. 19, 2020) (denying motion to deny class certification of nationwide unjust enrichment claim). Those three prongs are (1) material variance in state laws; (2) if such a variance exists, whether each jurisdiction's interest in the application of its own law under the circumstances of this particular case leads to a true conflict; and (3) if a true conflict exists, which state's interests would be more impaired if its policy were subordinated, given the nature and strength of the interest of each jurisdiction. *Id.* Even assuming *Mazza* remains good law, and the first prong (variance in state laws) is met, the "second and third prongs require fact-intensive analysis." *Gardner*, 2020 WL 6136091, at *6.

585.    The fact-intensive choice of law determination is not appropriate until class certification, in particular where (as here) Defendants have refused to provide more than a handful of documents in response to discovery requests related to unjust enrichment. *See e.g.*, *Brazil v. Dole Food Co.*, No. 12-CV-01831-LHK, 2013 WL 5312418, at *11 (N.D. Cal. Sept. 23, 2013) (finding that "striking the nationwide class allegations at this stage of this case would be premature"); *Dean v. Colgate-Palmolive Co.*, No. EDCV 15–0107 JGB, 2015 WL 3999313, at *11 (C.D. Cal. June 17, 2015) (holding that a choice-of-law analysis "is not appropriate at this stage of litigation" and should occur "after the parties have engaged in discovery"); *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1007 (N.D. Cal. 2014) (holding that a "choice of law analysis is a fact-specific inquiry which requires a more developed factual record than is generally available on a motion to dismiss").

586.    Unjust enrichment is a standalone claim in California. *See Bruton v. Gerber Prods. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017); *Penikila v. Sergeant's Pet Care Prods.*, LLC, 442 F. Supp. 3d

116

1212, 1215 (N.D. Cal. 2020); *Stevenson v. Allstate Ins. Co.*, No. 15-cv04788-YGR, 2016 WL 1056137, at *5 (N.D. Cal. Mar. 17, 2016). One remedy for unjust enrichment is disgorgement, which is "broader than restitution or restoration of what the plaintiff lost." *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1482–83, 171 Cal. Rptr. 3d 548, 572–73 (Cal. Ct. App. 2014), as modified (May 27, 2014). There are two types of disgorgement—restitutionary and non-restitutionary. *Id.* Typically, the defendant's benefit and plaintiff's loss are the same, but "many instances of liability based on unjust enrichment do not involve the restoration of anything the plaintiff previously possessed . . . includ[ing] cases involving the disgorgement of profits . . . wrongfully obtained." *Id.* (citation omitted). This is non-restitutionary disgorgement.

587. As this Court has recently held, "'California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss.'" *Lundy v. Facebook Inc.*, No. 18-CV-06793-JD, 2021 WL 4503071, at *2 (N.D. Cal. Sept. 30, 2021) (quoting *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599-600 (9th Cir. 2020)); *accord Cottrell v. AT&T Inc.*, No. 19-CV-07672-JCS, 2020 WL 4818606, at *4 (N.D. Cal. Aug. 19, 2020).

588. Wells Fargo received benefits by placing Plaintiffs and the Nationwide Class into forbearances without their consent. By placing Plaintiffs and members of the Nationwide Class's mortgages in forbearance, Wells Fargo continued to hold and service those mortgage loans, preventing Plaintiffs and the Nationwide Class from refinancing with another institution, and thus increasing the value of the MSRs.

589. Wells Fargo's forcing Plaintiffs and the Nationwide Class into forbearance without consent also provides a potential predicate for Wells Fargo to place GSE-backed mortgages in payment deferrals or repayment plans, making Wells Fargo eligible for GSE incentive payments of up to $1,000 per mortgage.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

590.     Wells Fargo's forcing of Plaintiffs and the Nationwide Class into forbearance without consent additionally capped Wells Fargo's potential obligations to make principal and interest advancements on loans that remained in the GSE trusts when nonperforming.

591.     As alleged *supra*, Wells Fargo's voluntary repurchase of loans from the GSE trust presents a substantial source of unjust profits. By placing the loans into forbearance, Wells Fargo made missed payments more likely, by removing the immediate risk of foreclosure due to non-payment and by placing hurdles in front of borrowers who wished to pay. Wells Fargo *turned off automatic loan payments* for borrowers placed into forbearances. Additionally, borrowers in forbearances were unable to make payments using mobile or online bill payment processes. Due to exorbitant wait times and branch closures, borrowers were unable to make payments via phone or in person. Thus, placing borrowers into forbearances led to non-payment.

592.     When GNMA loans became three months delinquent, they became eligible for voluntary repurchase out of the GSE trusts, at a discounted rate. Wells Fargo exercised the voluntary repurchase option at a historic rate, buying tens of billions of dollars of loans out of the GSE trusts, at par value. As the borrowers did not request forbearance, these loans are easily resold or resecuritized at the normal traditional trading value of 5% above par after the borrowers become current.

593.     Wells Fargo's retention of these benefits is unjust because it placed those loans in forbearance without the consent of the Plaintiffs and the Nationwide Class and in contravention of the requirements of the CARES Act.

594.     Some of the profits Wells Fargo made are coextensive with losses suffered by the borrowers. When Wells Fargo services loans that it owns, it profits through spread—the difference between interest payments made on the loans and the cost to service the loan. For loans that Wells Fargo held, including those it purchased through exercise of the early pool buyout option, these elevated interest payments were direct benefits paid from borrowers to Wells Fargo. A loan being placed in

118

forbearance indicates that the loan is risky, and even if not barred by regulation, impedes a borrower's practical ability to refinance with a different lender. By placing borrowers into forbearances, Wells Fargo made the borrowers ineligible to refinance during a period of historically low interest rates. Thus, borrowers paid more in interest payments because they couldn't refinance, and those payments went to Wells Fargo.

595.    However, most of Wells Fargo's ill-gotten profits are not coextensive with the corresponding loss to the borrowers. However, the borrowers did suffer losses, including those associated with the inability to refinance, and damages in law alone would be inadequate to redress this wrong. Wells Fargo's profit incentives led to the faulty forbearance program, and non-restitutionary disgorgement is necessary to deter and prevent future misconduct. Wells Fargo's profits from placing borrowers into forbearance are not coextensive with the damages Plaintiffs suffered, save for above-market interest payments made to Wells Fargo for loans held by Wells Fargo while borrowers were barred from refinancing.

596.    While the damages to the Class members is capable of proof with sufficient certainty, Wells Fargo's profits are more certain and swiftly calculable. The future harm to consumers due to reduced credit scores, restricted access to credit, and inability to refinance, are less fixed than Wells Fargo's profits, and preventing Wells Fargo from retaining those profits is the only adequate remedy.

597.    As a result, Plaintiffs and proposed Nationwide Class members are entitled to disgorgement of the benefits Wells Fargo has unjustly retained as a result of its forbearance program, in an amount to be proven at trial.

### Unjust Enrichment (Single-State Subclasses)

598.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

119

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

599.     In the alternative to a nationwide class under California law, Plaintiffs assert claims for unjust enrichment under the common law of the state of their residences on behalf of themselves and the following proposed subclasses.[100]

**California Unjust Enrichment Subclass**
**Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, and**
**Prado, and the California Subclass**

600.     Unjust enrichment is a standalone claim in California. *See Bruton*, 703 F. App'x at 470 (9th Cir. 2017); *Batis v. Dun & Bradstreet Holding*, No. 22-CV-01924-MMC, 2023 WL 1870057, at *4 (N.D. Cal. Feb. 9, 2023); *Penikila*, 442 F. Supp. 3d at 1215; *Stevenson*, 2016 WL 1056137, at *5. One remedy for unjust enrichment is disgorgement, which is "broader than restitution or restoration of what the plaintiff lost." *Am. Master Lease LLC*, 225 Cal. App. 4th 1451, at 1482–83, 171 Cal. Rptr. 3d at 572–73. There are two types of disgorgement—restitutionary and non-restitutionary. *Id.* Typically, defendant's benefit and plaintiff's loss are the same, but "[m]any instances of 'liability based on unjust enrichment . . . do not involve the restoration of anything the [plaintiff] previously possessed . . . includ[ing] cases involving the disgorgement of profits . . . wrongfully obtained." *Id.* (citation omitted.) This is non-restitutionary disgorgement.

601.     As this Court recently held, "'California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss.'" *Lundy*, 2021 WL 4503071, at *2  (quoting *In re Facebook*, 956 F.3d at 599-600) *accord Cottrell*, 2020 WL 4818606, at *4. In *Batis*, a defendant moved to dismiss an unjust enrichment claim arguing that a plaintiff must allege that "he lost dollars of his own." 2023 WL 1870057, at *4. The court found that "'California law,' as recent Ninth Circuit authority explained, 'recognizes a right to disgorgement of

---

[100] Plaintiffs respectfully reserve the right to request leave to add additional representative plaintiffs for single-state subclasses in the event that a nationwide unjust enrichment claim under California law is dismissed for choice of law reasons.

120

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

1  profits resulting from unjust enrichment, even where an individual has not suffered a corresponding

2  loss.'" *Id.* (quoting *In re Facebook*, 956 F.3d at 599).

3  602.  Wells Fargo received benefits by placing Plaintiffs Delpapa, Healy, Johnson, and Prado

4  and the California Subclass into forbearances without their consent. By placing Plaintiffs Delpapa's,

5  Healy's, Johnson's, and Prado's and California Subclass members' mortgages in forbearance, Wells

6  Fargo continued to hold and service those mortgage loans, preventing Plaintiffs Delpapa, Healy,

7  Johnson, and Prado and the California Subclass from refinancing with another institution, and thus

8  increasing the value of the MSRs.

9  603.  Wells Fargo's forcing Plaintiffs Delpapa, Healy, Johnson, and Prado and the California

10  Subclass into forbearance without consent also provides a potential predicate for Wells Fargo to place

11  GSE-backed mortgages in payment deferrals or repayment plans, making Wells Fargo eligible for GSE

12  incentive payments of up to $1,000 per mortgage.

13  604.  Wells Fargo's forcing of Plaintiffs Delpapa, Healy, Johnson, and Prado and the

14  California Subclass into forbearance without consent additionally capped Wells Fargo's potential

15  obligations to make principal and interest advancements on loans that remained in the GSE trusts when

16  nonperforming.

17  605.  As alleged *supra*, Wells Fargo's voluntary repurchase of loans from the GSE trust

18  presents a substantial source of unjust profits. By placing the loans into forbearance, Wells Fargo made

19  missed payments more likely, by removing the immediate risk of foreclosure due to non-payment and

20  by placing hurdles in front of borrowers who wished to pay. Wells Fargo *turned off automatic loan*

21  *payments* for borrowers placed into forbearances. Additionally, borrowers in forbearances were unable

22  to make payments using mobile or online bill payment processes. Due to exorbitant wait times and

23  branch closures, borrowers were unable to make payments via phone or in person. Thus, placing

24  borrowers into forbearances led to non-payment.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

606.    When GNMA loans became three months delinquent, they became eligible for voluntary repurchase out of the GSE trusts, at a discounted rate. Wells Fargo exercised the voluntary repurchase option at a historic rate, buying tens of billions of dollars of loans out of the GSE trusts, at par value. As the borrowers did not request forbearance, these loans are easily resold or resecuritized at the normal traditional trading value of 5% above par after the borrowers become current.

607.    Wells Fargo's retention of these benefits is unjust because it placed those loans in forbearance without the consent of Plaintiffs and the California Subclass and in contravention of the requirements of the CARES Act.

608.    Some of the profits Wells Fargo made are coextensive with losses suffered by the borrowers. When Wells Fargo services loans that it owns, it profits through spread—the difference between interest payments made on the loans and the cost to service the loan. For loans that Wells Fargo held, including those it purchased through exercise of the early pool buyout option, these elevated interest payments were direct benefits paid from borrowers to Wells Fargo. A loan being placed in forbearance indicates that the loan is risky, and even if not barred by regulation, impedes a borrower's practical ability to refinance with a different lender. By placing borrowers into forbearances, Wells Fargo made the borrowers ineligible to refinance during a period of historically low interest rates. Thus, borrowers paid more in interest payments because they couldn't refinance, and those payments went to Wells Fargo.

609.    However, most of Wells Fargo's ill-gotten profits are not coextensive with the corresponding loss to the borrowers. However, the borrowers did suffer losses, including those associated with the inability to refinance, and damages in law alone would be inadequate to redress this wrong. Wells Fargo's profit incentives led to the faulty forbearance program, and non-restitutionary disgorgement is necessary to deter and prevent future conduct. Wells Fargo's profits from placing borrowers into forbearance are not coextensive with the damages Plaintiffs suffered, save for above-

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

market interest payments made to Wells Fargo for loans held by Wells Fargo while borrowers were barred from refinancing.

610.    While the damages to the Class members is capable of proof with sufficient certainty, Wells Fargo's profits are more certain and swiftly calculable. The future harm to consumers due to reduced credit scores, restricted access to credit, and the inability to refinance, are less fixed than Wells Fargo's profits, and preventing Wells Fargo from retaining those profits is the only adequate remedy.

611.    As a result, Plaintiffs Delpapa, Healy, Johnson, and Prado and the California Subclass are entitled to disgorgement of the benefits Wells Fargo has unjustly retained as a result of its forbearance program, in an amount to be proven at trial.

**Florida Unjust Enrichment Subclass**
**Asserted on Behalf of Plaintiff Doctor and the Florida Subclass**

612.    To prove unjust enrichment in Florida a plaintiff must prove the essential elements of "a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Jackson-Jester v. Aziz*, 48 So. 3d 88, 90–91 (Fla. Dist. Ct. App. 2010) (quoting *Swindell v. Crowson*, 712 So. 2d 1162, 1163 (Fla. Dist. Ct. App. 1998)). Unjust enrichment is measured by the defendant's ill-gotten gains rather than the plaintiff's losses. *See SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017); *Ellett Bros. v. U.S. Fid. & Guar. Co.*, 275 F.3d 384, 388 (4th Cir. 2001) ("Restitution and disgorgement require payment of the defendant's ill-gotten gain, not compensation of the plaintiff's loss."). There is no requirement that the benefit be directly conferred on the defendant from the plaintiff, as such a requirement would "undermine the equitable purpose of unjust enrichment claims." *Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4901346, at *5 (S.D. Fla. Oct. 14, 2011).

613.    Wells Fargo received benefits by placing Plaintiff Doctor and the Florida Subclass into forbearances without their consent. By placing Plaintiff Doctor's and the Florida Subclass's mortgages

123

in forbearance, Wells Fargo continued to hold and service those mortgage loans, preventing Plaintiff Doctor and the Florida Subclass from refinancing with another institution, and thus increasing the value of the MSRs.

614. Wells Fargo's forcing Plaintiff Doctor and the Florida Subclass into forbearance without consent also provides a potential predicate for Wells Fargo to place GSE-backed mortgages in payment deferrals or repayment plans, making Wells Fargo eligible for GSE incentive payments of up to $1,000 per mortgage.

615. Wells Fargo's forcing of Plaintiff Doctor and the Florida Subclass into forbearance without consent additionally capped Wells Fargo's potential obligations to make principal and interest advancements on loans that remained in the GSE trusts when nonperforming.

616. As alleged *supra*, Wells Fargo's voluntary repurchase of loans from the GSE trust presents a substantial source of unjust profits. By placing the loans into forbearance, Wells Fargo made missed payments more likely, by removing the immediate risk of foreclosure due to non-payment and by placing hurdles in front of borrowers who wished to pay. Wells Fargo *turned off automatic loan payments* for borrowers placed into forbearances. Additionally, borrowers in forbearances were unable to make payments using mobile or online bill payment processes. Due to exorbitant wait times and branch closures, borrowers were unable to make payments via phone or in person. Thus, placing borrowers into forbearances led to non-payment.

617. When GNMA loans became three months delinquent, they became eligible for voluntary repurchase out of the GSE trusts, at a discounted rate. Wells Fargo exercised the voluntary repurchase option at a historic rate, buying tens of billions of dollars of loans out of the GSE trusts, at par value. As the borrowers did not request forbearance, these loans are easily resold or resecuritized at the normal traditional trading value of 5% above par after the borrowers become current.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

618. Wells Fargo's retention of these benefits is unjust because it placed those loans in forbearance without the consent of the Plaintiff Doctor and the Florida Subclass and in contravention of the requirements of the CARES Act.

619. Some of the profits Wells Fargo made are coextensive with losses suffered by the borrowers. When Wells Fargo services loans that it owns, it profits through spread—the difference between interest payments made on the loans and the cost to service the loan. For loans that Wells Fargo held, including those it purchased through exercise of the early pool buyout option, these elevated interest payments were direct benefits paid from borrowers to Wells Fargo. A loan being placed in forbearance indicates that the loan is risky, and even if not barred by regulation, impedes a borrower's practical ability to refinance with a different lender. By placing borrowers into forbearances, Wells Fargo made the borrowers ineligible to refinance during a period of historically low interest rates. Thus, borrowers paid more in interest payments because they couldn't refinance, and those payments went to Wells Fargo.

620. However, most of Wells Fargo's ill-gotten profits are not coextensive with the corresponding loss to the borrowers. However, the borrowers did suffer losses, including those associated with the inability to refinance, and damages in law alone would be inadequate to redress this wrong. Wells Fargo's profit incentives led to the faulty forbearance program, and non-restitutionary disgorgement is necessary to deter and prevent future conduct. Wells Fargo's profits from placing borrowers into forbearance are not coextensive with the damages Plaintiff Doctor suffered, save for above-market interest payments made to Wells Fargo for loans held by Wells Fargo while borrowers were barred from refinancing.

621. While the damages to the Class members is capable of proof with sufficient certainty, Wells Fargo's profits are more certain and swiftly calculable. The future harm to consumers due to

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

reduced credit scores, restricted access to credit, and inability to refinance, are less fixed than Wells Fargo's profits, and preventing Wells Fargo from retaining those profits is the only adequate remedy.

622. As a result, Plaintiff Doctor and the Florida Subclass are entitled to disgorgement of the benefits Wells Fargo has unjustly retained as a result of its forbearance program, in an amount to be proven at trial.

**Georgia Unjust Enrichment Subclass**
**Asserted on Behalf of Plaintiff Green and the Georgia Subclass**

623. The "theory of unjust enrichment applies when as a matter of fact there is no legal contract …, but where the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefited party equitably ought to return or compensate for." *Smith v. McClung*, 215 Ga. App. 786, 789(3), 452 S.E.2d 229, 232 (Ga. Ct. App. 1994) (citation omitted). Under the doctrine, a party is not allowed to enrich itself inequitably at another's expense. *Stoker v. Bellemeade, LLC*, 272 Ga. App. 817, 832, 615 S.E.2d 1, 14 (Ga. Ct. App. 2005).

624. Wells Fargo received benefits by placing Plaintiff Green and the Georgia Subclass into forbearances without their consent. By placing Plaintiff Green's and the Georgia Subclass's mortgages in forbearance, Wells Fargo continued to hold and service those mortgage loans, preventing Plaintiff Green and the Georgia Subclass from refinancing with another institution, and thus increasing the value of the MSRs.

625. Wells Fargo's forcing Plaintiff Green and the Georgia Subclass into forbearance without consent also provides a potential predicate for Wells Fargo to place GSE-backed mortgages in payment deferrals or repayment plans, making Wells Fargo eligible for GSE incentive payments of up to $1,000 per mortgage.

626. Wells Fargo's forcing of Plaintiff Green and the Georgia Subclass into forbearance without consent additionally capped Wells Fargo's potential obligations to make principal and interest advancements on loans that remained in the GSE trusts when nonperforming.

126

627.     As alleged *supra*, Wells Fargo's voluntary repurchase of loans from the GSE trust presents a substantial source of unjust profits. By placing the loans into forbearance, Wells Fargo made missed payments more likely, by removing the immediate risk of foreclosure due to non-payment and by placing hurdles in front of borrowers who wished to pay. Wells Fargo *turned off automatic loan payments* for borrowers placed into forbearances. Additionally, borrowers in forbearances were unable to make payments using mobile or online bill payment processes. Due to exorbitant wait times and branch closures, borrowers were unable to make payments via phone or in person. Thus, placing borrowers into forbearances led to non-payment.

628.     When GNMA loans became three months delinquent, they became eligible for voluntary repurchase out of the GSE trusts, at a discounted rate. Wells Fargo exercised the voluntary repurchase option at a historic rate, buying tens of billions of dollars of loans out of the GSE trusts, at par value. As the borrowers did not request forbearance, these loans are easily resold or resecuritized at the normal traditional trading value of 5% above par after the borrowers become current.

629.     Wells Fargo's retention of these benefits is unjust because it placed those loans in forbearance without the consent of the Plaintiff and the Georgia Subclass and in contravention of the requirements of the CARES Act.

630.     Some of the profits Wells Fargo made are coextensive with losses suffered by the borrowers. When Wells Fargo services loans that it owns, it profits through spread—the difference between interest payments made on the loans and the cost to service the loan. For loans that Wells Fargo held, including those it purchased through exercise of the early pool buyout option, these elevated interest payments were direct benefits paid from borrowers to Wells Fargo. A loan being placed in forbearance indicates that the loan is risky, and even if not barred by regulation, impedes a borrower's practical ability to refinance with a different lender. By placing borrowers into forbearances, Wells Fargo made the borrowers ineligible to refinance during a period of historically low interest rates. Thus,

127

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

1    borrowers paid more in interest payments because they couldn't refinance, and those payments went to

2    Wells Fargo.

3        631.    However, most of Wells Fargo's ill-gotten profits are not coextensive with the

4    corresponding loss to the borrowers. However, the borrowers did suffer losses, including those

5    associated with the inability to refinance, and damages in law alone would be inadequate to redress this

6    wrong. Wells Fargo's profit incentives led to the faulty forbearance program, and non-restitutionary

7    disgorgement is necessary to deter and prevent future conduct. Wells Fargo's profits from placing

8    borrowers into forbearance are not coextensive with the damages Plaintiffs suffered, save for above-

9    market interest payments made to Wells Fargo for loans held by Wells Fargo while borrowers were

10   barred from refinancing.

11       632.    While the damages to the Class members is capable of proof with sufficient certainty,

12   Wells Fargo's profits are more certain and swiftly calculable. The future harm to consumers due to

13   reduced credit scores, restricted access to credit, and inability to refinance, are less fixed than Wells

14   Fargo's profits, and preventing Wells Fargo from retaining those profits is the only adequate remedy.

15       633.    As a result, Plaintiff Green and the Georgia Subclass are entitled to disgorgement of the

16   benefits Wells Fargo has unjustly retained as a result of its forbearance program, in an amount to be

17   proven at trial.

18                          **New York Unjust Enrichment Subclass**
                  **Asserted on Behalf of Plaintiff Jacob and the New York Subclass**

19       634.    In New York to prevail on a claim for unjust enrichment, "[i]t is well settled that . . . 'a

20   party must show that (1) the other party was enriched, (2) at that party's expense and (3) that it is against

21   equity and good conscience to permit [the other party] to retain what is sought to be recovered.'"

22   *Hochheiser v. Alin*, 59 Misc. 3d 1207(A), 100 N.Y.S.3d 609 (N.Y. Sup. Ct. 2018) (quoting *Citibank,*

23   *N.A. v. Walker,* 12 A.D.3d 480, 787 N.Y.S.2d 48 (N.Y. App. Div. 2004)). The doctrine of unjust

24   enrichment does not require wrongful conduct by the one enriched only that the enrichment be unjust.

                                        128                    **FOURTH AMENDED**
                                                               **CONSOLIDATED CLASS**
                                                               **ACTION COMPLAINT**
                                                               **Case No. 3:20-cv-06009-JD**

*Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 179 A.D. 2d 592, 593, 579 N.Y.S.2d 353 (N.Y. App. Div. 1992). "[I]t is not a necessary element of a cause of action for unjust enrichment to show that plaintiff suffered a loss corresponding to the gain received by the defendant." *Saunders v. Kline*, 55 A.D.2d 887, 888, 391 N.Y.S.2d 1, 2 (N.Y. App. Div. 1977).

635. Wells Fargo received benefits by placing Plaintiff Jacob and the New York Subclass into forbearances without their consent, or extending forbearances despite express requests for the forbearances to be terminated. By placing Plaintiff Jacob's and members of the New York Subclass's mortgages in forbearance, or continuing those forbearances against the borrowers' wishes, Wells Fargo continued to hold and service those mortgage loans, preventing Plaintiff Jacob and the New York Subclass from refinancing with another institution, and thus increasing the value of the MSRs.

636. Wells Fargo's forcing Plaintiff Jacob and the New York Subclass into forbearance without consent also provides a potential predicate for Wells Fargo to place GSE-backed mortgages in payment deferrals or repayment plans, making Wells Fargo eligible for GSE incentive payments of up to $1,000 per mortgage.

637. Wells Fargo's forcing of Plaintiff Jacob and the New York Subclass into forbearance without consent additionally capped Wells Fargo's potential obligations to make principal and interest advancements on loans that remained in the GSE trusts when nonperforming.

638. As alleged *supra*, Wells Fargo's voluntary repurchase of loans from the GSE trust presents a substantial source of unjust profits. By placing the loans into forbearance, Wells Fargo made missed payments more likely, by removing the immediate risk of foreclosure due to non-payment and by placing hurdles in front of borrowers who wished to pay. Wells Fargo *turned off automatic loan payments* for borrowers placed into forbearances. Additionally, borrowers in forbearances were unable to make payments using mobile or online bill payment processes. Due to exorbitant wait times and

branch closures, borrowers were unable to make payments via phone or in person. Thus, placing borrowers into forbearances led to non-payment.

639.     When GNMA loans became three months delinquent, they became eligible for voluntary repurchase out of the GSE trusts, at a discounted rate. Wells Fargo exercised the voluntary repurchase option at a historic rate, buying tens of billions of dollars of loans out of the GSE trusts, at par value. As the borrowers did not request forbearance, these loans are easily resold or resecuritized at the normal traditional trading value of 5% above par after the borrowers become current.

640.     Wells Fargo's retention of these benefits is unjust because it placed those loans in forbearance without the consent of Plaintiff Jacob and the New York Subclass and in contravention of the requirements of the CARES Act.

641.     Some of the profits Wells Fargo made are coextensive with losses suffered by the borrowers. When Wells Fargo services loans that it owns, it profits through spread—the difference between interest payments made on the loans and the cost to service the loan. For loans that Wells Fargo held, including those it purchased through exercise of the early pool buyout option, these elevated interest payments were direct benefits paid from borrowers to Wells Fargo. A loan being placed in forbearance indicates that the loan is risky, and even if not barred by regulation, impedes a borrower's practical ability to refinance with a different lender. By placing borrowers into forbearances, Wells Fargo made the borrowers ineligible to refinance during a period of historically low interest rates. Thus, borrowers paid more in interest payments because they couldn't refinance, and those payments went to Wells Fargo.

642.     However, most of Wells Fargo's ill-gotten profits are not coextensive with the corresponding loss to the borrowers. However, the borrowers did suffer losses, including those associated with the inability to refinance, and damages in law alone would be inadequate to redress this wrong. Wells Fargo's profit incentives led to the faulty forbearance program, and non-restitutionary

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

1  disgorgement is necessary to deter and prevent future conduct. Wells Fargo's profits from placing

2  borrowers into forbearance are not coextensive with the damages Plaintiffs suffered, save for above-

3  market interest payments made to Wells Fargo for loans held by Wells Fargo while borrowers were

4  barred from refinancing.

5  643.    While the damages to the Class members is capable of proof with sufficient certainty,

6  Wells Fargo's profits are more certain and swiftly calculable. The future harm to consumers due to

7  reduced credit scores, restricted access to credit, and inability to refinance, are less fixed than Wells

8  Fargo's profits, and preventing Wells Fargo from retaining those profits is the only adequate remedy.

9  644.    As a result, Plaintiff Jacob and the New York Subclass are entitled to disgorgement of

10  the benefits Wells Fargo has unjustly retained as a result of its forbearance program, in an amount to be

11  proven at trial.

12  **Texas Unjust Enrichment Subclass**
**Asserted on Behalf of Plaintiffs Castros and Robinsons and the Texas Subclass**

13  645.    A party may recover under the unjust enrichment theory when one person has obtained

14  a benefit from another by fraud, duress, or the taking of an undue advantage. *Heldenfels Bros. v. City of*

15  *Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Non-restitutionary disgorgement is available as remedy

16  for unjust enrichment in Texas. *See Meadows v. Bierschwale*, 516 S.W.2d 125, 129 (Tex. 1974). Wells

17  Fargo received benefits by placing Plaintiffs Castros and Robinsons and the Texas Subclass into

18  forbearances without their consent, and based on inaccurate information. By placing Plaintiffs Castros'

19  and Robinson's and members of the Texas Subclass's mortgages in forbearance, Wells Fargo continued

20  to hold and service those mortgage loans, preventing Plaintiffs Castros and Robinsons and the Texas

21  Subclass from refinancing with another institution, and thus increasing the value of the MSRs.

22  646.    Wells Fargo's forcing Plaintiffs Castros and Robinsons and the Texas Subclass into

23  forbearance without consent also provides a potential predicate for Wells Fargo to place GSE-backed

131

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

1  mortgages in payment deferrals or repayment plans, making Wells Fargo eligible for GSE incentive
2  payments of up to $1,000 per mortgage.

3  647.  Wells Fargo's forcing of Plaintiffs Castros and Robinsons and the Texas Subclass into
4  forbearance without consent additionally capped Wells Fargo's potential obligations to make principal
5  and interest advancements on loans that remained in the GSE trusts when nonperforming.

6  648.  As alleged *supra*, Wells Fargo's voluntary repurchase of loans from the GSE trust
7  presents a substantial source of unjust profits. By placing the loans into forbearance, Wells Fargo made
8  missed payments more likely, by removing the immediate risk of foreclosure due to non-payment and
9  by placing hurdles in front of borrowers who wished to pay. Wells Fargo *turned off automatic loan*
10 *payments* for borrowers placed into forbearances. Additionally, borrowers in forbearances were unable
11 to make payments using mobile or online bill payment processes. Due to exorbitant wait times and
12 branch closures, borrowers were unable to make payments via phone or in person. Thus, placing
13 borrowers into forbearances led to non-payment.

14 649.  When GNMA loans became three months delinquent, they became eligible for voluntary
15 repurchase out of the GSE trusts, at a discounted rate. Wells Fargo exercised the voluntary repurchase
16 option at a historic rate, buying tens of billions of dollars of loans out of the GSE trusts, at par value. As
17 the borrowers did not request forbearance, these loans are easily resold or resecuritized at the normal
18 traditional trading value of 5% above par after the borrowers become current.

19 650.  Wells Fargo's retention of these benefits is unjust because it placed those loans in
20 forbearance without the consent of the Plaintiffs Castros and Robinsons and the Texas Subclass and in
21 contravention of the requirements of the CARES Act.

22 651.  Some of the profits Wells Fargo made are coextensive with losses suffered by the
23 borrowers. When Wells Fargo services loans that it owns, it profits through spread—the difference
24 between interest payments made on the loans and the cost to service the loan. For loans that Wells Fargo

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

held, including those it purchased through exercise of the early pool buyout option, these elevated interest payments were direct benefits paid from borrowers to Wells Fargo. A loan being placed in forbearance indicates that the loan is risky, and even if not barred by regulation, impedes a borrower's practical ability to refinance with a different lender. By placing borrowers into forbearances, Wells Fargo made the borrowers ineligible to refinance during a period of historically low interest rates. Thus, borrowers paid more in interest payments because they couldn't refinance, and those payments went to Wells Fargo.

652. However, most of Wells Fargo's ill-gotten profits are not coextensive with the corresponding loss to the borrowers. However, the borrowers did suffer losses, including those associated with the inability to refinance and the inability to access new lines of credit, and damages in law alone would be inadequate to redress this wrong. Wells Fargo's profit incentives led to the faulty forbearance program, and non-restitutionary disgorgement is necessary to deter and prevent future conduct. Wells Fargo's profits from placing borrowers into forbearance are not coextensive with the damages Plaintiffs suffered, save for above-market interest payments made to Wells Fargo for loans held by Wells Fargo while borrowers were barred from refinancing.

653. While the damages to the Class members is capable of proof with sufficient certainty, Wells Fargo's profits are more certain and swiftly calculable. The future harm to consumers due to reduced credit scores, restricted access to credit, and inability to refinance, are less fixed than Wells Fargo's profits, and preventing Wells Fargo from retaining those profits is the only adequate remedy.

654. As a result, Plaintiffs Castros and Robinsons and the Texas Subclass are entitled to disgorgement of the benefits Wells Fargo has unjustly retained as a result of its forbearance program, in an amount to be proven at trial.

**Virginia Unjust Enrichment Subclass**
**Asserted on Behalf of Plaintiff Forsburg and the Virginia Subclass**

655.    An action for unjust enrichment is a recognized claim under Virginia law. To prevail on a claim for unjust enrichment, a plaintiff must prove "(1) a benefit conferred on the defendant by the plaintiff;" as well as "(2) knowledge on the part of the defendant of the conferring of the benefit;" and "(3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *T & M Elec., Inc. v. Prologis Trust*, 70 Va. Cir. 403, 405–06 (Va. Cir. Ct. 2006) (citing *Nossen v. Hoy*, 750 F. Supp. 740, 745 (E.D.Va.1990)). Non-restitutionary disgorgement is available, as well as restitutionary disgorgement, if the circumstances make it equitable for the defendant to disgorge all profits. *Frank Shop, Inc. v. Crown Central Petroleum Corp.*, 264 Va. 1, 564 S.E.2d 134 (2002)). Wells Fargo received benefits by placing Plaintiff and the Virginia Subclass into forbearances without their consent, or by extending forbearances despite express requests for the forbearances to be terminated. By placing Plaintiff and members of the Virginia Subclass's mortgages in forbearance, or continuing those forbearances against the borrowers' wishes, Wells Fargo continued to hold and service those mortgage loans, preventing Plaintiff and the Class from refinancing with another institution, and thus increasing the value of the MSRs.

656.    Wells Fargo's forcing Plaintiff and the Virginia Subclass into forbearance without consent also provides a potential predicate for Wells Fargo to place GSE-backed mortgages in payment deferrals or repayment plans, making Wells Fargo eligible for GSE incentive payments of up to $1,000 per mortgage.

657.    Wells Fargo's forcing of Plaintiff and the Virginia Subclass into forbearance without consent additionally capped Wells Fargo's potential obligations to make principal and interest advancements on loans that remained in the GSE trusts when nonperforming.

658.    As alleged *supra*, Wells Fargo's voluntary repurchase of loans from the GSE trust presents a substantial source of unjust profits. By placing the loans into forbearance, Wells Fargo made

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

missed payments more likely, by removing the immediate risk of foreclosure due to non-payment and by placing hurdles in front of borrowers who wished to pay. Wells Fargo *turned off automatic loan payments* for borrowers placed into forbearances. Additionally, borrowers in forbearances were unable to make payments using mobile or online bill payment processes. Due to exorbitant wait times and branch closures, borrowers were unable to make payments via phone or in person. Thus, placing borrowers into forbearances led to non-payment.

659.    When GNMA loans became three months delinquent, they became eligible for voluntary repurchase out of the GSE trusts, at a discounted rate. Wells Fargo exercised the voluntary repurchase option at a historic rate, buying tens of billions of dollars of loans out of the GSE trusts, at par value. As the borrowers did not request forbearance, these loans are easily resold or resecuritized at the normal traditional trading value of 5% above par after the borrowers become current.

660.    Wells Fargo's retention of these benefits is unjust because it placed those loans in forbearance without the consent of the Plaintiff and the Virginia Subclass and in contravention of the requirements of the CARES Act.

661.    Some of the profits Wells Fargo made are coextensive with losses suffered by the borrowers. When Wells Fargo services loans that it owns, it profits through spread—the difference between interest payments made on the loans and the cost to service the loan. For loans that Wells Fargo held, including those it purchased through exercise of the early pool buyout option, these elevated interest payments were direct benefits paid from borrowers to Wells Fargo. A loan being placed in forbearance indicates that the loan is risky, and even if not barred by regulation, impedes a borrower's practical ability to refinance with a different lender. By placing borrowers into forbearances, Wells Fargo made the borrowers ineligible to refinance during a period of historically low interest rates. Thus, borrowers paid more in interest payments because they couldn't refinance, and those payments went to Wells Fargo.

662. However, most of Wells Fargo's ill-gotten profits are not coextensive with the corresponding loss to the borrowers. However, the borrowers did suffer losses, including those associated with the inability to refinance, and damages in law alone would be inadequate to redress this wrong. Wells Fargo's profit incentives led to the faulty forbearance program, and non-restitutionary disgorgement is necessary to deter and prevent future misconduct. Wells Fargo's profits from placing borrowers into forbearance are not coextensive with the damages Plaintiff suffered, save for above-market interest payments made to Wells Fargo for loans held by Wells Fargo while borrowers were barred from refinancing.

663. While the damages to the Class members is capable of proof with sufficient certainty, Wells Fargo's profits are more certain and swiftly calculable. The future harm to consumers due to reduced credit scores, restricted access to credit, and inability to refinance, are less fixed than Wells Fargo's profits, and preventing Wells Fargo from retaining those profits is the only adequate remedy.

664. As a result, Plaintiff and the Virginia Subclass are entitled to disgorgement of the benefits Wells Fargo has unjustly retained as a result of its forbearance program, in an amount to be proven at trial.

### SEVENTH CAUSE OF ACTION

**California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.***
**Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, and Prado, and the California Class**

665. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

666. Plaintiffs Delpapa, Healy, Johnson, and Prado bring this claim on behalf of the California Class.

667. California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices." Cal. Bus. & Prof. Code § 17200.

136

1   Wells Fargo engaged in unlawful and unfair business acts and practices in violation of the UCL as

2   follows.

3       668.    Wells Fargo's nonconsensual forbearance program is unlawful under the UCL because

4   it violates Sections 4022 and 4023 of the CARES Act, which require that a borrower affirmatively

5   request that their mortgage be placed in forbearance and affirmatively acknowledge they are

6   experiencing a hardship due to COVID-19, and that loan servicers only extend forbearance upon a

7   borrower's request. Additionally, by failing to comply with federal guidance regarding the CARES Act,

8   Wells Fargo's forbearance program violated Cal. Civ. Code § 3273.11(a).

9       669.    Additionally, Wells Fargo's practices are unlawful because they violate Regulation N,

10  "Mortgage Acts and Practices—Advertising," which forbids "any person to make any material

11  misrepresentation, expressly or by implication, in any commercial communication, regarding any term

12  of any mortgage credit product[.]" 12 C.F.R. § 1014.3. Wells Fargo violated Regulation N by failing to

13  inform borrowers that they were placing their mortgages in forbearance without their consent, and by

14  sending notices with inaccurate information regarding the impact of forbearances.

15      670.    Additionally, Wells Fargo violated Regulations X and Z, as alleged *supra*, by failing to

16  timely credit loan payments and by failing to provide adequate notice to borrowers associated with the

17  unilateral forbearance plans.

18      671.    Wells Fargo's conduct described herein threatens an incipient violation of California's

19  consumer protection laws, violates the policy or spirit of such laws, and/or otherwise significantly

20  threatens or harms competition by avoiding procedures intended by the Legislature to protect

21  California's consumers, including under the California Consumer Credit Reporting Act ("CCRA"), Cal.

22  Civ. Code § 1785. 25 *et seq.*, and the Rosenthal Fair Debt Collection Practices Act ("Rosenthal

23  FDCPA"), Cal. Civ. Code § 1788 *et seq.*

24

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

672.    Wells Fargo's practices were also unfair under the UCL because placing borrowers' mortgages in forbearance without their consent is contrary to established public policy; immoral, unethical, oppressive or unscrupulous; and causes injury to consumers that outweighs its benefits.

673.    The harm to Plaintiffs Delpapa, Healy, Johnson, and Prado and the California Class of being placed in a mortgage forbearance without their consent outweighs the utility, if any, of Wells Fargo's policies and practices.

674.    Plaintiffs Delpapa, Healy, Johnson, and Prado and the California Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misconduct.

675.    Pursuant to Cal. Bus. & Prof. Code § 17200, Plaintiffs Delpapa, Healy, Johnson, and Prado and the California Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices; any such orders or judgments as may be necessary to restore to Plaintiffs Delpapa, Healy, Johnson, and Prado and the California Class any money acquired by unfair competition, including restitution, as provided in Cal. Bus. & Prof. Code §§ 3345 and 17203; public injunctive relief to prohibit future violations as alleged herein in the interest of protecting the California public; and any other just and proper relief available under the California UCL. To the extent these remedies are equitable, Plaintiffs Delpapa, Healy, Johnson, and Prado and the California Class seek them in the alternative to any adequate remedy at law they may have.

**California Consumer Credit Reporting Act ("CCRA"), Cal. Civ. Code § 1785. 25 *et seq.*
Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, and Prado, and the California Class**

676.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

677.    Plaintiffs Delpapa, Healy, Johnson, and Prado bring this claim on behalf of the California Class.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

678.    The CCRA provides that a "person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." Cal. Civ. Code § 1785.25(a).

679.    Wells Fargo, a "person" under the CCRA, furnished information on the mortgages of Plaintiffs Delpapa's, Healy's Johnson's, and Prado's and the California Class members' mortgage forbearances that it knew or should have known was incomplete or inaccurate to consumer credit reporting agencies.

680.    Chiefly, Wells Fargo reported borrowers as in forbearance, with the attendant implication of financial hardship, when the borrowers had not requested that relief and were not unable to make payments. One clear example is Ms. Delpapa, who was prepaid for the duration of her forbearance.

681.    For borrowers who *did* continue to make payments while on unrequested forbearances, those payments were not properly reported. For instance, Wells Fargo reported Mr. Healy as "Account in Forbearance," and also falsely claimed he had not made any recent payments during the forbearance even though he had, in fact, made every single monthly payment in full and on time even during the time period that his account had been placed into forbearance.

682.    The forbearance information reported by Wells Fargo was incomplete, inaccurate, or materially misleading because the Plaintiffs did not request that their account would be placed in forbearance, or for that forbearance to be extended, and the false information was negative to Plaintiffs Delpapa, Healy, Johnson, and Prado and the California Class.

683.    Plaintiffs Delpapa, Healy, Johnson, and Prado suffered actual damage as a result of this violation because they were not able to pursue a refinancing or other forms of credit while in forbearance and for months after exiting those plans.

139

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

684. Wells Fargo's violation was willful under Cal. Civ. Code § 1785.31 because Wells Fargo acted with reckless disregard for the rights of the Plaintiffs Delpapa, Healy, Johnson, and Prado and the California Class in exploiting a statutory scheme meant to help, not further harm, borrowers.

685. As a result of Wells Fargo's negligent and willful violations of the CCRA, Plaintiffs Delpapa, Healy, Johnson, and Prado and the California Class seek all available remedies under the CCRA, including actual damages, court costs, loss of wages, attorney's fees, pain and suffering, and punitive damages.

### EIGHTH CAUSE OF ACTION

**Rosenthal Fair Debt Collection Practices Act ("Rosenthal FDCPA"),**
**Cal. Civ. Code § 1788 *et seq.***
**Asserted on Behalf of Plaintiffs Delpapa, Healy, Johnson, and Prado, and the California Class**

686. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

687. Plaintiffs Delpapa, Healy, Johnson, and Prado bring this claim on behalf of the California Class.

688. The Rosenthal FDCPA prohibits debt collectors from, among other things, making false, deceptive, or misleading representations in an effort to collect a debt. Cal. Civ. Code § 1788.

689. Wells Fargo is a "debt collector" because it "regularly . . . engages in debt collection" as a mortgage servicer. *See* Cal. Civ. Code § 1788.2(c). Plaintiffs Delpapa, Healy, Johnson, and Prado and the California Class are "person[s]", and their mortgage loans are "consumer debts" under the Rosenthal FDCPA. *Id.* § 1788.2(f), (g).

690. The Rosenthal FDCPA incorporates by reference and prohibits violations of the federal Fair Debt Collection Practices Act. Cal. Civ. Code § 1788.17. That includes the Federal Act's prohibition of "false, deceptive, or misleading representation or means in connection with the collection of any debt[,]" including the false representation of the status of any debt, and the "use of any false

representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(2), (10).

691.   Wells Fargo violated the Rosenthal FDCPA through its violations of Section 1692e of the Federal Act, when it provided false, deceptive, or misleading information about the mortgage debt of Plaintiffs and the Class to the borrowers. *See Reyes v. Wells Fargo Bank, N.A.*, No. C-10-01667 JCS, 2011 WL 30759, at *20 (N.D. Cal. Jan. 3, 2011) (finding misleading statements in offer letter of forbearance agreement was "debt collection" sufficient for a Rosenthal FDCPA claim).

692.   For example, in a letter from Wells Fargo to Plaintiff Delpapa dated April 2, 2021, Wells Fargo falsely and misleadingly stated that "when an account is reported as current and in forbearance, the borrower's FICO score would not be impacted."

693.   Additionally, in a letter from Wells Fargo to Plaintiff Healy dated June 3, 2020, Wells Fargo falsely stated that Mr. Healy "had asked for help with [his] mortgage payments because [he] was facing a financial hardship as a result of the [COVID-19] crisis." Wells Fargo then stated that "To help, we suspended your mortgage payments for three months, but you've still been making your payments."

694.   The June 3, 2020 letter from Wells Fargo did not inform Mr. Healy that the "help" they were offering could negatively impact his credit. Instead, the letter deceptively states that "continuing to make payments and opting out of payment suspension . . . is a good choice" in order to "[p]rovide[] . . . the opportunity to apply for new credit or to refinance with Wells Fargo" and to "[r]emove the comment on your credit report that the loan is in short-term payment suspension." In other words, the letter focuses on the benefits of opting out and making payments, but misleadingly and deceptively omits the financial consequences the forbearance—that Mr. Healy never requested—could cause him. Nor does the letter state that the forbearance would impact Mr. Healy's ability to refinance with a lender other than Wells Fargo.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

695. In a letter from Wells Fargo date July 6, 2020, Wells Fargo admitted that Mr. Healy "did not request or accept the [forbearance] plan at that time and the plan was added to the account in error." Wells Fargo apologized "for any confusion or frustration regarding how your credit report may have been impacted due to the COVID-19 pandemic."

696. As a result of Wells Fargo's false and misleading statements, Mr. Healy's attempt to extend his credit for a home mortgage refinance loan was declined by another lender.

697. Wells Fargo's false and misleading statements are further exemplified in its correspondence with Plaintiff Johnson.

698. In a letter from Wells Fargo to Mr. Johnson dated June 17, 2020, Wells Fargo states that it "suspended [Mr. Johnson's] mortgage payments for three months" but failed to explicitly state that Mr. Johnson's account was being placed in forbearance. The letter also included misleading and deceptive language that failed to disclosure the full consequences of the forbearance plan. Instead, the letter stated that resuming payments "Provides you with the opportunity to apply for new credit or to refinance with Wells Fargo" but failed to disclose the impact on Mr. Johnson's ability to apply for new credit or refinance with lenders other than Wells Fargo. Indeed, the only discussion of restrictions on Mr. Johnson's financing in the June 17, 2020 are mentioned when discussing the impacts of Mr. Johnson requesting an *extension* for payment suspension. The letter also failed to mention that forbearance could negatively impact Mr. Johnson's credit score.

699. As a result of Wells Fargo's false and misleading statements and conduct, Mr. Johnson suffered damages, including a decrease in his credit score of at least 13 points and an inability to decrease his principal and interest on his mortgage loan for payments he made in July and August 2020.

700. Wells Fargo failed to provide adequate disclosures to the California Class about the negative consequences of being placed into a forbearance before placing them into that program. Wells Fargo's communications with borrowers were false and misleading in that they omitted known negative

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

consequences of being placed into a forbearance and inaccurately described the consequences that Wells Fargo did disclose.

701.    As a result of Wells Fargo's violation of the State and Federal Acts, Plaintiffs Delpapa, Healy, Johnson, and Prado and the California Class are entitled to actual and statutory damages, fees, and costs available under those Acts. *See* Cal. Civ. Code § 1788.17; *see also* 15 U.S.C. § 1692k.

## NINTH CAUSE OF ACTION

### Georgia Fair Business Practices Act ("GFBA"), O.C.G.A. § 10-1-390 *et seq*.
### Asserted on behalf of Plaintiff Green & the Georgia Class

702.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

703.    Wells Fargo committed unfair business acts and practices in violation of GFBA, by providing inaccurate information to Plaintiff Green and the Georgia Class regarding the status of their loans, the consequences of the forbearance option, and by involuntarily enrolling Plaintiff Green and the Georgia Class Members into forbearances program.

704.    Specifically, in a letter from Wells Fargo to Ms. Green dated June 13, 2020, Wells Fargo used false, deceptive, and misleading language in connection with the collection of Ms. Green's mortgage loan. The letter states, "You should know that you'll still be required to repay any suspended payments."

705.    Wells Fargo improperly placed Ms. Green's mortgage loan into forbearance without her consent and knowledge. On June 15, 2020, Ms. Green spoke with a Wells Fargo representative about her concerns related to her escrow payments and she stated that she was not interested in Wells Fargo's forbearance program. Prior to the call, Ms. Green made a mortgage payment to Wells Fargo on June 12, 2020.

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

706.    Despite Ms. Green's express statements, and without her knowledge or consent, Wells Fargo placed her account into forbearance and failed to timely apply Ms. Green's June 12, 2020 payment to her mortgage or escrow account.

707.    Ms. Green again spoke with a Wells Fargo representative on June 26, 2020, where she was subsequently informed that her mortgage had been placed into forbearance. Ms. Green informed the representative that she had never requested or consented to a forbearance and demanded that her account be taken out of forbearance. In a letter from Wells Fargo to Ms. Green dated July 1, 2020, Wells Fargo recounts that Ms. Green "did not request" that her mortgage be placed into forbearance. However, Wells Fargo failed to inform Ms. Green, either on the July 26, 2020 phone call or in the July 1, 2020 letter, that Wells Fargo did not apply Ms. Green's June 12, 2020 payment to her mortgage or escrow account.

708.    Wells Fargo failed to provide adequate disclosures to the Georgia Class about the negative consequences of being placed into a forbearance before placing them into that program. Wells Fargo's communications with borrowers were false and misleading in that they omitted known negative consequences of being placed into a forbearance and inaccurately described the consequences that Wells Fargo did disclose.

709.    Wells Fargo's unconscionable, deceptive and/or unfair practices caused damages to Plaintiff Green and the Georgia Class who were unaware that their mortgages had been placed in forbearance without their knowledge or consent.

710.    Defendants' foregoing deceptive acts and practices, including their omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

711.    As a direct and proximate result of Wells Fargo's unfair and deceptive practices, Plaintiff Green and the Georgia Class suffered and will continue to suffer actual damages.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

712.    As a direct and proximate result of Defendants' deceptive acts and practices, including their omissions, Plaintiff Green and the Georgia Class have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

713.    In addition, Plaintiff Green and the Georgia Class seek equitable and injunctive relief against Wells Fargo on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

## TENTH CAUSE OF ACTION

**New York Deceptive Trade Practices Act, N.Y. Gen. Bus Law § 340 *et seq.***
**Asserted on behalf of Plaintiff Jacob and the New York Class**

714.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

715.    Wells Fargo committed unfair business acts and practices in violation of N.Y. Gen. Bus. § 349, *et seq.*, by providing inaccurate information to Plaintiff Jacob and the New York Class regarding the status of their loans.

716.    For example, on March 16, 2020, Mr. Jacob called Wells Fargo and requested that his mortgage payments no longer be automatically debited from his bank account, but he never requested that Wells Fargo place his mortgage into forbearance. Mr. Jacob then received a letter from Wells Fargo dated March 20, 2020, stating that Wells Fargo had "completed your request to suspend your automatic mortgage payments."

717.    Less than one week later, in a letter from Wells Fargo dated March 26, 2020, Mr. Jacob learned that Wells Fargo placed his mortgage into forbearance for six months and that his monthly mortgage obligations had been suspended until October 1, 2020. The March 26, 2020 letter falsely stated

145

FOURTH AMENDED<br>
CONSOLIDATED CLASS<br>
ACTION COMPLAINT<br>
Case No. 3:20-cv-06009-JD

1    that the "payment relief option is based on an incomplete application for assistance" despite the fact that

2    Mr. Jacob never requested forbearance.

3        718.    The March 26, 2020 letter did not inform Mr. Jacob that Wells Fargo placed him into a

4    forbearance, nor does the word "forbearance" appear anywhere in the letter. Instead, the letter used

5    deceptive terms such as "short-term payment relief" and "payment suspension," and stated that his

6    mortgage payments were "suspended" until October 1, 2020.

7        719.    The March 26, 2020 letter also provided misleading and false assurances by stating that

8    Wells Fargo "won't report a past-due status for this account to the consumer reporting agencies." In

9    reality, the forbearance for Mr. Jacob's loan account is reflected on his credit report—despite the fact

10   Mr. Jacob never requested a forbearance in the first place.

11       720.    As a result, Mr. Jacob's attempt to secure a small business loan was denied, at least in

12   part because Wells Fargo reported to credit reporting agencies that Mr. Jacob's mortgage loan was in

13   forbearance.

14       721.    Additionally, on or about September 2020, Mr. Jacob was unable to refinance his

15   mortgage and obtain a lower interest rate on his mortgage because Wells Fargo had placed his mortgage

16   into forbearance without his consent.

17       722.    Wells Fargo failed to provide adequate disclosures to the New York Class about the

18   negative consequences of being placed into a forbearance before placing them into that program. Wells

19   Fargo's communications with borrowers were false and misleading in that they omitted known negative

20   consequences of being placed into a forbearance and inaccurately described the consequences that Wells

21   Fargo did disclose.

22       723.    Wells Fargo's practices were consumer oriented because they essentially placed

23   unwilling consumers, who wished to continue making payments on their loans and preserve their credit

24   history, into forbearance, without even notifying such consumers or obtaining their permission.

**FOURTH AMENDED
                                                        CONSOLIDATED CLASS
                                                        ACTION COMPLAINT
                                                        Case No. 3:20-cv-06009-JD**

724. Wells Fargo's unconscionable, deceptive and/or unfair practices caused damages to Plaintiff Jacob and the New York Class who were unaware that their mortgages had been place "in forbearance" without their knowledge or consent.

725. Defendants' foregoing deceptive acts and practices, including their omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

726. As a direct and proximate result of Wells Fargo's unfair and deceptive practices, Plaintiff Jacob and the New York Class suffered and will continue to suffer actual damages.

727. Defendants' practice was misleading in a material respect because it caused Plaintiff Jacob and the New York Class damages.

728. Plaintiff Jacob and the New York Class did not wish to opt into forbearance, and yet, that was not an option for them.

729. As a direct and proximate result of Defendants' deceptive acts and practices, including their omissions, Plaintiff Jacob and the New York Class have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

730. In addition, Plaintiff Jacob and the New York Class seek equitable and injunctive relief against Wells Fargo on terms that the Court considers reasonable and appropriate, as well as reasonable attorneys' fees and costs.

### ELEVENTH CAUSE OF ACTION

**Texas Debt Collection Practices Act ("TDCPA"), Tex. Fin. Code § 392.001 *et seq.*
Asserted on behalf of Plaintiffs Castros and Robinsons and the Texas Class**

731. Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

732. Wells Fargo committed unfair business acts and practices in violation of the Texas Debt Collection Act, ("TDCA"), Tex. Fin. Code Section 392.001 *et seq.*

733. For Plaintiffs Castros, Wells Fargo—through its website—used fraudulent, deceptive, or misleading representations in debt collection and in obtaining information from Plaintiffs Castros. Wells Fargo also falsely represented the nature of the services it was rendering with its website.

734. As described above, in late March 2020, Mr. Castro logged onto Wells Fargo's website and clicked on a "Get Help Now" button for payment assistance as a result of the COVID-19 pandemic. Upon clicking the button, Wells Fargo's website displayed a message "congratulating" him.

735. Mr. Castro did not receive any additional information at that time explaining the terms or the consequences of the forbearance program, and Mr. Castro assumed that being automatically enrolled in the program would not be detrimental to him or Mrs. Castro.

736. Wells Fargo sent Mr. and Mrs. Castro a letter dated April 16, 2020, regarding the "short-term payment suspension." The April 16, 2020 letter stated: "This payment suspension option is based on an incomplete application for assistance. Other payment assistance options may be available. If you would like a review for all available assistance options, you may submit a complete application, which would include information about your income and expenses. This review is available whether or not you accept this short-term payment suspension. Please contact us for more information."

737. The April 16, 2020 letter also stated: "Note: If you find you don't need this short-term payment suspension, please continue to make your normal payments. Take advantage of this payment suspension only when you really need it, because you may need to repay any missed payments at the end of the short-term payment suspension period."

738. The April 16, 2020 letter did not disclose that the forbearance status of Mr. and Mrs. Castro's mortgage loan account would be reported to the credit reporting agencies or that Wells Fargo

would suppress its reporting regarding the payments it was receiving from Mr. and Mrs. Castro during the forbearance period.

739.    In addition, the April 16, 2020 letter, among other things, used false and deceptive means for debt collection and/or in attempt to obtain information from the Castros. Along with the statements concerning collection of the Castros' payments as listed above, Wells Fargo made the following statements:

- "[A]s your account servicer, we are attempting to collect a debt and any information obtained will be used for that purpose";

- "Unless you receive further relief, you'll need to resume your regular mortgage payment schedule beginning on July 1, 2020"; and

- "If you choose to extend your payment suspension period, you will still need to repay all missed payments."

740.    Much of the April 16, 2020 letter discusses the repayment of payments on the Castros' mortgage loan.

741.    The April 16, 2020 letter did not inform the Castros that Wells Fargo placed them into forbearance but instead used the deceptive terms, "short-term payment assistance," and "payment suspension." The April 16, 2020 letter also falsely stated that, "You can end the payment suspension at any time. If you decide to shorten the plan, or if you decide later that this is not the right solution for you, please contact us."

742.    As a result of Wells Fargo's false and misleading statements and conduct, the Castros suffered damages, including the inability to refinance their mortgage for lower interest rates, a decrease in their overall credit, and a late penalty that accrued as a result of the barrier imposed for refinancing.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

743.    Plaintiffs Robinsons also were provided with false and misleading information from Wells Fargo. First, Wells Fargo wrongfully placed the Plaintiffs Robinsons' account into forbearance despite the fact that they never requested a forbearance.

744.    In a letter from Wells Fargo to Plaintiffs Robinsons dated June 15, 2020, Wells Fargo confirmed the cancellation of "the short-term payment suspension" and stated that it would "return to normal servicing for your account[,]" including "reporting your payment activity to the consumer reporting agencies." However, Wells Fargo misleadingly failed to disclose that the period for which the Robinsons had been placed in forbearance may have had negative impacts on their credit scores or ability to obtain a new line of credit.

745.    As a result of Wells Fargo's false and misleading statements and conduct, Plaintiffs Robinsons suffered damages, including the inability to obtain a new line of credit for travel benefits after Wells Fargo cancelled the forbearance plan—a plan that Plaintiffs Robinsons had never even requested in the first place—because of the forbearance coding on their credit report.

746.    Plaintiffs Castros and Robinsons are "consumers" as that term is defined by the TDCPA.

747.    Plaintiffs Robinsons' and Castros' relationships with Wells Fargo arose out of a "consumer debt" as that term is defined under the TDCPA.

748.    Wells Fargo regularly collects consumer debt and is a "debt collector" as that term is defined in the TDCPA.

749.    Wells Fargo failed to provide adequate disclosures to the Texas Class about the negative consequences of being placed into a forbearance before placing them into that program. Wells Fargo's communications with borrowers were false and misleading in that they omitted known negative consequences of being placed into a forbearance, and inaccurately described the consequences that Wells Fargo did disclose.

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT**
Case No. 3:20-cv-06009-JD

750.     Plaintiffs Castros and Robinsons and the Texas Class have suffered actual damage, as alleged above, as a result of Wells Fargo's misleading reporting of their loan status.

751.     Plaintiffs Castros and Robinsons and the Texas Class are entitled to their actual damages, attorneys' fees, and injunctive relief under Tex. Fin. Code § 392.403.

**TWELFTH CAUSE OF ACTION**

**Florida Consumer Collections Practices Act ("FCCPA"), Fla. Stat. § 559 *et seq.*
Asserted on behalf of Plaintiff Doctor and the Florida Class**

752.     Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

753.     Plaintiff Doctor is a "consumer," as she is a natural person obligated to pay a debt on her homestead property.

754.     The debt which Defendants attempted to collect was a "consumer debt" within the meaning of Fla. Stat. § 559.55(6) of the FCCPA, as Plaintiff Doctor's mortgage debt in question arises out of debt incurred for family or household purposes.

755.     Defendants violated Fla. Stat. § 559.72(5) of the FCCPA by providing inaccurate information to Plaintiff Doctor and the Florida Class regarding the status of their loans.

756.     Specifically, at some point prior to June 29, 2020, Wells Fargo placed Ms. Doctor's mortgage loan into forbearance for the months of May and June 2020 without her knowledge and consent. During this same time period, Wells Fargo furnished information to credit reporting agencies that Ms. Doctor's mortgage loan was in forbearance.

757.     Ms. Doctor only learned that her mortgage had been placed in forbearance after contacting a loan officer at Fairwinds Credit Union on June 29, 2020 to inquire about obtaining a secured loan. Ms. Doctor, who was pregnant at the time, sought the loan to cover both out-of-pocket medical expenses for herself and her unborn child and to make improvements to her homestead.

151

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

758.    Prior to June 29, 2020, Ms. Doctor had applied for and received several loans with the credit union, but her request to extend credit on June 29, 2020 was denied because of the furnishing to the credit reporting agency that her Wells Fargo account was in forbearance for May and June 2020.

759.    On a June 29, 2020 phone call between a Wells Fargo representative and Ms. Doctor, the representative informed Ms. Doctor that her loan was automatically placed into forbearance since every Wells Fargo borrower had been affected by COVID-19. The representative told Ms. Doctor that she could opt out of the forbearance program. Ms. Doctor demanded that her account be removed from the forbearance program, particularly given that she never requested forbearance relief in the first place.

760.    On a July 1, 2020 phone call between a Wells Fargo representative and Ms. Doctor, the representative stated that Ms. Doctor's account would reflect she had chosen to opt out of the final forbearance month of July 2020 but that Wells Fargo would not change the information it reported that Ms. Doctor's mortgage loan was in forbearance for the months of May and June 2020.

761.    Wells Fargo failed to provide adequate disclosures to the Florida Class members about the negative consequences of being placed into a forbearance before placing them into that program. Wells Fargo's communications with borrowers were false and misleading in that they omitted known negative consequences of being placed into a forbearance and inaccurately described the consequences that Wells Fargo did disclose.

762.    Defendants' representations to the credit reporting agencies regarding Ms. Doctor and the members of the Florida Class harmed Ms. Doctor's and the Florida Class members' reputations. Specifically, due to Defendants' representations to the credit reporting agencies that Ms. Doctor's mortgage loan account was in forbearance, Ms. Doctor's application for credit was denied.

763.    Pursuant to § 559.77(2) of the FCCPA, Ms. Doctor is entitled to her actual damages, statutory damages of $1,000.00, and her reasonable attorneys' fees and costs. The members of the

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

Florida Class are entitled to statutory damages in the amount of $500,000 or 1% of the Defendants' net worth, whichever is less.

### THIRTEENTH CAUSE OF ACTION

### Gross Negligence on Behalf of Plaintiffs and the Nationwide Class

764.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

765.    In a mortgagor-mortgagee relationship, a lender owes a borrower the duty to exercise reasonable care to avoid a foreseeable risk of injury to the borrower. *Hurd v. BAC Loan Servicing, LP*, 880 F. Supp. 2d 747, 763 (N.D. Tex. 2012) (citing *Thrash v. Ocwen Loan Servicing, LLC*, 433 B.R. 585, 598-97 (Bankr. N.D. Tex. 2010). *See also Lukasik v. San Antonio Blue Haven Pools, Inc.*, 21 S.W.3d 394, 403 (Tex. App. 2000) (citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987) (Every person has a duty to exercise reasonable care to avoid foreseeable risk of injury to others.)); *Trevino v. HSBC Mortg. Servs., Inc.*, 535 B.R. 110, 150-51 (Bankr. S.D. Tex. 2015).

766.    By knowingly placing borrowers' loans into forbearance status without their consent, Defendants demonstrated an utter disregard of prudence amounting to complete neglect of the safety and financial welfare of Plaintiffs and the Class. Wells Fargo's misconduct is such a degree of negligence as would shock any fair-minded person. *Ferguson v. Ferguson*, 212 Va. 86, 92, 181 S.E.2d 648, 653 (Va. Ct. App. 1971).

767.    Alternatively, or additionally, Wells Fargo acted with willful and wanton negligence, with conscious disregard or reckless indifference, to Plaintiffs' and the Class's rights by placing Plaintiffs' and the Class's mortgage loans into forbearance status without their knowledge or consent. Wells Fargo knew from its knowledge of existing circumstances and conditions, as reflected by its own website and published materials and its own institutional knowledge regarding how the credit markets would function and the effect a forbearance notation would have on consumers' credit, that its conduct

FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD

probably would cause injury to Plaintiffs and the Class. *Woods v. Mendez*, 265 Va. 68, 7677, 574 S.E.2d 263, 268 (Va. 2003).

768.     As a result of Wells Fargo's conduct as described herein, Plaintiffs have been damaged, including the cancellation mortgage modifications, credit damage, loss of access to credit markets and/or home equity lines of credit, reputational damage, frustration, outrage, and various out-of-pocket costs and other pecuniary damages and general damages.

## VIII.   REQUEST FOR RELIEF

769.     Plaintiffs, individually and on behalf of all others similarly situated, request that the Court enter judgment against Defendants, and for Plaintiffs, as follows:

A.     Certify the Classes under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), or alternatively 23(b)(4), and appoint Plaintiffs as representatives of the Classes and appoint Plaintiffs' counsel as Class counsel;

B.     Award declaratory relief, including but not limited to a declaration that Wells Fargo's actions and business practices are unlawful and that Wells Fargo must comply with state and federal lending laws;

C.     Award injunctive relief, including public injunctive relief permanently enjoining Wells Fargo from performing further unfair and unlawful acts as alleged;

D.     Award all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the Classes, including penalties, and all other relief allowed under applicable law;

E.     Grant Plaintiffs and the Class awards of restitutionary and non-restitutionary disgorgement of Wells Fargo's profits from its unfair and unlawful practices described above;

F.     Award all costs of prosecuting this action, including attorneys' fees and expert fees as may be allowable under applicable law;

G.     Award both pre-judgment and post-judgment interest on any amounts awarded;

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

H.    Award treble or punitive damages insofar as they are allowed by applicable laws;

I.    Award appropriate individual relief as requested above; and

J.    Grant such other and further relief, including declaratory, injunctive, and equitable relief, as the Court may deem proper.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED this 19th day of May, 2023.

KELLER ROHRBACK L.L.P.

By: *s/ Zachary W. Gussin*
    Derek W. Loeser (*Pro Hac Vice*)
    Gretchen Freeman Cappio (*Pro Hac Vice*)
    Zachary W. Gussin (*Pro Hac Vice*)
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101-3052
    (206) 623-1900, Fax (206) 623-3384
    dloeser@kellerrohrback.com
    gcappio@kellerrohrback.com
    zgussin@kellerrohrback.com

    Matthew J. Preusch (SBN 298144)
    KELLER ROHRBACK L.L.P.
    801 Garden Street, Suite 301
    Santa Barbara, CA 93101
    (805) 456-1496, Fax (805) 456-1497
    mpreusch@kellerrohrback.com

    Abbas Kazerounian (SBN: 249203)
    KAZEROUNI LAW GROUP, APC
    245 Fischer Avenue, Suite D1
    Costa Mesa, CA 92626
    (800) 400-6808, Fax (800) 520-5523
    ak@kazlg.com

    Jason A. Ibey (SBN: 284607)
    KAZEROUNI LAW GROUP, APC
    321 N Mall Drive, Suite R108
    St. George, UT 84790
    (800) 400-6808, Fax (800) 520-5523
    jason@kazlg.com

155

**FOURTH AMENDED**
**CONSOLIDATED CLASS**
**ACTION COMPLAINT**
**Case No. 3:20-cv-06009-JD**

1

2                                            

Theodore O. Bartholow III ("Thad")
Texas State Bar No. 24062602
Karen L. Kellett
Texas State Bar No. 11199520
KELLETT & BARTHOLOW PLLC
11300 N. Central Expressway, Suite 301
Dallas, TX 75243
(214) 696-9000, Fax (214) 696-9001
thad@kblawtx.com
kkellet@kblawtx.com

Malissa L. Giles
Tracy A. Giles
GILES & LAMBERT PC
PO Box 2780
Roanoke, VA 2401
(540) 981-9000
mgiles@gileslambert.com
tgiles@gileslambert.com

Abelardo Limon, Jr.
Texas State Bar No. 1235770
LIMON LAW OFFICE P.C.
890 W. Price Road
Brownsville, TX 78520
(956) 544-7770, Fax (956) 544-4949
alimon@limonlaw.com

Babak Semnar (SBN: 224890)
Jared M. Hartman (SBN 254860)
SEMNAR & HARTMAN, LLP
41707 Winchester Road, Suite 201
Temecula, CA 92590
(951) 293-4187, Fax (888) 819-8230
bob@sandiegoconsumerattorneys.com
jared@sandiegoconsumerattorneys.com

156

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**

**CERTIFICATION OF SERVICE**

I, Zachary W. Gussin, hereby certify that on May 19, 2023, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record who have appeared in this action.

s/ *Zachary W. Gussin*
Zachary W. Gussin

**FOURTH AMENDED
CONSOLIDATED CLASS
ACTION COMPLAINT
Case No. 3:20-cv-06009-JD**